## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| LIVE WELL FINANCIAL, INC., | Case No. 19-11317 (LSS) |
| Debtor. | |
| DAVID W. CARICKHOFF, solely in his capacity as chapter 7 trustee of Live Well Financial, Inc., | |
| Plaintiff, | |
| - against - | |
| MICHAEL C. HILD, LAURA D. HILD, CHURCH HILL VENTURES LLC, ANDERSON'S NECK LLC, THE BUTTERBEAN LLC, CLIMAX BEVERAGE CO. LLC, DOGTOWN BREWING LLC, GARDENIA LLC, HOT DIGGITY DONUTS LLC, KINGFISHER LLC, MANASTOH BREWING LLC, URBAN BLEAT CHEESE CO. LLC, ARAGON COFFEE CO. LLC, PETER STUMPF BREWING COMPANY LLC, PIN MONEY PICKLES LLC, ROSENEGK BREWING CO. LLC, VALENTINE'S MEAT-JUICE COMPANY LLC, ERIC G. ROHR, and C. DARREN STUMBERGER, | Adv. Pro. No. __ - _____ (LSS) |
| and | |
| JOHN DOES 1-100; | |
| Defendants. | |

## COMPLAINT

Plaintiff, David W. Carickhoff, the Chapter 7 Trustee ("Plaintiff" or the "Trustee") of the estate of Live Well Financial, Inc. ("Live Well" or "Debtor"), by and through his undersigned counsel, files this Complaint and, in support thereof, alleges as follows:

## NATURE OF THE ACTION

1.      Through this adversary proceeding, the Trustee seeks to recover tens of millions of dollars that represent the fruits of a fraudulent criminal scheme that substantially enriched each of the Defendants at the expense of Live Well and its creditors, as well as other damages caused by Defendants' fraudulent conduct.

2.      Defendant Michael C. Hild, with the assistance of his top lieutenants, Eric G. Rohr and C. Darren Stumberger, caused Live Well to falsely inflate the values of its bond portfolio in order to convince third party financial institutions to lend Live Well more and more money. Michael Hild, Rohr, and Stumberger used the money from these loans to enrich themselves and to cover up, extend, and exacerbate their fraud.  And in an attempt to hide the proceeds of his fraud, Michael Hild transferred much of the money he received to the remaining Defendants, including his wife, Laura D. Hild, and businesses that they jointly owned or controlled.

3.      The Court should have no doubts about the Defendants' culpability.  In August 2019, Rohr and Stumberger each pleaded guilty to committing pervasive criminal fraud against Live Well and most of its creditors and some of its holders of a minority, aggregate stake in the company's common stock.  Hild faced the same charges, but he decided to fight them.  On April 30, 2021, after a three-week federal trial featuring damning testimony from Rohr, Stumberger and Hild himself, a federal jury unanimously found Hild guilty on all five counts against him.  The jury only needed four hours of deliberations to convict Hild.  Hild, Rohr and Stumberger await sentencing by the United States District Court for the Southern District of New York (the "New York District Court") in the coming months.

4.      The scheme was straightforward.  Hild and Stumberger pressured an outside pricing service to report Live Well's bond portfolio valuations *verbatim*, knowing full well that Live Well's bond lenders would provide additional funding to Live Well so long as the purportedly

independent valuations increased over time. Hild, Rohr, and Stumberger caused Live Well to submit valuations to the pricing service that bore no relation to the market value of the bonds. Instead, the valuations were made out of whole cloth so the Defendants could enrich themselves via excessive bonuses, fees, overcompensation, and other unjustified payments totaling not less than *$36,280,663.84*.

5.      Michael Hild and his wife, Defendant Laura Hild, were the biggest beneficiaries of the Defendants' fraud. In total, between 2015 and 2019 Michael Hild caused Live Well to transfer at least *$26,051,622.99* from Live Well, to himself or Laura Hild, in the form of grossly excessive overcompensation. The Hilds used substantially all of these ill-gotten amounts to acquire real property and businesses in the Richmond, Virginia area.

6.      Michael Hild also enriched his coconspirators. He caused Live Well to pay Rohr unjustified bonuses and overcompensation totaling not less than $2,917,160.18 and to pay Stumberger unjustified bonuses totaling not less than $4,187,820.91. In an effort to cover up the fraud, Hild paid off several members of the Live Well board of directors either to get out of the way or to allow the scheme to continue. And Hild caused Live Well to pay not less than $3,124,059.76 in legal fees for his own defense and the defense of his coconspirators.

7.      As a direct and proximate result of Defendants' egregious misconduct, more than 200 Live Well employees lost their jobs, Live Well was forced into an involuntary chapter 7 bankruptcy, and the Live Well estate and its creditors were left with more than $110 million in unpaid, non-insider claims.

8.      The Trustee brings this action pursuant to Part VII of the Federal Rules of Bankruptcy Procedure, on behalf of the Live Well estate and its creditors, seeking to hold Hild, Rohr, and Stumberger financially responsible for the grave harms they caused and to recover the

fraudulently obtained proceeds thereof from Michael Hild, Laura Hild, the Hild entities, Rohr, and Stumberger.  By this action the Trustee seeks the entry of a judgment, among other things: (i) avoiding and recovering the multitude of fraudulent transfers made to Defendants pursuant to 11 U.S.C. §§ 548, 544, 550 and applicable state law; (ii) avoiding and recovering preferential transfers made to or for the benefit of Defendants pursuant to 11 U.S.C. §§ 547(b) and 550; (iii) holding Hild, Rohr, and Stumberger liable for their many breaches of fiduciary duty, aiding and abetting breaches of duty, civil conspiracy, and corporate waste; (iv) declaring Laura Hild and the Hild entities to be the alter ego or instrumentality of Michael Hild and holding them liable for the Trustee's claims against Hild; (v) imposing a constructive or resulting trust in favor of the Trustee with respect to the Subject Real Properties (defined below) and all other bank accounts, businesses, and other real and personal property of Michael Hild, Laura Hild, and the Hild entities traceable to the fruits of the fraud; (vi) declaring Michael Hild's Personal Guaranty Fee and Indemnity Agreement with Live Well, and every obligation incurred and transfer made thereunder, to be an actual or constructive fraudulent transfer and void *ab initio*; (vii) disallowing the proofs of claim filed by Hild and Rohr against the estate pursuant to 11 U.S.C. § 502(d); and (viii) granting the Trustee other relief as set forth in this Complaint.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware, dated February 29, 2012.

10.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

11.     Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409(a).  This adversary proceeding is related to a bankruptcy case under chapter 7 of title 11 of

the United States Code (the "Bankruptcy Code") that is pending in this district with docket number 19-11317 (LSS) (the "Bankruptcy Case").

13.   The predicates for the relief sought herein are sections 105(a), 502, 544, 547, 548, and 550 of the Bankruptcy Code, Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and applicable state law.

13.   Pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff consents to the entry of final orders and judgment by the Court in this adversary proceeding.

## PARTIES

14.   Plaintiff is the Trustee of Live Well in the Bankruptcy Case.  Plaintiff is authorized to bring this action pursuant to section 704 of the Bankruptcy Code.

15.   Live Well is a corporation incorporated under the laws of the State of Delaware and which, prior to the Bankruptcy Case, had its principal place of business in Richmond, Virginia. Prior to ceasing operations, Live Well was a financial services company that provided reverse mortgages and forward mortgages to customers, serviced mortgages, and traded in mortgage-backed securities.

16.   Defendant Michael C. Hild ("Michael Hild" or "Hild") is an individual who, upon information and belief, resides in Richmond, Virginia.  Michael Hild founded Live Well in 2005 and, at all relevant times, including August 2014 through June 2019, served as a director on Live Well's board of directors and served as its Chief Executive Officer.  Hild also holds the majority of Live Well's common stock.  On or about November 27, 2019, Hild filed two claims in this Bankruptcy Case, which are identified on the claims register as claims no. 49 and 51 (together, the "Hild proofs of claim").  On April 30, 2021, in a criminal proceeding before the New York District

Court, a jury of his peers convicted Michael Hild of pervasive fraud and financial crimes,[1] which victimized the Live Well estate's creditors and particularly its largest creditors, repurchase counterparties and bond lenders (these creditors were owed, in the aggregate, as of the claims bar date, approximately $97 million). Hild awaits sentencing.

17.     Defendant Laura D. Hild ("Laura Hild") is an individual who, upon information and belief, resides in Richmond, Virginia. At all relevant times, Laura Hild was Michael Hild's spouse. Laura Hild personally received millions of dollars that Michael Hild diverted to her, directly or indirectly, from Live Well.

18.     Defendant Church Hill Ventures LLC ("Church Hill Ventures") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at Forest Hill Station, P.O. Box 14144, Richmond, Virginia 23225. Church Hill Ventures was formed on September 16, 2014, shortly after Michael Hild caused Live Well to acquire the bond portfolio described more fully below. Church Hill Ventures is a real estate holding company that, between 2015 and 2018, acquired at least 38 real properties located in Richmond, Virginia with funds traced from Live Well.

19.     Defendant Anderson's Neck LLC ("Anderson's Neck") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at 1696 Cherry Row Ln., Shacklefords, Virginia 23156. Anderson's Neck operates an oyster farm and sells oysters and other seafood at that location.

20.     Defendant The Butterbean LLC ("Butterbean") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at

---

[1] Specifically, Hild was found guilty of: (i) conspiracy to commit securities fraud, (ii) conspiracy to commit wire fraud and bank fraud, (iii) securities fraud, (iv) wire fraud, and (v) bank fraud.

1204 Hull Street, Richmond, Virginia 23224.   Butterbean operates a market and cafe at that address.

21.     Defendant Climax Beverage Co. LLC ("Climax Beverage") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at Forest Hill Station, P.O. Box 14144, Richmond, Virginia 23225.

22.     Defendant Dogtown Brewing LLC ("Dogtown Brewing") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at 1209 Hull Street, Richmond, Virginia 23224.   Dogtown Brewing operates a brewery and restaurant at that address.

23.     Defendant Gardenia LLC ("Gardenia") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at Forest Hill Station, P.O. Box 14144, Richmond, Virginia 23225.   Gardenia is a real estate holding company that, in 2018, acquired at least six (6) real properties located in Richmond, Virginia with funds traced from Live Well.

24.     Defendant Hot Diggity Donuts LLC ("Hot Diggity Donuts") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at 1011 Boulder Springs Dr., Suite 420, N. Chesterfield, Virginia 23224.   Hot Diggity Donuts operated a donut bakery, bar, and cafe located at 1213 Hull Street, Richmond, Virginia.

25.     Defendant Kingfisher LLC ("Kingfisher") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at Forest Hill Station, P.O. Box 14144, Richmond, Virginia 23225.   Kingfisher is a real estate holding company that, in 2018, acquired at least 17 real properties located in Richmond, Virginia with funds traced from Live Well.

26.     Defendant Manastoh Brewing LLC ("Manastoh Brewing") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at 1128 Hull Street, Richmond, Virginia 23224.

27.     Defendant Urban Bleat Cheese Co. LLC ("Urban Bleat") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at Forest Hill Station, P.O. Box 14144, Richmond, Virginia 23225.

28.     Defendant Aragon Coffee Co. LLC ("Aragon Coffee") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at Forest Hill Station, P.O. Box 14144, Richmond, Virginia 23225.

29.     Defendant Peter Stumpf Brewing Company LLC ("Peter Stumpf Brewing") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at Forest Hill Station, P.O. Box 14144, Richmond, Virginia 23225.

30.     Defendant Pin Money Pickles LLC ("Pin Money Pickles") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at Forest Hill Station, P.O. Box 14144, Richmond, Virginia 23225.

31.     Defendant Rosenegk Brewing Co. LLC ("Rosenegk Brewing") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at 2302 E. Marshall St., Richmond, Virginia 23223.

32.     Defendant Valentine's Meat-Juice Company LLC ("Valentine's Meat-Juice") is a limited liability company organized under the laws of the Commonwealth of Virginia with its principal place of business at Forest Hill Station, P.O. Box 14144, Richmond, Virginia 23225.

33.     Collectively, the corporate entities identified in paragraphs 18 through 32 above are referred to as the "Hild entities."

34.     Upon information and belief, Laura Hild is the sole owner of each of the Hild entities.  All or substantially all of the funds that each of the Hild entities received between 2015 and mid-2019 to acquire their properties and to operate or expand their businesses is directly traceable to Live Well and the fruits of Michael Hild's fraud.

35.     Upon further information and belief, Michael Hild managed, controlled, and/or held himself out to be the manager, controller, or owner of each of the Hild entities from the times such entities were created through and including at least mid-2019.

36.     Defendant Eric G. Rohr ("Rohr") is an individual who, upon information and belief, resides in or about Richmond, Virginia.  Between in or about December 2008 and December 2018, Rohr served as Senior Vice President and Chief Financial Officer of Live Well and oversaw several of Live Well's departments, including without limitation, accounting, financial reporting, compliance and risk management.  Rohr reported directly to Hild.  On or about November 27, 2019, Rohr filed two claims in this Bankruptcy Case, which are identified on the claims register as claims no. 50 and 52 (collectively, with the Hild proofs of claims, the "Proofs of Claim").  Rohr has pleaded guilty to the same financial crimes for which Hild was convicted, specifically: (i) conspiracy to commit securities fraud; (ii) conspiracy to commit wire fraud and bank fraud; (iii) securities fraud; (iv) wire fraud; and (v) bank fraud.  During Michael Hild's criminal trial, Rohr testified at length against Hild, establishing Hild's leadership of and knowing participation in a cabal to commit criminal fraud in respect of the bond mispricing scheme.  Rohr awaits sentencing by the New York District Court.

37.     Defendant Charles Darren Stumberger ("Stumberger") is an individual who, upon information and belief, resides in or about Rumson, New Jersey.  Between in or about September 2014 and in or about March 2019, Stumberger served as Executive Vice President of Live Well,

overseeing Live Well's bond trading desk, managing the bond portfolio, and supervising bond pricing and risk. Stumberger reported directly to Hild and also took direction from Rohr. Stumberger has pleaded guilty to the same financial crimes for which Hild was convicted, specifically: (i) conspiracy to commit securities fraud; (ii) conspiracy to commit wire fraud and bank fraud; (iii) securities fraud; (iv) wire fraud; and (v) bank fraud. During Michael Hild's criminal trial, Stumberger testified at length against Hild, establishing Hild's leadership of and knowing participation in a cabal to commit criminal fraud in respect of the bond mispricing scheme. Stumberger awaits sentencing by the New York District Court.

38.    Collectively, Defendants Michael Hild, Rohr, and Stumberger are referred to as the "Criminal Defendants."

39.    Each of Michael Hild, Laura Hild, the Hild entities, Rohr, and Stumberger is an "insider" of Live Well as defined in 11 U.S.C. § 101(31) or by virtue of the control exercised by each of the Hilds, Rohr and Stumberger over Live Well, the scheme, the Hild entities, and/or the network of Richmond, Virginia real property investments and businesses that were the fruit of this poisonous fraud.

## FACTUAL BACKGROUND

A.    **Live Well Acquires and Finances the Bond Portfolio.**

40.    Live Well was founded in 2005 as a private financial services company. For the first nine years of its operations, Live Well primarily operated two related lines of business: (i) originating home equity conversion mortgages ("HECMs"), more commonly known as "reverse mortgages," and (ii) servicing those mortgages.

41.    A HECM is a loan to a borrower aged 62+ that is secured by a mortgage lien on the borrower's primary residence. Generally, the borrower can borrow either a lump sum or amounts

over time to cover living expenses or other expenses.  Unlike a traditional home mortgage, a HECM generally has no repayment obligation during the life of the borrower so long as the borrower continues to reside in the primary residence and the loan otherwise is not in default.  A HECM originator and servicer such as Live Well typically generates income by originating, securitizing, and servicing a large pool of these mortgages.

42.     In or around August 2014, Stumberger approached Hild about expanding Live Well's business by establishing a trading desk to invest in HECM IO (Home Equity Conversion Mortgage, Interest Only) bond strips.

43.     HECM IO bonds are reverse mortgage-backed securities that entitle the holder to receive a portion of the interest payments, but not principal payments, from a particular pool of reverse mortgage loans and pay the holder a monthly "coupon" (effectively, an interest rate) based upon the performance of the underlying reverse mortgage loans.

44.     Stumberger worked at the HECM trading desk at Stifel Nicolaus ("Stifel"), a New York-based investment bank and broker-dealer, and thus, had knowledge about the market for HECM IO bonds.  Stifel had decided to exit the HECM trading business and was looking to sell its portfolio.

45.     Stumberger and Hild soon began working toward a deal for Live Well to acquire a portfolio of 18 HECM IO bond strips from Stifel for approximately $46 million and for Stumberger, and several members of his team, to leave Stifel to join Live Well to manage the portfolio.  As discussed below, Live Well ultimately acquired more than 50 HECM IO bonds.

46.     Live Well financed the acquisition of both its initial HECM IO bond portfolio and its subsequent acquisitions of HECM IO bonds by entering into a series of bond repurchase ("repo") agreements with various third party counter-parties or lenders ("bond lenders" or "repo

lenders").  Many of Live Well's repo lenders were based in New York City and New York law generally governed the repo agreements.

47.     A repo agreement is essentially a type of short-term borrowing that is structured as a sale and repurchase of the security.  In a repo, the seller of a security (the borrower) sells the collateral to the purchaser (the lender or repo counterparty) and promises to buy the collateral back from the purchaser at a later date and at a specified price (which is generally higher than the initial sale price to incorporate an "interest" payment).

48.     The amount of money that a repo seller such as Live Well can borrow from a repo lender is determined by:  (i) the fair market value of the securities that served as collateral, and (ii) the discount or "haircut" applied by the lender.

49.     Typically, the repo lenders that loaned to Live Well applied a haircut of between 10% and 20% of the value of the pledged bonds.  By way of example, if the value of the pledged bonds was $10 million, the repo lender would only "lend" $8 or $9 million depending on terms of the relevant repo agreement.

50.     This "haircut" was important to protect the repo lenders because, if Live Well defaulted on its obligations, the lenders could seize the bonds and liquidate them to satisfy the debt.  Thus, the haircut was intended to ensure that the proceeds of a sale of the bonds would be sufficient to satisfy the debt.

51.     Because the value of the HECM IO bonds that served as collateral could fluctuate up or down, the repo transactions included two-way "margin" agreements to maintain the haircut that would effectively increase or decrease the amount of the "loan" in proportion to the increase or decrease in the value of the bonds.  If the value of the bonds decreased by a certain dollar amount, Live Well would be required to "post margin"; *i.e.,* make a payment, to the repo lender

proportional to the amount of the decrease in value. This would decrease the amount of the loan. Conversely, and importantly here, if the value of the bond increased, the repo lender would be required to transfer money post margin, to Live Well, increasing the amount of the loan. These transactions are known as "margin calls" and they are intended to maintain the haircut at the agreed upon level.

52.     At all stages of these financing transactions, determining an independent valuation of the HECM IO bonds serving as collateral for the repo lenders was the critical issue. The repo agreements between Live Well and its repo lenders required Live Well to obtain third party pricing for the HECM IO bonds from an *independent* source.

53.     Without independent bond valuations, repo lenders would never have agreed to extend financing for the purchase of the bonds.

54.     Each of the Criminal Defendants knew that obtaining third-party valuations of the HECM IO bonds was a prerequisite to Live Well's bond trading activities. As Hild wrote to Stumberger in August 2014, "We need to find a way to get past this silly, but significant issue of 3rd party valuation."

55.     Each of the Criminal Defendants played a central role in the development and implementation of the scheme to "get past" the requirement for objective bond pricing and to accomplish a massive fraud.

**B.     The Criminal Defendants Scheme to Defraud Live Well's Repo Lenders with Fraudulently Inflated Bond Valuations.**

56.     The HECM IO bonds Live Well acquired were relatively thinly traded and not often found in pricing service databases.

57.     Interactive Data Pricing and Reference Data LLC ("IDC"), a New York-based pricing service, was one of the few, if only, pricing services that published prices for these HECM IO bonds.

58.     Prior to in or about November 2014, first at Stifel and then at Live Well, Stumberger and the bond trading desk provided IDC with price quotes for the HECM IO bonds based on the bond trading desk's estimate of the bonds' fair market value and IDC would publish those prices.

59.     In or about November 2014, shortly after Live Well's acquisition of the initial HECM IO bond portfolio, IDC began to publish daily price quotes for Live Well's HECM IO bonds using IDC's own independent methodology.

60.     Michael Hild soon became unhappy with IDC's valuation methodology and its impact on the profitability of the bond portfolio.

61.     Hild directed Stumberger and other Live Well trading desk employees to challenge IDC's independent valuations and to pressure IDC to rely exclusively on price quotes from Live Well trading desk employees.

62.     At Hild's direction, Stumberger and other Live Well bond trading desk employees had numerous calls, meetings, and emails with IDC in an effort to convince IDC to stop publishing its own price quotes and to rely exclusively on bond price quotes submitted by employees of Live Well.

63.     In February 2015, that pressure campaign proved successful.  Stumberger reported to Hild in a February 12, 2015 email: "This issue is solved…. We will be supplying prices daily to IDC, and IDC will use these." Stumberger further assured Hild that IDC "***will use the prices verbatim and not model these bonds until we are interested in them doing so***." (emphasis added).

64. From that point forward, IDC ceased using its own pricing model and instead published the prices provided to IDC by the Criminal Defendants exactly as conceived and written by them.

> i. **The Criminal Defendants Immediately Manipulated Their Control of the Bond Valuations to Avoid a Margin Payment.**

65. Once the Criminal Defendants knew IDC would simply publish their bond price quotes as written by the Criminal Defendants and without any independent verification, the Criminal Defendants set about *immediately* manipulating the HECM IO bond prices.

66. The *same day* IDC agreed to accept Live Well's price quotes without any independent verification, Hild directed Stumberger to submit prices to "undo" a recent $30,000 reduction in IDC's published bond prices that would have caused Live Well to have to make a $247,000 margin payment.

67. Stumberger replied to Hild: "We can mark everything up by 1.25 ticks to erase out the IMC [implied margin call]."

68. After the trading desk had submitted the inflated price quote as Michael Hild had directed, Hild wrote back to Stumberger: "IDC marks are up ~$250k today for tmrw's distribution . . . . Well that was easy :-)".

69. The Criminal Defendants prevented a margin call by manipulating the prices published by IDC, not based on any analysis of the bonds' actual market value, but rather based solely on their liquidity needs. Live Well's bond lenders, who had no idea IDC was not independently valuing the bonds, continued to accept IDC's prices as representative of the fair market value.

70. Soon after the first successful manipulation of the bond price quotes, Stumberger and the bond trading desk began modeling various "scenarios", i.e., sets of "assumptions" and

parameters, for valuing the bond portfolio in an effort to maximize the "value" of the bond portfolio, without regard for the bonds' actual fair market value.

71.     Each of the Criminal Defendants actively participated in the development and implementation of the fraudulently inflated bond price quotes.

72.     Ultimately, however, it was Michael Hild who determined what bond price quotes were submitted to IDC.

73.     Hild pushed Stumberger and the bond trading desk employees to submit bond price quotes that increased the apparent value of Live Well's bond portfolio.

74.     Indeed, by as early as April 2015, Live Well's bond-related debt already exceeded the fair market value of the bonds.  This was plainly inconsistent with the terms of the repo lending arrangements, which required the debt to be substantially less than the fair market value of the collateral, and the Criminal Defendants knew it.

75.     Implementing the nascent fraud required regular communications among the Conspirators.  The Criminal Defendants had a standing call at 9:30 a.m. each Monday through Thursday with the employees of Live Well's bond trading desk.  During such calls, the fraud was discussed and developed and issues relating to the bond mispricing were regularly discussed.  In addition, the conspirators communicated regularly by phone, email, Bloomberg messages, and face to face.  Live Well set up a "HECM Trading" email listserv that included Rohr, Stumberger, and certain trading desk employees that participated in the fraud.  That listserv was routinely used by the Criminal Defendants to communicate among themselves about matters relating to the fraud.

76.     As a result of the nascent bond mispricing scheme, between January 2015 and August 2015, the total reported value of Live Well's bond portfolio increased from approximately $50 million to approximately $70 million.

ii.     **Hild and His Criminal Defendants Unleash Their "Self-Generating Money Machine."**

77.     In or about September 2015, the Criminal Defendants ramped up the fraudulent bond pricing scheme and dramatically grew the bond portfolio.

78.     Specifically, in or about August or September 2015, with the knowledge and at the direction of the Criminal Defendants, Stumberger and other employees of the Live Well trading desk developed and implemented what became known as "scenario 14."

79.     On or about September 9, 2015, the Criminal Defendants and certain bond trading desk employees participated in a conference call regarding scenario 14.   They discussed, among other things, whether or not scenario 14 prices should be submitted to IDC, the implications if they started submitting scenario 14 prices, and how potentially the repo lenders or other investors could react if they learned the prices were being produced internally by Live Well and did not reflect actual market prices or the prices at which Live Well could sell the bonds.

80.     Soon after that call, a bond trading desk employee submitted the inflated scenario 14 bond price quotes to IDC.

81.     As the Criminal Defendants well knew, Scenario 14 represented a fundamental change to how the bond portfolio was valued by Live Well for purposes of submitting valuations to IDC.  Among other things, scenario 14 "assumed" a dramatic drop in the bond yields (*i.e.,* the return on the bonds demanded by the market), which resulted in a dramatic increase in the purported "value" of the bond portfolio.

82.     Neither the "assumptions" underlying scenario 14 nor the resulting dramatic increase in bond valuations when scenario 14 was applied had any market basis whatsoever.  To the contrary, the Criminal Defendants knew the inflated price quotes based on scenario 14 that were submitted to IDC were false, misleading, and could never actually be obtained in the market.

83. And as discussed above, the Criminal Defendants knew that IDC would publish the bond price quotes Live Well submitted without question.

84. The Criminal Defendants also knew that, with one exception, all of Live Well's repo lenders relied ***exclusively*** on IDC's published prices in determining how much credit those lenders were willing (or required) to extend.

85. This was by design. The Criminal Defendants specifically targeted repo lenders that relied solely on IDC for bond price quotes, even if those repo lenders offered financing terms that were ***less favorable*** than lenders that obtained bond prices from sources other than IDC.

86. Because Michael Hild and the other Criminal Defendants had complete control over the bond price quotes submitted to IDC, they could make the published bond prices whatever they wanted the prices to be and, by extension, fraudulently manufacture increased credit from the repo lenders.

87. For example, on September 15, 2015, a bond trading desk employee sent to Hild and the HECM Trading listserv an updated bond analysis "run with Scenario 14 methodology." Hild asked whether "the price listed below for the CS bond we bought Friday what was submitted to IDC?" The employee responded: "Yes. We bought at 12-26 and I submitted 15-12 to IDC."

88. This email demonstrate clearly that: (i) Hild and his coconspirators were directly involved in the implementation of scenario 14 scheme; (ii) they knew that fraudulently inflated scenario 14 bond price quotes were being submitted to IDC; and (iii) they knew that fraudulently inflated scenario 14 bond price quotes submitted to IDC (15-12) were materially higher than the prices Live Well had just paid for those same bonds (12-26). In fact, the bond in question in the September 15, 2015 email exchange was immediately marked up by 20% when the fraudulently inflated bond price quote was submitted to IDC.

89.     The Criminal Defendants ran this play again and again—causing Live Well to borrow funds based upon fraudulently inflated bond values to purchase more bonds, then inflating the values of the newly acquired bonds to purchase even more bonds, and so on.  Using this scheme, Live Well increased the size of its bond portfolio from its initial portfolio of fewer than 20 HECM IO bonds to approximately 50 bonds.

90.     The impact of "scenario 14" in terms of escalating the Criminal Defendants' bond mispricing fraud, and the purported "values" of the bond portfolio, were immediate and undeniable.

91.     Beginning in September 2015, the Criminal Defendants consistently submitted prices to IDC that were on average 29% higher than the purchase price Live Well paid for the bonds in arms-length market transactions, often on the ***same day***.  The following table demonstrates the mechanics of the inflation scheme:

| Bond | Purchase Date | Purchase Price | Date Price Submitted to IDC | Price Quote Submitted to IDC | Immediate Inflation in Bond "Value" |
|---|---|---|---|---|---|
| GNR 2015-H14 AI | 09/11/2015 | 12.8125 | 09/14/2015 | 15.3750 | **20.00%** |
| GNR 2013-H08 DI | 09/15/2015 | 10.3906 | 09/15/2015 | 12.0469 | **15.94%** |
| GNR 2015-H16 DI | 09/15/2015 | 13.6406 | 09/15/2015 | 16.8750 | **23.71%** |
| GNR 2015-H23 AI | 09/28/2015 | 12.4063 | 09/28/2015 | 14.9700 | **20.66%** |
| GNR 2015-H12 BI | 09/17/2015 | 12.4531 | 09/18/2015 | 14.7031 | **18.07%** |
| GNR 2015-H12 BI | 09/21/2015 | 12.4531 | 09/18/2015 | 14.7031 | **18.07%** |
| GNR 2015-H22 CI | 09/28/2015 | 12.7813 | 09/29/2015 | 15.6400 | **22.37%** |
| GNR 2015-H17 AI | 09/24/2015 | 13.0000 | 09/25/2015 | 16.0938 | **23.80%** |
| GNR 2015-H06 DI | 09/24/2015 | 11.0000 | 09/25/2015 | 14.1875 | **28.98%** |
| GNR 2015-H08 BI | 09/24/2015 | 11.4375 | 09/25/2015 | 14.0313 | **22.68%** |
| GNR 2015-H08 BI | 10/07/2015 | 11.3438 | 10/12/2015 | 14.6665 | **29.29%** |
| GNR 2015-H27 AI | 11/04/2015 | 11.7500 | 11/04/2015 | 14.2500 | **21.28%** |
| GNR 2015-H29 JI | 11/13/2015 | 12.1406 | 11/24/2015 | 15.3750 | **26.64%** |
| GNR 2015-H29 BI | 11/17/2015 | 11.3125 | 11/24/2015 | 14.5626 | **28.73%** |
| GNR 2015-H30 CI | 12/01/2015 | 11.6250 | 12/01/2015 | 15.4375 | **32.80%** |

| Bond | Purchase Date | Purchase Price | Date Price Submitted to IDC | Price Quote Submitted to IDC | Immediate Inflation in Bond "Value" |
|---|---|---|---|---|---|
| GNR 2015-H26 BI | 12/02/2015 | 12.1250 | 12/02/2015 | 16.0625 | **32.47%** |
| GNR 2015-H28 BI | 12/03/2015 | 9.2500 | 12/03/2015 | 11.8438 | **28.04%** |
| GNR 2015-H32 MI | 12/30/2015 | 9.6906 | 12/30/2015 | 12.4375 | **28.35%** |
| GNR 2015-H32 AI | 12/30/2015 | 11.9063 | 12/30/2015 | 15.8750 | **33.33%** |
| GNR 2015-H33 AI | 01/04/2016 | 12.1094 | 01/04/2016 | 15.8750 | **31.10%** |
| GNR 2016-H04 DI | 02/25/2016 | 10.9177 | 02/25/2016 | 14.7813 | **35.39%** |
| GNR 2016-H07 KI | 03/21/2016 | 11.0938 | 03/25/2016 | 14.8750 | **34.08%** |
| GNR 2016-H07 KI | 04/01/2016 | 11.2813 | 03/25/2016 | 14.8750 | **31.86%** |
| GNR 2016-H09 NI | 05/05/2016 | 12.0625 | 05/10/2016 | 16.1894 | **34.21%** |
| GNR 2016-H11 LT | 05/11/2016 | 16.0800 | 05/25/2016 | 21.2309 | **29.22%** |
| GNR 2016-H11 LM | 05/27/2016 | 16.0800 | 05/31/2016 | 20.5403 | **27.74%** |
| GNR 2016-H11 LG | 06/08/2016 | 16.0800 | 06/08/2016 | 20.9823 | **30.49%** |
| GNR 2016-H16 LX | 07/27/2016 | 14.7645 | 07/26/2016 | 19.3075 | **30.77%** |
| GNR 2016-H17 AI | 08/26/2016 | 14.4797 | 08/26/2016 | 20.0533 | **38.49%** |
| GNR 2016-H11 MI | 09/12/2016 | 11.6875 | 09/12/2016 | 17.0620 | **45.99%** |
| GNR 2016-H17 BI | 09/29/2016 | 12.1016 | 09/29/2016 | 17.1250 | **41.51%** |
| GNR 2016-H07 GI | 09/29/2016 | 11.0000 | 09/29/2016 | 15.2813 | **38.92%** |
| GNR 2016-H23 MI | 10/25/2016 | 15.1250 | 10/26/2016 | 18.2094 | **20.39%** |
| GNR 2016-H11 JI | 10/28/2016 | 11.8438 | 10/31/2016 | 14.5313 | **22.69%** |
| GNR 2016-H24 BI | 11/29/2016 | 14.2656 | 11/29/2016 | 17.7500 | **24.42%** |
| GNR 2016-H23 BI | 11/29/2016 | 11.3281 | 11/29/2016 | 14.5625 | **28.55%** |

92.     As discussed above, Live Well's repo lenders typically applied a haircut of between 10% and 20% to the quoted bond prices. But because the Criminal Defendants were fraudulently marking up the bonds by an average of 29%, the repo lenders frequently were underwater on the day they made the loans as a result of fraudulent scheme.

93.     The fraudulently inflated bond prices allowed Live Well to borrow more money with no additional risk. In turn, this allowed Live Well to purchase more bonds, which were marked up again, allowing Live Well, in turn, to borrow more money, *etc.*

94.     Hild aptly described this scheme on a phone call with employees on Live Well's bond trading desk: "**it is a little bit of a self-generating money machine, right?** In that if you

buy [HECM IO bonds] in the marketplace and then apply this methodology, **every single time you do that, you're gonna free up additional borrowing capacity, right**?" (emphasis added).

95.     Between September 2015 and November 2016, Hild, with the active participation of the other Criminal Defendants, caused Live Well to borrow *hundreds of millions of dollars* from its bond repo lenders based upon fraudulently inflated bond price quotes. As Hild knew at the time, the repo lenders would never have agreed to lend to Live Well this money had the bonds been priced at fair market value.

96.     Over the next several years, Hild and the other Criminal Defendants expanded the fraud.

97.     Whenever Live Well needed more cash to purchase additional bonds, repay loans or satisfy other obligations, or when Hild decided to enrich himself and his coconspirators, Hild would direct the other Criminal Defendants and the bond trading desk employees to submit prices based on the amount of money needed to "harvest" from the margin calls to lenders, not based upon the actual market value of the bonds.  For example, in January 2016, a Live Well trading desk employee stated in an email, "[a]s it sits in IDC right this second we could harvest 850k. Depending on which exact prices we want to export itd [*sic*] be an additional 3.3-4.2M on top of that."

### iii.     Unable to Find Someone "Slimy" Enough to Vouch for Their Fraudulent Values, the Criminal Defendants Seek Out New Victims.

98.     Throughout the course of the scheme, the Criminal Defendants needed new repo lenders, *i.e.,* new potential victims, to continue to perpetuate their scheme and to pay down existing repo credit lines from repo lenders[2] that wanted to reduce their exposure to the Live Well bonds.

---

[2] Nothing in this Complaint implies or is intended to imply that any repo lenders, other than the petitioning creditors in connection with the involuntary chapter 7 case against Live Well, are or are not victims.  Further, the Trustee

99.     For example, in early 2015, Live Well had three repo lenders.  By mid-2015 (after the Criminal Defendants had obtained exclusive control over the IDC bond price quotes), each of those three counterparties had sought to reduce or eliminate their exposure to the bonds.  Thus, as would become their pattern, Hild and the other Criminal Defendants sought out and obtained bond repo financing from three new repo lenders—Wedbush, Mizuho, and Nomura—to get the necessary liquidity to payoff Live Well's old repo-lenders (*i.e.*, repurchase the financed bonds).

100.     By the first quarter of 2017, Wedbush and Mizuho had sought to reduce or eliminate their repo bond lending facilities with Live Well.  Specifically, in or about late January 2017, Wedbush informed Live Well it would be reducing its credit line from $210 million to $143 million.  Then in or about March 2017, Mizuho informed Live Well that it was terminating its line of credit.

101.     This created a crisis for the Criminal Defendants because they knew the overvalued bonds could not be sold in the marketplace for anywhere near the amount of the corresponding debt and, if the lenders lowered the value of the bonds, that would require Live Well to make an immediate pay down and Live Well did not have sufficient funds to pay down the debt.

102.     In one tense phone call, Rohr observed to the Criminal Defendants and members of Live Well's bond trading desk that they might need to find someone outside Live Well, who could vouch for the inflated bond prices with the then-existing bond lenders. Rohr specifically stated that "you know, you pick someone who is really slimy, who would be willing to be slimy for you."  As Rohr later testified, "it felt like what we were doing was slimy, so we had to find someone else who was slimy to play along with what we were doing."

---

reserves his rights generally under applicable law, rules or in equity on behalf of the estate, and may seek to bring any action against any third party.

103.    The Criminal Defendants, however, could not find someone "slimy" enough to vouch for their inflated bond prices.  So, instead, the Criminal Defendants implemented a further round of artificial increases to the bond price quotes submitted to IDC, which they termed "scenario 4."

104.    In implementing scenario 4, the Criminal Defendants abandoned any pretense of using a methodology to value the bonds and instead simply backed into whatever number they needed.  For example, between January 2017 and February 2017, the value of the bond portfolio increased by $32.4 million and between February 2017 and March 2017, the value of the bond portfolio increased by an additional $21 million, even though the portfolio consisted of the exact same bonds and even though the values of HECM IO bonds naturally decline over time as the mortgages underlying the bonds payoff.

105.    This enabled Live Well to address short term liquidity needs.  For example, in March 2017, one of repo lenders demanded that Live Well pay over $2 million to meet a margin call.  In response, Hild directed than an increased bond price quote be submitted to IDC to meet that margin call.

106.    But the scenario 4 prices also increased the risk that the fraud would be uncovered because the prices bore no relationship to reality.  As just one example, on or about March 17, 2017, a Live Well employee acting at the direction of Hild and the other Criminal Defendants increased the price quotes of five bonds by exactly $1 each and increased the price on a sixth bond by exactly $0.50.  Needless to say, there was no analysis conducted to even nominally support those blanket increases in the valuations.  Rather, they were dictated exclusively by an immediate need for cash.  That employee testified at Michael Hild's criminal trial that he intentionally submitted these obviously fraudulent bond price quotes in hopes that someone would notice and

intervene because "**my opinion was that this was really wrong and I wanted Live Well to get caught** . . . ." (emphasis added).

107.    On a March 30, 2017 call with Hild, Stumberger and others, Rohr warned that the bond prices were "getting farther and farther away from reality, I guess, or the center of the universe."

108.    The scenario 4 prices were so far from reality that, by March 24, 2017, the Criminal Defendants' bond prices were *45.7% higher* than the bond prices that were used by the one bond repo lender that did not rely on IDC pricing.

109.    By this point, the Criminal Defendants' bond prices were so inflated that, for much of 2017, Rohr simply stopped including the scenario 4 valuations in Live Well's financial statements and, instead, used lower (but still inflated) bond valuations in the financial statements for much of 2017.

110.    Given the pressure asserted by Wedbush, Mizuho, and Nomura to exit their facilities with Live Well, the Criminal Defendants targeted several Wall Street trading houses and a federally-insured bank, convincing the three petitioning creditors to rely exclusively on IDC pricing (which remained under the control of the Criminal Defendants), and obtained or borrowed hundreds of millions of dollars from these new innocent lenders, using the funds to pay off the old repo lenders.

111.    Because the bonds securing the debts of the old repo lenders were so grossly inflated, the funds borrowed from the new victim bond lenders were used to pay artificially high returns to the old repo lenders.

112.    The Criminal Defendants used the artificially inflated bond valuations as well as fraudulent financial statements to create the appearance that the bond portfolio was profitable. As

a result, the Criminal Defendants were able to attract new repo lenders that were unaware of, and had no reason to be suspicious of, the fraud, using the new lenders' money to perpetuate the scheme.  In reality, these new lenders were underwater from the first day they funded Live Well.

113.    Throughout the period of 2015, 2016, 2017, and 2018, Hild and Rohr repeatedly prepared, presented, or signed off on fraudulent financial statements that relied upon the inflated bond valuations and inflated values for other assets.

114.    As reflected on Live Well's fraudulently prepared financial statements, between early 2015 and March 2017, the value of the bond portfolio based upon the fraudulent prices rose from approximately $50 million to nearly a high of more than $570 million and the portfolio had grown from 20 bonds to approximately 50 bonds.  At that time, the bond portfolio represented nearly 65% of the book value of all of Live Well's assets, according to Live Well's December 31, 2016 balance sheet.

115.    During that same time period, Live Well's bond secured debt ballooned from less than $46 million to more than $414 million.

116.    In reality, the actual value of the bond portfolio was at least ***$200 million less*** than the fraudulently inflated valuations and the true value of the bonds was at least ***$100 million less*** than the amount Live Well owed to its bond repo lenders.

117.    In addition to artificially inflating asset values, Hild and Rohr also, among other things, provided at least one repo lender with backdated financial statements and, in another instance, provided a repo lender with a copy of the financial statements that specifically omitted the dramatic bond price increases the Criminal Defendants had just pushed through in the first quarter of 2017 in order to avoid suspicion.

118.    Throughout the time period from 2015 to 2019, the Criminal Defendants knew their fraudulently inflated bond valuations were being included in Live Well's financial statements and in other communications to, and being relied upon by, among others, the repo lenders, Live Well's other lenders, auditors, regulators, and Live Well's board of directors.

### C.    Hild Leverages the Bond Portfolio to Buy Unfettered Control of Live Well and to Grossly Overcompensate Himself and His Henchmen.

119.    During the period of 2015 through September 2016, Live Well had a five-member board of directors consisting of:  (i) Michael Hild; (ii) (a) Brett Rome ("Rome") and (b) James Karides ("Karides"), each of whom were appointed to the Board by certain holders of Live Well's series A preferred stock; (iii) Glenn Goldstein ("Goldstein"), who was appointed to the Board by certain common stockholders of Live Well; and (iv) Stuart Cantor ("Cantor"), an outside director who had served on the Board since in or about 2006.

120.    Since founding Live Well in 2005, Michael Hild had personally guaranteed all or substantially all of Live Well's mortgage warehouse debt, but not its bond repo debt.

121.    The mortgage warehouse debt generally was secured by, among other things, the underlying mortgage loans, liens, the properties that secured those liens, servicing rights, and other assets.  Thus, the mortgage warehouse debt, by design, was fully secured financing, assuming Live Well continued to operate as a going concern or was wound down in an orderly manner.

122.    Absent the fraud, Michael Hild had very little, if any, actual real risk on his personal guarantees of the mortgage warehouse debt.

123.    And prior to Live Well's collapse into bankruptcy, Michael Hild never paid one cent on account of his personal guarantees of Live Well's debts.

124.    Notwithstanding, on multiple occasions prior to 2016, Hild had demanded payment from Live Well in exchange for his personal guarantees of the mortgage warehouse debt.

125.     Prior to 2016, a majority of Live Well's board consistently had refused Hild's demands for guaranty fee payments.

126.     Hild also sought payment of director fees (i.e., additional payments for serving on the board of directors), and the Board rejected that as well.

127.     Beginning in or about May 2016, Hild defied the Board and unilaterally directed Live Well to begin making guaranty fee payments to Hild.  Hild caused Live Well to pay him at least *$1.2 million* in guaranty fee payments before the Board had authorized any such payments be made.

128.     In addition, on or about June 27, 2016, Hild executed an initial guaranty fee agreement with Live Well that provided for payment of both retroactive guaranty fee payments and future guaranty fee payments.  No Board approval was sought or obtained for entering into this agreement.  Rohr—at Hild's direction—signed the agreement on behalf of Live Well.

129.     Hild's unilateral action in purportedly binding Live Well to pay him guaranty fees precipitated a governance crisis.

130.     On or about July 7, 2016, Board members Rome, Karides, and Goldstein challenged the validity of the guaranty fee payment and sought to prohibit guaranty fee payments while a special committee of the Board considered the issue.

131.     In response, on July 20, 2016, Hild sent an email to the Board and to Rohr purporting to revoke his personal guarantees to certain of Live Well's creditors and counterparties.  Hild knew his anticipatory breach of his guarantee obligations (the guaranties were irrevocable of course) could cause numerous defaults under Live Well's existing lending and repurchase arrangements.

132.    Hild's misconduct here did resolve the governance dispute.  Goldstein resigned from the Board on July 27, 2016.  Meanwhile, Rome and Karides, the principal holders of preferred equity in Live Well at the time, found a way to accommodate Hild to their discredit.  Rome, Karides, and the other remaining Board members approved resolutions to establish:  (i) a special committee to "consider" a repurchase of the preferred stock, and (ii) a special committee to "consider" guaranty fee payments to Hild.  Each of those two special committees consisted of only one person:  Cantor.

133.    On September 30, 2016, at Hild's direction and rubber stamped by the one-man special committee (Cantor), Hild caused Live Well to enter into a Stock Purchase Agreement (the "SPA") with the preferred stockholders.

134.    Even though Hild was clearly conflicted, he signed the SPA as President and CEO of Live Well.

135.    Among other things, the SPA provided that Live Well would redeem all outstanding preferred stock in exchange for $29 million (including preferred equity owned indirectly by Rome and Karides), consisting of $18 million in cash to be paid at closing and $11 million in subordinated notes payable that bore 6% interest and matured on September 30, 2021.

136.    Under the SPA, among other things:  (i) an entity affiliated with Karides received at least $8,952,461.10 in cash at closing plus a $5,500,000 note, and (ii) an entity affiliated with Rome received at least $3,843,937.89 in cash plus a $2,361,547.09 note.

137.    Even though Karides and Rome were the last real check on Hild's unfettered control of Live Well, Karides and Rome each took a payout rather than stay and exercise their fiduciary duties.

138.    The preferred stockholder payoff was made possible only through excessive borrowings from the repo lenders supported by Hild's fraudulently inflated bond prices.

139.    The $18 million cash component of the preferred stockholder payoff was funded through contemporaneous transactions with repo lenders based upon inflated bond prices.  For example, as detailed above in paragraph 91, during the period that the Board was approving the SPA and the SPA was closing, Hild caused Live Well's trading desk employees to submit to IDC the following fraudulently inflated bond price quotes:

      a.      On July 26-27, 2016, a price quote was submitted that was ***30.77% higher*** than the market price Live Well had just paid for that bond.

      b.      On August 26, 2016, a price quote was submitted that was ***38.49% higher*** than the market price Live Well had just paid for that bond.

      c.      On September 12, 2016, a price quote was submitted that was ***45.99% higher*** than the market price Live Well had just paid for that bond.

      d.      On September 29, 2016, two price quotes were submitted that, respectively, were ***38.92% and 41.51% higher*** than the market price Live Well had just paid for that bond.

140.    The price quotes submitted on August 26 and September 12 and 19, 2016, during the run up to the SPA closing, were the ***most inflated fraudulent bond price quotes*** submitted to IDC at Hild's direction during the period from September 2015 through November 2016.

141.    Further, as discussed more fully below, by mid-2016, Live Well already was deeply insolvent.  Thus, Hild caused Live Well to incur $29 million in debt, much of which was financed using fraudulently inflated bond price quotes, for worthless equity interests.

142.    To be clear, the only purpose for the preferred stockholder payoff was to allow Michael Hild, now majority common stockholder as well as CEO and chairman, to dominate and control Live Well and its Board up to the Filing Date for the benefit of himself, his affiliates, and the Criminal Defendants and Hild's other enablers.

143.    After the preferred stockholder payoff, Cantor remained on the Board.  But Cantor was little more than a rubber stamp for Hild's agenda of personal enrichment.  Cantor not only enabled the continuation of the bond pricing fraud but also the systematic looting of Live Well by Hild and the other Criminal Defendants, in exchange for which Cantor personally received nearly $1.4 million in largely back-dated, "historical" director fees.

144.    Immediately after the payoff of the preferred stockholders and the abdications by their board representatives, Hild began implementing his scheme to vastly overcompensate himself and to overcompensate and reward his coconspirators.

145.    On or about November 22, 2016, Hild executed a Personal Guaranty Fee and Indemnity Agreement with Live Well (the "Guaranty Fee Agreement").  The Guaranty Fee Agreement was signed on behalf of Live Well by Rohr, one of Hild's closest criminal conspirators.

146.    Among other things, the Guaranty Fee Agreement provided for Hild to receive monthly guaranty fee payments equal to 1.5% per year of the full amount of Live Well's credit facilitates with various lenders dating back to April 1, 2006, which Hild asserted he had guaranteed.  Live Well was obligated under the Guaranty Fee Agreement regardless of whether or not it had borrowed the full amount under the underlying facility and whether or not the debt had fully repaid by Live Well.  Indeed, the debts "guaranteed"  by Hild dated all the way back to April 1, 2006 and, it appears, much of them were no longer owed at the time the Guaranty Fee Agreement was executed.  Moreover, Hild had guaranteed much of Live Well's mortgage warehouse debt which, by its nature, was structured to be fully secured.  And as a guarantor, Hild would only ever be liable if Live Well (the primary obligor) did not pay the debt in full.  Notably, Hild did not personally guaranty Live Well's repo debt, which was at the heart of the fraud.  In short, under the Guaranty Fee Agreement, Hild was entitled to receive more than $***500,000 per month*** for

"guaranteeing" debts that were, in most cases, already retired and for which Hild had virtually no risk, if any at all.

147.    The minutes of the December 15, 2016 meeting of Live Well's board of directors (now just Hild and Cantor) reflect that the Board had previously given unanimous written consent to the Guaranty Fee Agreement.  The minutes also reflect that the board unanimously approved the payment of historical and future director fee payments to Hild and Cantor.  Within weeks of this meeting, Hild caused Live Well to transfer more than $1,000,000 in "historical" director fee payments to Cantor.

###    D.    The Criminal Defendants Loot Live Well.

148.    Prior to the preferred stockholder payoff, the Board had set Hild's base compensation at $250,000 and the Board had approved certain performance bonuses for Hild.

149.    Prior to the fraud, Hild's total pre-tax compensation from Live Well averaged approximately $1 million.  This is consistent with the total pre-tax compensation that other similar size firms in the industry paid to their CEOs at the time.

150.    By contrast, after the preferred stockholder payoff, Hild caused Live Well to pay him more than ***$9.7 million in total compensation in 2017*** and ***nearly $8.1 million in total compensation in 2018.***  During the first six months of 2019, when Live Well was deeply insolvent and approaching bankruptcy, Hild caused Live Well to pay him more than ***$2.9 million*** in total compensation, which was more than ***double*** the total compensation paid to Hild in 2015, the last year before the preferred stockholder payoff.

151.    Hild's overcompensation was evidenced by multiple transactions and arrangements.  Among other things, Hild caused Live Well to:  (i) enter into the Guaranty Fee Agreement, described above; (ii) pay Hild quarterly director fees, including $1,002,200 in "historical" director fees for board service that had already been tendered without such

compensation; (iii) increase Hild's base salary five-fold to $1,242,500; and (iv) pay significantly larger bonuses to Hild and the other Criminal Defendants, including a $2,500,000 cash bonus to Hild for 2016 and a $1,507,500 cash bonus to Hild for 2017.

152.    By way of example, and without limitation, during the course of and in furtherance of the fraud, between February 2015 and June 2019, Hild caused Live Well to pay him not less than *$26,051,622.99* in overcompensation.  Together with other amounts Hild received from Live Well during that period, his total compensation averaged more than *$7.25 million per year* and more than *seven times* his total annual compensation prior to the fraud.

153.    The specific date, amount, and details of each individual transfer from Live Well to or for the benefit of Michael Hild comprising these aggregate amounts are set forth in **Exhibit A** to this Complaint, which totals not less than *$26,051,622.99*.  Such transfers include, without limitation, the following:

a.    Guaranty fee payments totaling not less than $15,563,644.52;

b.    Director fee payments totaling not less than $1,346,000; and

c.    Excessive salary and unjustified bonuses totaling not less than $9,141,978.47.

154.    In addition, Hild:  (i) caused Live Well to pay at least $1,493,280.64 to law firms representing Hild and/or his wife and the Hild entities, as set forth on **Exhibit E** to this Complaint; (ii) caused Live Well to pay millions of dollars  to other law firms representing the Criminal Defendants and their coconspirators in connection with the government's investigation of the bond pricing scheme; and (iii) repeatedly used Live Well's funds, employees, and resources for the Hilds' personal businesses, as discussed more fully below.

155.     Hild also used his domination of Live Well to reward and overcompensate the other Criminal Defendants, Rohr and Stumberger, as well as others who enabled Hild's systematic looting of Live Well.

156.     In exchange for his active participation in the bond mispricing scheme and his knowing preparation and dissemination of fraudulent financial reports, among other misconduct, Rohr received at least *$2,917,160.18* in overcompensation, including, among other things:

     a.     a $600,000 unjustified bonus payment for 2015;

     b.     a $1,000,000 unjustified bonus payment for 2016;

     c.     a $642,500 unjustified bonus payment for 2017; and

     d.     at least $ 674,660.18 in excessive salary during the period between January 2017 and December 2018.

157.     In addition, Hild caused Live Well to pay at least $274,498.17 to Rohr's individual legal counsel, as set forth on **Exhibit F** to this Complaint.

158.     Stumberger's compensation was directly tied to the size and performance of the bond portfolio and, therefore, he had a direct financial incentive to actively participate in the fraudulent bond mispricing scheme, including directly overseeing the bond trading desk and providing purported justifications for the obviously inflated and unjustifiable bond price quotes. In exchange for his fraud and other misconduct, Stumberger received at least *$4,187,820.91* in overcompensation, including, among other things:

     a.     $678,711 in unjustified bonus payments for 2015;

     b.     $1,559,502 in unjustified bonus payments for 2016;

     c.     $1,017,520 in unjustified bonus payments for 2017; and

     d.     $932,088 in unjustified bonus payments for 2018.

159.     In addition, Hild caused Live Well to pay at least $1,356,280.95 to Stumberger's individual legal counsel, as set forth on **Exhibit F** to this Complaint.

160.     Such overcompensation of Hild, Rohr, and Stumberger was not ordinary and had no precedent within Live Well.

161.     Such overcompensation of Hild, Rohr, and Stumberger vastly exceeded the total compensation that other companies in the industry paid for similar services during this time period.

162.     There was no rational business basis for the gross overcompensation of Hild, Rohr, and Stumberger.  The fraud was the only factor driving such overcompensation.

163.     Further, the payment of legal fees and expenses for Hild, Rohr, Stumberger, and certain of their coconspirators was not authorized under Live Well's corporate governance documents and applicable law.  Live Well's Certificate of Incorporation requires an undertaking as a condition precedent for the advancement of legal fees in connection with civil, criminal, administrative, or investigative actions, suits or proceedings.  Based upon a review of Live Well's books and records, none of the Criminal Defendants, nor any of their coconspirators, ever made such an undertaking.  Therefore, none of the Criminal Defendants was entitled to advancement of the amounts set forth on **Exhibit F** to this Complaint and such transfers were unlawful.

164.     To be clear, all of the transfers to or for the benefit of the Criminal Defendants or the other Defendants, as described in detail in this Complaint and in the Exhibits hereto, were unlawful, void, and should be avoided and unwound.  The bonus payments to Hild, Rohr, and Stumberger were approved by a faithless board of directors, in flagrant dereliction of their duties of loyalty, oversight, good faith, and care, both prior to and after the preferred stockholder payoff.  Similarly, each of the (i) approval and payment of salary increases for Hild and Rohr, (ii) entry into and obligations incurred under the Guaranty Fee Agreement, (iii) approval and payment of guaranty fee payments to Hild, (iv) approval and payment of director fee payments to Hild, and (v) other transfers to or transactions with or benefiting the Criminal Defendants and the other

Defendants were unlawful, because both Hild and Cantor were materially and hopelessly conflicted.  Hild, as the mastermind of the fraud, was wholly conflicted as to all such transfers and transactions.  Cantor was materially conflicted because, among other things, he took more than $1 million in director fees (a bribe) as a *quid pro quo* for rubber-stamping Hild's agenda of self-enrichment and overcompensation and because Cantor's title company was directly involved in numerous transactions by which the Hilds and the Hild entities acquired many real properties in Richmond, Virginia for the purpose of hiding the money Hild stole from Live Well and its creditors.

165.    During the course of this proceeding, the Trustee may learn (through discovery or otherwise) of additional money that the Criminal Defendants wrongfully took from Live Well.  It is the Trustee's intention, by this proceeding, to recover from the Defendants all amounts wrongfully taken from Live Well and to recover from them the full amount of damages suffered by the Live Well estate and its creditors as a result of the Criminal Defendants' fraudulent conduct.

**E.      The Criminal Defendants' Fraudulent Conduct Rendered Live Well Insolvent.**

166.    Even as the Criminal Defendants, in particular Michael Hild, extracted vast sums from Live Well to enrich themselves, the bond mispricing scheme, gross overcompensation, and mismanagement was rendering Live Well insolvent, undercapitalized, and unable to pay its debts as such debts became due.

167.    Live Well's financial statements for the periods ending December 31, 2015, 2016, 2017, and 2018—each of which relied on the inflated bond valuations—falsely showed Live Well to be solvent.

168.     In fact, by as early as April 2015, just months after the Criminal Defendants had taken exclusive control of the bond pricing, the total amount of bond-secured debt ***consistently exceeded the fair market value of the bonds.***

169.     By no later than May or June 2016, Live Well already was balance sheet insolvent as a result of the Criminal Defendants' fraud and other misconduct.

170.     Specifically, by June 2016, the actual value of the bond portfolio was ***at least $200 million less*** than the inflated valuations put forward by the Criminal Defendants.

171.     Further, Hild had caused Live Well to incur bond related debts that were ***at least $100 million greater*** than the actual value of the bond portfolio.

172.     That amount far exceeded the unencumbered value of Live Well's legitimate business activities and assets and rendered Live Well consistently insolvent, undercapitalized, and unable to pay its debts in full as they became due.

173.     Moreover, because of the pervasive fraud and criminal conduct perpetrated by the Criminal Defendants, including the Criminal Defendants' ever-growing dependence on new bond repo lenders to repay old lenders, Live Well is presumed to have been insolvent from the very inception of the Criminal Defendants' fraudulent scheme beginning in 2015.

**F.     The Fraudulent Scheme Unravels, and Live Well Collapses into Bankruptcy.**

174.     In or about March 2017, the SEC opened an investigation into the bond trading activities at Live Well, directed by Michael Hild with the participation of the other Criminal Defendants, Rohr and Stumberger.

175.     In or about July 2017, the Criminal Defendants learned the U.S. Securities and Exchange Commission ("SEC") had opened an investigation into their bond trading activities.

176.     On or about July 19, 2017, the SEC issued a subpoena for documents to Live Well, care of Michael Hild.

177.   The SEC also issued subpoenas directed to Stumberger and to certain other individuals in the Live Well bond trading desk.

178.   In response to the SEC investigation, the Criminal Defendants ceased continuing to inflate the bond price quotes and simply held the bond price quotes static (at already inflated prices) for a period of *22 months* from July 2017 through April 2019.  This 22 month perfect equilibrium could not occur in an illiquid marketplace let alone a fully functioning trading market (and the sort of bonds in question did trade, from time to time) and demonstrates that the Live Well bond pricing during this period relied upon by, for example, the petitioning creditors, was a fiction manufactured by the Criminal Defendants in order to defraud innocent, good faith Live Well stakeholders and to line the pockets of the Criminal Defendants and entities affiliated with them.

179.   These actions demonstrate that the Criminal Defendants knew their conduct in continually pumping up the bond valuations prior to July 2017 (and thereafter) was dishonest, improper, immoral, and at odds with all proper financial, accounting and business practice.

180.   In or about August 2018, certain repo lenders became suspicious.

181.   That month, one repo lender obtained independent valuations of several of the bonds, and the independent valuations were significantly below the prices Live Well had quoted to IDC.

182.   Shortly thereafter, another lender began to suspect the bond portfolio was significantly overvalued.

183.   In or about late 2018, representatives of the two lenders raised their concerns about the value of the bond portfolio with Michael Hild.  Hild told at least one of them—falsely—that no other lender had raised such concerns.

184.    Eventually, one of the lenders demanded that Live Well repay the loan principal of over $100 million. In response, Hild stated that Live Well lacked the cash to make the required payment.  When that lender demanded that Live Well sell their collateral to generate the necessary cash, Hild claimed he could not do so because the bonds were illiquid and did not regularly trade in the market.

185.    In or about December 2018, Rohr resigned from Live Well.

186.    In or about March 2019, Stumberger resigned from Live Well.

187.    In or about late-April 2019, Live Well's newly appointed interim CFO observed that the bond portfolio was not being priced, or "marked," to market.

188.    The interim CFO informed Michael Hild that he would not sign off on Live Well's financial statements for the first quarter of 2019 because the interim CFO believed, correctly, that the reported value of the bond portfolio was significantly overstated.

189.    As a result, on or about on May 3, 2019, Hild caused Live Well to cease business operations and to terminate substantially all its staff.

190.    In June 2019, the bond portfolio was re-valued using independent pricing.  This caused the aggregate value of the bond portfolio to drop from more than $446 million to less than $236.4 million, a staggering re-valuation of ***nearly $210 million***.

191.    On June 10, 2019 (the "Filing Date"), three of Live Well's repo lenders filed an involuntary bankruptcy petition under Chapter 7 of the Bankruptcy Code against Live Well in the United States Bankruptcy Court for the District of Delaware.

192.    On July 1, 2019, this Court entered the Order for Relief in Involuntary Case.

193.    On that same date, the Trustee was appointed pursuant to section 701 of the Bankruptcy Code.

194.    The Trustee is the duly qualified and appointed Chapter 7 Trustee of the Live Well bankruptcy estate.

195.    Live Well's creditors (excluding insiders) have asserted more than $110 million in claims.  Before and after the date of each transfer challenged in this Complaint and as of the Filing Date, Live Well had at least one unsecured creditor holding an allowable claim that could have challenged such transfers.  Such creditors include, without limitation, Mirae Asset Securities (USA) Inc., Republic Bank & Trust Company, Reverse Lending Club LLC, and Credit Plus, Inc., among many others.

196.    On August 29, 2019, the office of the United States Attorney for the Southern District of New York (the "U.S. Attorney") announced a five-count Indictment against Michael Hild relating to the bond pricing scheme, specifically:  (i) conspiracy to commit securities fraud; (ii) conspiracy to commit wire fraud and bank fraud; (iii) securities fraud; (iv) wire fraud; and (v) bank fraud.

197.    On that same date, the U.S. Attorney's office announced that both Rohr and Stumberger had entered into plea agreements regarding their respective roles in the fraudulent bond mispricing scheme and were cooperating with federal authorities.

198.    Rohr and Stumberger each admitted to participating in the scheme with Michael Hild to defraud Live Well's bond repo lenders.

199.    As part of his plea allocution, Rohr stated, among other things:

> I agreed with others, including Michael Hild, the CEO of Live Well, to cause a third party, Pricing Service, to misrepresent the value of certain bonds to Live Well's counterparties and repurchase agreement transactions in order to induce the counterparties to purchase the bonds from Live Well for higher prices than they otherwise would have accepted or to induce the counterparties to loan more money to Live Well than they otherwise would have. . . . I also agreed with Hild and others to provide misrepresentations

> from Live Well about the value of certain collateral in order to induce a federally insured bank to loan more money to Live Well than it otherwise would have.

200.    As part of his plea allocution, Stumberger stated, among other things:

> From 2015 until its bankruptcy in 2019, Live Well, at the direction of its CEO Michael Hild, submitted inflated valuations to IDC knowing that IDC was publishing those valuations in its database verbatim and expecting that Live Well's lenders would rely on those inflated valuations in making lending decisions. Live Well's knowing publication of inflated valuations caused lenders to be less secure in their extension of credit to Live Well than they believed. I was aware that Live Well was doing this. I knew that it was wrong for Live Well to submit valuations that did not reflect the market value of the interest-only bonds in Live Well's portfolio . . . .

201.    Also on August 29, 2019, the SEC filed a civil complaint against Hild, Rohr, Stumberger, and Live Well seeking declaratory, injunctive, and other relief.

202.    On April 12, 2021, Michael Hild went on trial in the New York District Court.

203.    At the criminal trial, both Rohr and Stumberger testified, consistent with their plea allocutions, that they had participated in the scheme to defraud Live Well's bond lenders by inflating the values of the bonds and that Michael Hild directed that scheme. Each of Rohr and Stumberger also directly implicated the other Criminal Defendants, among others, in the fraud.

204.    On April 30, 2021, after a three week trial and after less than four hours of deliberation, a jury unanimously found Michael Hild guilty on all counts charged and specifically referenced above.

205.    That guilty verdict demonstrates beyond a reasonable doubt, as the government stated in its summation at the criminal trial, that:

> Michael Hild masterminded a deliberate scheme to defraud and deceive and mislead his lenders. He tricked them into lending Live Well Financial hundreds of millions of dollars. He hid from them the fact that what they thought were independent market values for the bonds that Live Well owned were in fact Live Well's own pie-in-the-sky prices, [p]rices that bore no relation to where you could

sell the bonds in the market.  He used IDC as his puppet for years, pumping up prices when it suited him and never acknowledging that he was the one pulling the strings.

Why did he do it?

You know the answer.  It was all about the money. The defendant pocketed over $25 million from the scheme, and he continued to line his pockets even as the entire company was crumbling around him.

### G.    Laura Hild and the Hild Entity Defendants Furthered Michael Hild's Fraud and Personal Enrichment.

206.    Michael Hild could not have executed his fraudulent bond mispricing scheme without the use and participation of Defendants Laura D. Hild and the Hild entities.

207.    Laura Hild was at all times relevant hereto married to Michael Hild.

208.    During most, if not all, of the time period relevant to this Complaint, Michael Hild and Laura Hild maintained one or more joint bank accounts at Wells Fargo.

209.    Laura Hild personally and substantially benefited from Hild's fraudulent scheme and systematic looting of Live Well.

210.    As set forth in detail on **Exhibit A** to this Complaint and as detailed above, between February 2015 and June 2019, Michael Hild caused Live Well to transfer to him not less than $26,051,622.99 in overcompensation, as well as not less than $1,493,280.64 in other funds Michael Hild misappropriated from Live Well as set forth above.

211.    All or virtually all of the money Michael Hild looted from Live Well in the form of overcompensation between 2015 and June 2019 was deposited into the Hild's joint account at Wells Fargo.

212.    Upon information and belief, Laura Hild was aware that her husband, Michael Hild, was being grossly overcompensated by Live Well and that such funds were being transferred into the couple's joint account.

213.    Indeed, Laura Hild exercised dominion and control over all or substantially all of the funds fraudulently transferred by Live Well to Michael Hild and Laura Hild diverted those funds to entities, businesses and properties titled in her name or to her own individual bank account, helping to hide the proceeds of Hild's fraud from his creditors.

214.    More than ***$4,200,000*** in proceeds of the fraud ended up in ***Laura Hild's personal bank account at Bank of America***.   In one series of transactions in early 2017, Michael Hild caused Live Well to transfer $1,903,118.93 to the Hilds' joint account at Wells Fargo.  About two weeks later, the Hilds transferred $1,900,000 to Church Hill Ventures (for no consideration).  Just days later, on February 8, 2017, Laura Hild caused Church Hill Ventures to transfer that same $1,900,000 to Laura Hild's individual account Bank of America.  And in November 2018, Michael Hild or Laura Hild caused Church Hill Ventures to transfer an additional $2,300,000 in proceeds of the fraud that had been accumulating in Church Hill Ventures to Laura Hild's personal bank account (again, for no consideration).

      **i.**      **Michael Hild and Laura Hild Use the Hild Entities and the Subject Real Properties to Stash the Ill-Gotten Proceeds.**

215.    Virtually all of the money Michael Hild looted from Live Well in the form of overcompensation flowed through the Hild entities, which included Church Hill Ventures, an intermediary through which funds were passed from the Hilds to the other Hild entities, and the remaining Hild entities which were primarily the operating entities for business.

216.    Essentially, the Hild entities functioned like a giant laundry machine.  Michael Hild and Laura Hild would transfer the proceeds of the fraud from their joint bank account to one of the Hild entities.  Those funds would wash from entity to entity in the form of "rent payments" or "capital contributions."  Ultimately, the funds either ended up being invested in real properties located in Richmond, Virginia, or in Laura Hild's personal bank account.

217.    Between February 2015 and August 2019, Michael Hild and/or Laura Hild transferred from their joint account at Wells Fargo account not less $19,982,300 to the Hild entities, including without limitation the following amounts to the following Hild entities:

      a.    $16,967,000 to Church Hill Ventures;

      b.    $443,500 to Anderson's Neck;

      c.    $437,500 to Butterbean;

      d.    $15,000 to Climax Beverage Co.;

      e.    $565,000 to Dogtown Brewing;

      f.    $1,000,500 to Gardenia;

      g.    $292,500 to Hot Diggity Donuts;

      h.    $175,000 to Kingfisher;

      i.    $76,300 to Manastoh Brewing, and

      j.    $10,000 to Urban Bleat Cheese Co.

218.    The specific date, amount, and other details of each individual transfer from Michael and Laura Hild's personal bank account to these entities that comprise the respective aggregate amounts are set forth in **Exhibit B** to this Complaint.

219.    In addition to the foregoing, between November 2017 and August 2019, Michael Hild and Laura Hild caused Defendant Church Hill Ventures to transfer at least $3,066,859.54  to certain other Hild entities, including not less than the following amounts to the following Hild entities:

      a.    $32,350 to Anderson's Neck;

      b.    $283,523.54 to Butterbean;

      c.    $612,374 to Dogtown Brewing;

      d.      $1,117,928 to Gardenia;

      e.      $168,985 to Hot Diggity Donuts; and

      f.      $851,700 to Kingfisher.

220.    The specific date, amount, and other details of each individual transfer from Defendant Church Hill Ventures to these entities that comprise the respective aggregate amounts are set forth in **Exhibit C** to this Complaint.

221.    None of the above transfers was supported by valuable or sufficient consideration. Live Well received nothing whatsoever in exchange for such transfers.

222.    Nor were the above transfers made in good faith. Rather, the transfers were deliberately made in an attempt to place the proceeds of Michael Hild's fraud out of the reach of the victims of that fraud (Live Well's creditors) and also to make it appear as if the Hilds' money came from legitimate sources.

223.    Each of the Hild entities has been wholly-owned and formally managed by Laura Hild during the period that the fraud was ongoing.

224.    In reality, prior to December 2017, Michael Hild was the manager of the Hild entities, including Church Hill Ventures, Anderson's Neck, Butterbean, Dogtown Brewing, Hot Diggity Donuts, and Manastoh Brewing. Michael Hild only disclaimed his official role with respect to those entities in December 2017 and declined to take any official role with the Hild entities registered after December 2017 because, upon information and belief, Michael and Laura Hild were aware that the SEC was investigating Michael Hild and Live Well.

225.    Of course, Michael Hild disclaimed his official role with respect to the Hild entities in December 2017 in name only. Upon information and belief, Michael Hild continued to exercise control (along with Laura Hild) over these entities. And Michael Hild publicly held himself out

to be the owner and/or manager of the Hild entities.  For example, through a website called "The Dogtown Dish," Michael Hild has promoted the businesses and properties of various Hild entities, and he has publicly held himself out to be the owner or controller of the Hild entities, including Dogtown Brewing and Hot Diggity Donuts.

226.    Michael Hild also directed certain Live Well employees to perform substantial work for the benefit of the Hild entities at Live Well's sole cost.  For example, Michael Hild directed members of Live Well's accounting staff and other employees to do work for the Hild entities on company time using company resources.  One Live Well accounting employee, who was compensated by Live Well, spent approximately 75% of his work hours on work for the Hild entities on matters that were unrelated Live Well.  Live Well accounting staff possessed the login information to and maintained the QuickBooks accounting records for a number of the Hild entities.  Upon information and belief, most if not all of the Hild entities had no "back office" and minimal if any staff, other than Live Well employees who were required by Hild to do work for his personal businesses.

227.    Michael Hild personally guaranteed the obligations of certain of the Hild entities. For example, in or about 2016 through 2018, Church Hill Ventures entered into at least seven loan transactions with Virginia Credit Union and Michael Hild guaranteed those debts.  And in May 2019, when Hild caused Live Well to cease business operations, that triggered a default under Church Hill Ventures' loans with Virginia Credit Union.

228.    The distinction between the Hilds and the Hild entities was purely a fiction— designed to hide the proceeds of Michael Hild's fraud and to place such funds outside the reach of Live Well and Michael Hild's creditors, of which Live Well is by far the largest.

229.     Nearly every dollar that capitalized the Hild entities and that they received can be directly traced to the initial fraudulent transfers that Michael Hild caused Live Well to make into the joint account he and Laura Hild had at Wells Fargo.  And those initial fraudulent transfers and the subsequent fraudulent transfers to the individual Hild entities were made with the actual intent to hinder, delay, or defraud Live Well's creditors.

230.     Many of the Hild entities conducted no business of their own.  They were merely receptacles or conduits for proceeds of Michael Hild's fraud.

231.     Three of the Hild entities, Church Hill Ventures, Gardenia and Kingfisher, appear to have existed solely for the purpose of funneling the proceeds of Michael Hild's fraud into numerous real properties located in Richmond, Virginia, into other Hild entities and, in the case of Church Hill Ventures, into Laura Hild's personal bank account.

232.     While it appears that a handful of the Hild entities, namely Anderson's Neck, Butterbean, Dogtown Brewing, and Hot Diggity Donuts, did conduct some independent business, each of these entities appears to have been substantially undercapitalized and unable to continue operating its business but for the substantial transfers of proceeds of the fraud from the Hilds.

233.     Unsurprisingly, the Hilds frequently failed to respect the separate existences of the Hild entities.

234.     Upon information and belief, certain of the Hild entities—Gardenia, Kingfisher, Manastoh Brewing, Aragon Coffee Co., Peter Stumpf Brewing Company, Pin Money Pickles, Rosenegk Brewing, and Valentine's Meat-Juice—did not even have operating agreements.

235.     Laura Hild or Michael Hild was the registered agent of each Hild entity.

236.     The majority of the Hild entities had no physical address and, instead, listed as their principal place of business as a P.O. box that is located at a post office in Richmond, Virginia.

237.   As already noted, Michael Hild directed employees at Live Well to perform substantial work for the Hild entities at Live Well's expense.

238.   Moreover, as reflected above, the Hilds routinely commingled business and personal funds and moved cash around the various bank accounts of the Hilds and their Hild entities.   For example, the Hilds used more than $1 million in funds from their personal bank accounts to pay business debts of the Hild entities.   These included, without limitation:   (i) a $475,000 transfer from Laura Hild's personal account at Bank of America in January 2019, and (ii) a $530,770.54 transfer from the Hilds' joint account at Wells Fargo, each to satisfy a business loan owed by Church Hill Ventures to Virginia Credit Union.   Such transfers from the Hilds' personal accounts were necessitated by the fact that, in late-November 2018, substantially all of the funds in Church Hill Ventures account ($2,300,000), which funds were the proceeds of Michael Hild's fraud and are traceable from Live Well's operating account, were transferred to Laura Hild's personal account at Bank of America.

239.   Further, as detailed above, the Hilds caused Church Hill Ventures to transfer more than $3 million to certain other Hild entities.   While certain of these transfers were nominally disguised as capital contributions, many of the transfers between the Hild entities have no apparent legitimate business purpose.

240.   In addition, upon information and belief, in or about October 2015, Hild caused Anderson's Neck to transfer its property in Shacklefords, Virginia to Church Hill Ventures for no consideration and thereafter caused Anderson's Neck to make "rent" payments to Church Hill Ventures.

ii.     **The Hilds Hid Millions of Dollars of Ill-Gotten Proceeds in Richmond, Virginia Real Estate.**

241.     Among the transfers described above, Michael Hild and Laura Hild funneled at least $7,500,000 that Hild fraudulently obtained from Live Well through three of the Hild entities, Church Hill Ventures, Gardenia, and Kingfisher, to acquire a number of real properties located in or around the Manchester neighborhood of Richmond, Virginia.

242.     As just one example, on February 18, 2016, Live Well made a $776,997.39 transfer to the Hilds' joint bank account at Wells Fargo.   Upon information and belief, that transfer represented a portion of Hild's 2015 bonus.   That same day, the sum of $775,000 was transferred from the Hilds' joint account to Church Hill Ventures' account at Virginia Credit Union.   Over the next month, Church Hill Ventures used approximately $748,000 of those funds to purchase several properties located in Richmond, Virginia (1209 Hull Street, 12 W. 12th Street, 16 W. 12th Street, and 1213 Hull Street).

243.     Similarly, Michael Hild caused Live Well to make a $272,055.47 guaranty fee payment to him on December 1, 2016.   On December 8, 2016, Hild transferred $250,000 to Church Hill Ventures.   On December 19, 2016, Church Hill Ventures (using these and other proceeds of the fraud) cut a $289,955.64 check to "cash" and on December 21, 2016 Church Hill Ventures acquired the properties located at 12 West 10th Street and 1001 and 1009 Hull Street for $242,000.

244.     This pattern accelerated throughout 2017 and 2018, with Hild causing Live Well to make monthly guaranty fee payments of nearly $250,000 each and, the next day or a few days after Live Well made that transfer, Hild would transfer a comparable amount to Church Hill Ventures.   Church Hill Ventures then used the proceeds of the fraud, funneled through the Hilds' joint account, to go on a spending spree buying up dozens of real properties in Richmond, Virginia.

245.     The Hilds followed a similar pattern with Kingfisher and Gardenia, the other two Hild real estate holding entities.  For example, on September 28, 2018, Michael Hild or Laura Hild caused Church Hill Ventures to transfer $260,000 in proceeds of the fraud to Gardenia. The next day, Gardenia transferred $288,335.99 to Cantor's title company and on October 1, 2018, Gardenia acquired the real property located at 1228 Hull Street, Richmond, Virginia for $285,000.

246.     Similarly, on November 2, 2018, Michael Hild caused Live Well to transfer a total of $569,119.09 to him in guaranty fee payments.  On November 4, 2017, Laura Hild transferred $565,000 to Church Hill Ventures.  On November 5, 2017, Michael Hild or Laura Hild caused Church Hill Ventures to transfer $600,000 to Kingfisher.  That same day, Kingfisher transferred $591,767.76 to Cantor's title company and, on November 9, 2018, Kingfisher acquired a number of real properties identified as 6, 18, 20 W. 19th Street; 9, 13, 17, 19, 21 W. 20th Street; 1917 Hull Street; 12 W. 19th Street; 1900 Bainbridge Street; 22 W. 19th Street; and 1906 Bainbridge Street, all located in Richmond, Virginia.

247.     Through the above described transfers and in numerous other transactions, Michael Hild and Laura Hild used the Hild entities' real properties and businesses to stash the ill-gotten proceeds of Michael Hild's crimes and fraud.

248.     Between September 2015 and November 2018, Church Hill Ventures purchased numerous real properties located in Richmond, Virginia with proceeds traceable to the excessive compensation taken by Hild from Live Well and funneled through Church Hill Ventures, including without limitation the following (collectively, the "Church Hill Ventures Properties"):

    a.     1122 Bainbridge Street;
    b.     1200 Hull Street;
    c.     1202 Hull Street;
    d.     1204 Hull Street;
    e.     1206 Hull Street;
    f.     1129 Hull Street;

g.      1124 Bainbridge Street;
h.      1209 Hull Street;
i.      12 W. 12th Street;
j.      16 W. 12th Street;
k.      1213 Hull Street;
l.      1128 Hull Street;
m.      12 W. 10th Street;
n.      1001 Hull Street;
o.      1009 Hull Street;
p.      1219 Decatur Street;
q.      1704 Boston Ave.;
r.      1803 Boston Ave.;
s.      1903 Boston Ave.;
t.      1214 Decatur Street;
u.      1804 Stockton Street;
v.      1806 Stockton Street;
w.      2010 Maury Street;
x.      2005 Hull Street;
y.      2000 Bainbridge Street;
z.      1603 Hull Street;
aa.      1605 Hull Street;
bb.      2100 Chicago Ave.;
cc.      1806 Everett Street;
dd.      1703 Maury Street;
ee.      1715 Maury Street;
ff.      1717 Maury Street;
gg.      1427 Hull Street;
hh.      1812 Hull Street;
ii.      1814 Hull Street;
jj.      7 East 19th Street;
kk.      1201 Decatur Street;
ll.      223 East 15th Street;
mm.      2100 Edwards Ave.; and
nn.      2106 Edwards Ave.

249.    Between August 2018 and November 2018, Gardenia purchased numerous real properties located in Richmond, Virginia with proceeds traceable to the excessive compensation taken by Hild from Live Well and funneled through Gardenia including, without limitation, the following (collectively, the "Gardenia Properties"):

a.      1518 Hull Street;
b.      1228 Hull Street;
c.      1901 Hull Street;

      d.      1920 Bainbridge Street;
      e.      1922 Bainbridge Street; and
      f.      1910 Hull Street.

250.    Also between August 2018 and November 2018, Kingfisher purchased numerous real properties located in Richmond, Virginia with proceeds traceable to the excessive compensation taken by Hild from Live Well and funneled through Kingfisher, including without limitation the following (collectively with the Church Hill Ventures Properties and the Gardenia Properties, the "Subject Real Properties"):

      a.      6 E. 16th Street;
      b.      8 E. 16th Street;
      c.      10 E. 16th Street;
      d.      12 E. 16th Street;
      e.      16 W. 19th Street;
      f.      18 W. 19th Street;
      g.      20 W. 19th Street;
      h.      9 W. 20th Street;
      i.      13 W. 20th Street;
      j.      17 W. 20th Street;
      k.      19 W. 20th Street;
      l.      21 W. 20th Street;
      m.      1917 Hull Street;
      n.      12 W. 19th Street;
      o.      1900 Bainbridge Street;
      p.      22 W. 19th Street; and
      q.      1906 Bainbridge Street.

251.    Michael Hild and Laura Hild not only used the fruits of the fraud to pay the purchase price for the Subject Real Properties, they also spent millions of dollars on building or renovating Hild's vanity project in Richmond, Virginia.   For example, at least $11,909,321 in funds fraudulently obtained from Live Well were used by the Hilds and the Hild entities to pay contractors, architects, designers and other professional firms and to purchase equipment installed at the Subject Real Properties.   Further, the Hilds used at least $3,164,333 in funds fraudulently obtained from Live Well were to pay construction loans used by the Hilds to build, renovate, or

upgrade the Subject Real Properties.  In sum, at least *$22.5 million* that Michael Hild fraudulently obtained from Live Well is directly traceable to the Subject Real Properties.

252.    The Hilds leveraged the Subject Real Properties to perpetuate the fraud and to benefit themselves, Hild's coconspirators, and others within the Hild orbit.

253.    For example, at least $6,645,281.45 in funds that Hild stole from Live Well were transferred to Title Works of Virginia, Inc., an entity owned or controlled by Cantor, in connection with the Hilds' acquisition of the Subject Real Properties.

254.    And after the Filing Date and after the New York District Court had entered a restraining order with respect to many of the Subject Real Properties, in or about March 2020 the Hilds granted a $1,436,000 deed of trust mortgage lien to Michael Hild's criminal attorney, thereby clouding title to assets that rightly should be available for the creditor-victims of Hild's crimes and fraud.

255.    During the course of this adversary proceeding, the Trustee may learn (through discovery or otherwise) of additional property acquired by Michael Hild, Laura Hild, or the Hild entities with money wrongfully diverted from Live Well.  It is the Trustee's intention through this adversary proceeding to recover from Defendants all real and personal property wrongfully taken from Live Well and its creditors.

256.    Laura Hild and each of the Hild entities were instruments and alter egos of Michael Hild, used by him to perpetrate and perpetuate his fraudulent scheme and his systematic looting of Live Well.

257.    As alter egos and mere instrumentalities of Michael Hild, Laura Hild and each of the Hild entities is liable to the Trustee for the more than $18 million Michael Hild stole from Live Well as well as the other damages caused to Live Well by Hild's wrongful conduct.

258.   Laura Hild and each of the Hild entities is liable for the damages caused by Michael Hild because they participated in or were used by Hild in furtherance of his fraudulent scheme.

## FIRST CAUSE OF ACTION
### (Avoidance of Actual Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1)(A) Against All Defendants)

259.   The Trustee incorporates each and every allegation contained in paragraphs 1 through 258 as though they were fully set forth herein.

260.   As set forth in detail above, within the two years prior to the Filing Date, that is June 10, 2017 to June 10, 2019, Michael Hild caused Live Well to transfer to him not less than $15,920,527.19—comprising $12,127,202.35 in "guaranty" fees, $300,825 in "director fees," and at least $3,492,499.84 in excessive and unjustified salary, bonuses and other compensation—to a joint bank account owned by Michael Hild and Laura Hild.  The specific date, amount, and other details of each individual transfer comprising the above aggregate amounts are set forth in **Exhibit A** attached hereto.

261.   During that same two-year time period, Michael Hild and Laura Hild transferred millions of dollars in fruits of the fraud to certain Hild entities, including not less than the following:

a.   $9,524,000 to Church Hill Ventures, of which not less than $2,300,000 was transferred by Church Hill Ventures to Laura Hild;

b.   $208,500 to Anderson's Neck;

c.   $412,500 to Butterbean;

d.   $15,000 to Climax Beverage Co.;

e.   $540,000 to Dogtown Brewing;

f.   $1,000,500 to Gardenia;

g.   $272,500 to Hot Diggity Donuts;

      h.      $175,000 to Kingfisher; and

      i.      $10,000 to Urban Bleat Cheese Co.

The specific date, amount, and other details of each individual transfer from Michael Hild and

Laura Hild's personal bank account(s) to these entities that comprise the respective aggregate

amounts are set forth in **Exhibit B** attached hereto.

262.    Also during that same two-year time period, Michael Hild and Laura Hild caused

Church Hill Ventures to make transfers to certain other Hild entities, including not less than:

      a.      $11,350 to Defendant Anderson's Neck;

      b.      $198,023.54 to Butterbean;

      c.      $363,354 to Dogtown Brewing;

      d.      $1,070,928 to Gardenia,

      e.      $137,484 to Hot Diggity Donuts; and

      f.      $851,700 to Kingfisher.

The specific date, amount, and other details of each individual transfer from Church Hill Ventures

to these entities that comprise the respective aggregate amounts are set forth in **Exhibit C** attached

hereto.

263.    With respect to Defendant Eric Rohr, as set forth above, within the two years prior

to the Filing Date, Rohr received more than $1,255,701.85 in overcompensation and unjustified

bonuses as a result of his participation in the fraudulent bond mispricing scheme during the period

from and after June 10, 2017.  The specific date, amount, and other details of each individual

transfer from Live Well to Rohr are set forth in **Exhibit D** attached hereto.

264.    With respect to Defendant Darren Stumberger, as set forth above, within the two

years prior to the Filing Date, Stumberger received more than $1,543,050.39 in overcompensation

as a result of his participation in the fraudulent bond mispricing scheme during the period from

and after June 10, 2017. The specific date, amount, and other details of each individual transfer from Live Well to Stumberger is set forth in **Exhibit E** attached hereto.

265.    In addition to the foregoing, during that same two-year time period, Hild caused Live Well to pay a total of (i) at least $1,193,280.64 to law firms that represented Hild and/or Laura Hild and the Hild entities, (ii) at least $274,498.17 to a law firm that represented Rohr, and (iii) at least $1,356,280.95 to a law firm that represented Stumberger, even though none of them had given an undertaking or otherwise was entitled to have such legal fees paid. Such transfers are set forth on **Exhibit F** to this Complaint. Hild also repeatedly used Live Well's funds, employees, and resources for the Hilds' personal businesses, for the benefit of Michael Hild, Laura Hild, and each of the Hild entities.

266.    All of the above transfers derived from one of Live Well's bank accounts and Live Well had an interest in the property transferred.

267.    As explained in detail above, all of the above transfers were made, and received, with the actual intent to hinder, delay, or defraud Live Well, its creditors, and Michael Hild's creditors, the largest of which is the Live Well estate. And because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the inevitability that Live Well would and did become unable to repay its repo lenders, such transfers are also presumed to have been made with actual with intent to hinder, delay, or defraud creditors.

268.    None of the transferors of the above transfers received anything of value in exchange for such transfers.

269.    None of the transferees took for value or in good faith.

270.    During the two-year prepetition period from June 10, 2017 through June 10, 2019, the three Criminal Defendants collectively received at least ***$21,543,329.19*** in unjustified bonuses,

fraudulent guaranty fee and director fee payments, misappropriated funds, and other excessive compensation and unlawful payments, all of which were outside of the ordinary course for Live Well itself and in respect of companies like it and were the direct proceeds and fruits of their fraud.

271.    The initial transfers from Live Well to Michael Hild and, therefore, to Laura Hild were naked fraud.  Principals of closely held or private corporations guarantee their companies' obligations to lenders and similar obligors because of their confidence in the value of their equity and because the guaranteed leverage enhances the value of their companies and their equity; they do not charge those companies fees for building their own wealth.  These payments were extraordinary, irregular, and fraudulent as to Live Well and its creditors and other innocent stakeholders.

272.    As for the transfers from Michael Hild and Laura Hild to the Hild entities and to Laura Hild individually, Live Well received ***nothing*** in return for the transfers.  These transfers were simply a means of diverting and hiding the proceeds of the fraud from Live Well, its creditors, and Michael Hild's creditors, the largest of which is the Live Well estate.

273.    Among other things, as detailed above, by April 2015 the Criminal Defendants' fraudulent bond mispricing scheme had caused Live Well to borrow from the repo lenders more than the market value of the bonds underlying the repo agreements and Live Well did not have other sufficient sources of liquidity to repay the full amounts owed to the repo lenders.  As a direct result of the Criminal Defendants' fraudulent bond pricing scheme, Live Well was balance sheet insolvent by no later than June 2016, as the fair value of its liabilities far exceeded the fair value of its assets.   And because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the Criminal Defendants' ever-growing dependence on new bond repo

lenders to repay old lenders, Live Well is also presumed to have been insolvent from the very inception of the Criminal Defendants' fraudulent scheme beginning in 2015.

274.    As a result of the overvaluation of the bond portfolio, Live Well owed more than $100 million more than the underlying bonds were worth and Live Well had no financial ability to repay such debts as they matured.  As detailed above, the Defendants received millions of dollars as a result of the fraud.

275.    By reason of the foregoing, the above transfers (and as set forth in detail in the exhibits to this Complaint) constitute actual fraudulent transfers which should be avoided pursuant to Bankruptcy Code section 548.

### SECOND CAUSE OF ACTION
**(Avoidance of Actual Fraudulent Transfers Pursuant to 11 U.S.C. § 544 and Applicable State Law, including without limitation 6 Del. Code § 1301, *et seq*., N.Y. D.C.L. § 270, *et seq.*, and Va. Code Ann. §§ 55-80; 55.1-400, *et seq*. Against All Defendants)**

276.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 275 as though they were fully set forth herein.

277.    As set forth in detail above, during the course of and as a direct result of the fraud, between 2015 and 2019, Michael Hild caused Live Well to transfer to him a total of not less than $26,051,622.99—comprising $15,563,644.52 in "guaranty" fees, $1,346,000 in "director fees," and at least $9,141,978.47 in excessive and unjustified salary, bonuses and other compensation— to a joint bank account owned by Michael Hild and Laura Hild.  The specific date, amount, and other details of each individual transfer comprising the above aggregate amounts are set forth in **Exhibit A** attached hereto.

278.    During that same time period, Michael Hild and Laura Hild transferred at least $19,982,300.00 in fruits of the fraud from their Wells Fargo account to certain Hild entities, including not less than:

a.    $16,967,000 to Church Hill Ventures of which not less than $4,200,000 was transferred by Church Hill Ventures to Laura Hild;

b.    $443,500 to Anderson's Neck;

c.    $437,500 to Butterbean;

d.    $15,000 to Climax Beverage Co.;

e.    $565,000 to Dogtown Brewing;

f.    $1,000,500 to Gardenia;

g.    $292,500 to Hot Diggity Donuts;

h.    $175,000 to Kingfisher;

i.    $76,300 to Manastoh Brewing; and

j.    $10,000 to Urban Bleat Cheese Co.

The specific date, amount, and other details of each individual transfer from Michael Hild and Laura Hild's personal bank account(s) to these entities that comprise the respective aggregate amounts are set forth in **Exhibit B** attached hereto.

279.    Also during that same time period, Michael Hild and Laura Hild caused Church Hill Ventures to transfer not less than $3,066,859.54 to certain other Hild entities, including not less than:

a.    $32,350 to Anderson's Neck;

b.    $283,523.54 to Butterbean;

c.    $612,374 to Dogtown Brewing;

d.    $1,117,928 to Gardenia;

e.    $168,985 to Hot Diggity Donuts; and

f.    $851,700 to Kingfisher.

The specific date, amount, and other details of each individual transfer from Church Hill Ventures to these entities that comprise the respective aggregate amounts are set forth in **Exhibit C** attached hereto.

280.    With respect to Defendant Eric Rohr, as set forth above, during that same time period, Rohr received at least $2,917,160.18 in overcompensation as a result of his participation in the fraudulent bond mispricing scheme including, without limitation:  (i) a $600,000 unjustified bonus for 2015; (ii) a $1,000,000 unjustified bonus for 2016; (iii) a $642,500.00 unjustified bonus for 2017; and (iv) at least $674,660.18 in excessive salary during the period between January 2017 and December 2018.  The specific date, amount, and other details of each individual transfer from Live Well to Rohr is set forth in **Exhibit D** attached hereto.

281.    With respect to Defendant Darren Stumberger, as set forth above, during that same time period, Stumberger received more than $4,187,820.91 in overcompensation as a result of his participation in the fraudulent bond mispricing scheme including, without limitation:  (i) $678,711 in unjustified bonus payments for 2015; (ii) $1,559,502 in unjustified bonus payments for 2017; (iii) $1,017,520 in unjustified bonus payments for 2017; and (iv) $932,088 in unjustified bonus payments for 2018.  The specific date, amount, and other details of each individual transfer from Live Well to Stumberger is set forth in **Exhibit E** attached hereto.

282.    In addition to the foregoing, during that same period, Hild caused Live Well to pay a total of (i) at least $1,493,280.64 to law firms that represented Hild and/or Laura Hild and the Hild entities, (ii) at least $274,498.17 to a law firm that represented Rohr, and (iii) at least $1,356,280.95 to a law firm that represented Stumberger, even though none of them had given an undertaking or otherwise was entitled to have such legal fees paid.  Such transfers are set forth on **Exhibit F** to this Complaint.  Hild also repeatedly used Live Well's funds, employees, and

resources for the Hilds' personal businesses, for the benefit of Michael Hild, Laura Hild, and each of the Hild entities.

283.    All of the above transfers derived from one of Live Well's bank accounts and Live Well had an interest in the property transferred.

284.    As explained in detail above, all of the above transfers were made, and received, with the actual intent to hinder, delay, or defraud Live Well, its creditors, and Michael Hild's creditors, the largest of which is the Live Well estate.  The primary purpose of these transfers, indeed the only conceivable reason for the unjustifiable compensation and other transfers, could be to delay, hinder and defraud Live Well's creditors.

285.    Because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the Criminal Defendants' ever-growing dependence on new repo lenders to repay old lenders and the inevitability that Live Well would and did become unable to repay its repo lenders, such transfers are also presumed to have been made with actual intent to hinder, delay, or defraud creditors and Live Well is presumed to have been insolvent from the very inception of the Criminal Defendants' fraudulent scheme beginning in 2015.

286.    These transfers were not made for valuable consideration as Live Well received nothing in return for the transfers.

287.    In addition, because the Criminal Defendants were well aware of the bond mispricing fraud and its impact on Live Well's financial condition, each of the Criminal Defendants has notice of the fraudulent intent in making the transfers.  Further, each of the other Defendants had notice of the fraudulent intent of her or its immediate grantor or of the fraud rendering void the title of such grantor because, among other things, such Defendants received substantial transfers for which they gave no consideration.

288.     During the period that the fraud was occurring from February 2015 through June 2019, the Criminal Defendants collectively received at least *$36,280,663.84* in unjustified bonuses, fraudulent guaranty fee and director fee payments, misappropriated funds, and other excessive compensation and payments, all of which were outside of the ordinary course for Live Well itself and in respect of companies like it and were the direct proceeds and fruits of their fraud.

289.     Before and after the date of each transfer challenged in this Complaint and as of the Filing Date, Live Well had at least one unsecured creditor holding an allowable claim that could have challenged such transfers.

290.     Pursuant to applicable law, each and every transfer made by Live Well to the Criminal Defendants and their alter egos is void.

291.     By reason of the foregoing, the above transfers (and as set forth in detail in the exhibits hereto) constitute actual fraudulent transfers which should be avoided, unwound and recovered and returned to Live Well's estate pursuant to Bankruptcy Code section 544 and applicable state law.

### THIRD CAUSE OF ACTION
**(Avoidance of Constructive Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1)(B)
<u>Against All Defendants</u>)**

292.     The Trustee incorporates each and every allegation contained in paragraphs 1 through 291 as though they were fully set forth herein.

293.     As set forth in detail above, within the two years prior to the Filing Date, that is June 10, 2017 to June 10, 2019, Michael Hild caused Live Well to transfer to him not less than $15,920,527.19—comprising $12,127,202.35 in "guaranty" fees, $300,825 in "director fees," and at least $3,492,499.84 in excessive and unjustified salary, bonuses and other compensation—to a joint bank account owned by Michael Hild and Laura Hild.  The specific date, amount, and other

details of each individual transfer comprising the above aggregate amounts are set forth in **Exhibit A** attached hereto.

294.    During that same two-year time period, Michael Hild and Laura Hild transferred millions of dollars in fruits of the fraud to certain Hild entities, including not less than the following:

a.    $9,524,000 to Church Hill Ventures, of which not less than $2,300,000 was transferred by Church Hill Ventures to Laura Hild;

b.    $208,500 to Anderson's Neck;

c.    $412,500 to Butterbean;

d.    $15,000 to Climax Beverage Co.;

e.    $540,000 to Dogtown Brewing;

f.    $1,000,500 to Gardenia;

g.    $272,500 to Hot Diggity Donuts;

h.    $175,000 to Kingfisher; and

i.    $10,000 to Urban Bleat Cheese Co.

The specific date, amount, and other details of each individual transfer from Michael Hild and Laura Hild's personal bank account(s) to these entities that comprise the respective aggregate amounts are set forth in **Exhibit B** attached hereto.

295.    Also during that same two-year time period, Michael Hild and Laura Hild caused Church Hill Ventures to make transfers to certain other Hild entities, including not less than:

a.    $11,350 to Defendant Anderson's Neck;

b.    $198,023.54 to Butterbean;

c.    $363,354 to Dogtown Brewing;

d.    $1,070,928 to Gardenia,

e.    $137,484 to Hot Diggity Donuts; and

      f.     $851,700 to Kingfisher.

The specific date, amount, and other details of each individual transfer from Church Hill Ventures to these entities that comprise the respective aggregate amounts are set forth in **Exhibit C** attached hereto.

296.    With respect to Defendant Eric Rohr, as set forth above, within the two years prior to the Filing Date, Rohr received not less than $1,255,701.85 in overcompensation and unjustified bonuses as a result of his participation in the fraudulent bond mispricing scheme during the period from and after June 10, 2017.  The specific date, amount, and other details of each individual transfer from Live Well to Rohr is set forth in **Exhibit D** attached hereto.

297.    With respect to Defendant Darren Stumberger, as set forth above, within the two years prior to the Filing Date, Stumberger received not less than $1,543,040.39 in overcompensation as a result of his participation in the fraudulent bond mispricing scheme during the period from and after June 10, 2017.  The specific date, amount, and other details of each individual transfer from Live Well to Stumberger is set forth in **Exhibit E** attached hereto.

298.    In addition to the foregoing, during that same two-year time period, Hild caused Live Well to pay a total of (i) at least $1,193,280.64 to law firms that represented Hild and/or Laura Hild and the Hild entities, (ii) at least $274,498.17 to a law firm that represented Rohr, and (iii) at least $1,356,280.95 to a law firm that represented Stumberger, even though none of them had given an undertaking or otherwise was entitled to have such legal fees paid.  Such transfers are set forth on **Exhibit F** to this Complaint.  Hild also repeatedly used Live Well's funds, employees, and resources for the Hilds' personal businesses, for the benefit of Michael Hild, Laura Hild, and each of the Hild entities.

299.    All of the above transfers derived from one of Live Well's bank accounts and Live Well had an interest in the property transferred.

300.     As explained in detail above, Live Well received no reasonably equivalent value on account of any of the foregoing transfers.

301.     In particular, the nearly $16 million in overcompensation, guaranty fee payments, and director fee payments that Michael Hild extracted from Live Well during the two year period prior to the Filing Date far exceeded the value of Hild's legitimate services as an officer of Live Well, the compensation granted to Hild by the Board of Live Well prior to Hild engineering the buyout of the preferred stockholders, and the ordinary course market value of the legitimate services.  Live Well received nothing of value in exchange for such transfers.

302.     Similarly, the excessive compensation that Michael Hild caused Live Well to pay to the other Criminal Defendants, Rohr and Stumberger, far exceeded the value of their legitimate services as officers or employees of Live Well as it represented unjustified bonuses or excessive pay increases based upon the fraudulently inflated valuation and performance of the bond portfolio.  Live Well received nothing of value in exchange for such transfers.

303.     Each of the above transfers were made at a time when Live Well was undercapitalized.

304.     Each of the above transfers was made at a time when Live Well was insolvent or such transfers rendered Live Well insolvent.  Because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the Criminal Defendants' ever-growing dependence on new bond repo lenders to repay old lenders, Live Well is also presumed to have been insolvent from the very inception of the Criminal Defendants' fraudulent scheme beginning in 2015.

305.     Each of the above transfers was made at a time when Live Well intended to incur or believed it would incur debts beyond its ability to repay as such debts matured.

306.    Among other things, as detailed above, by April 2015 the Criminal Defendants' fraudulent bond mispricing scheme had caused Live Well to borrow from the repo lenders more than the market value of the bonds underlying the repo agreements and Live Well did not have other sufficient sources of liquidity to repay the full amounts owed to the repo lenders.  As a direct result of the fraudulent bond pricing scheme, Live Well was balance sheet insolvent by no later than June 2016, as the fair value of its liabilities far exceeded the fair value of its assets.  As a result of the overvaluation of the bond portfolio at Hild's direction, Live Well owed more than $100 million more than the underlying bonds were worth and Live Well had no financial ability to repay such debts as they matured.  During the two years prior to the Filing Date, Hild, Rohr, Stumberger, and the other Defendants personally profited by a total of at least $21,543,329.19 as a direct result of the fraud.

307.    Moreover, each above the above transfers was made to or for the benefit of insiders (Michael Hild, Rohr, or Stumberger), or incurred for the benefit of insiders (Michael Hild, Rohr, or Stumberger), under employment contracts and not in the ordinary course of business.  As detailed above, after Michael Hild engineered the preferred stockholder payoff, Hild caused Live Well to grossly overcompensate himself and the other Criminal Defendants, Rohr and Stumberger.  Their overcompensation was not ordinary both because:  (i) it was materially higher than and not ordinary when compared to compensation paid to them by Live Well prior to the fraudulent bond pricing scheme, and (ii) it was materially higher than and not ordinary when compared to the compensation paid by other companies in the industry to officers or employees in similar positions.

308.    None of the transferees took for value or in good faith.

309.    By reason of the foregoing, the above transfers (and as set forth in detail in the exhibits hereto) constitute constructive fraudulent transfers which should be avoided pursuant to Bankruptcy Code section 548.

**FOURTH CAUSE OF ACTION**
**(Avoidance of Constructive Fraudulent Transfers Pursuant to 11 U.S.C. § 544 and Applicable State Law, including without limitation 6 Del. Code § 1301, *et seq*., N.Y. D.C.L. § 270, *et seq.*, and Va. Code Ann. §§ 55-81; 55.1-401, *et seq.***
**Against All Defendants)**

310.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 309 as though they were fully set forth herein.

311.    As set forth in detail above, during the course of and as a direct result of the fraud, between 2015 and 2019, Michael Hild caused Live Well to transfer to him not less than $26,051,622.99—comprising $15,563,644.52 in "guaranty" fees, $1,346,000 in "director fees," and at least $9,141,978.47 in excessive and unjustified salary, bonuses and other compensation— to a joint bank account owned by Michael Hild and Laura Hild.  The specific date, amount, and other details of each individual transfer comprising the above aggregate amounts is set forth in **Exhibit A** attached hereto.

312.    During that same time period, Michael Hild and Laura Hild transferred at least $19,982,300 in fruits of the fraud from their Wells Fargo account to certain Hild entities, including not less than:

    a.    $16,967,000 to Church Hill Ventures of which not less than $4,200,000 was transferred by Church Hill Ventures to Laura Hild;

    b.    $443,500 to Anderson's Neck;

    c.    $437,500 to Butterbean;

    d.    $15,000 to Climax Beverage Co.;

    e.    $565,000 to Dogtown Brewing;

      f.        $1,000,500 to Gardenia;

      g.       $292,500 to Hot Diggity Donuts;

      h.       $175,000 to Kingfisher;

      i.        $76,300 to Manastoh Brewing; and

      j.        $10,000 to Urban Bleat Cheese Co.

The specific date, amount, and other details of each individual transfer from Michael Hild and Laura Hild's personal bank account(s) to these entities that comprise the respective aggregate amounts is set forth in **Exhibit B** attached hereto.

313.     Also during that same time period, Michael Hild and Laura Hild caused Church Hill Ventures to make transfers to certain other Hild entities, including not less than:

      a.       $32,350 to Anderson's Neck;

      b.       $283,523.54 to Butterbean;

      c.       $612,374 to Dogtown Brewing;

      d.       $1,117,928 to Gardenia;

      e.       $168,985 to Hot Diggity Donuts; and

      f.        $851,700 to Kingfisher.

The specific date, amount, and other details of each individual transfer from Church Hill Ventures to these entities that comprise the respective aggregate amounts are set forth in **Exhibit C** attached hereto.

314.     With respect to Defendant Eric Rohr, as set forth above, during that same time period, Rohr received more than $2,917,160.18 in overcompensation as a result of his participation in the fraudulent bond mispricing scheme including, without limitation:  (i) a $600,000 unjustified bonus for 2015; (ii) a $1,000,000 unjustified bonus for 2016; (iii) a $642,500.00 unjustified bonus for 2017; and (iv) at least $674,660.18 in excessive salary during the period between January 2017

and December 2018.  The specific date, amount, and other details of each individual transfer from Live Well to Rohr is set forth in **Exhibit D** attached hereto.

315.    With respect to Defendant Darren Stumberger, as set forth above, during that same time period, Stumberger received more than $4,187,820.91 in overcompensation as a result of his participation in the fraudulent bond mispricing scheme including, without limitation:  (i) $678,711 in unjustified bonus payments for 2015; (ii) $1,559,502 in unjustified bonus payments for 2017; (iii) $1,017,520 in unjustified bonus payments for 2017; and (iv) $932,088 in unjustified bonus payments for 2018.  The specific date, amount, and other details of each individual transfer from Live Well to Stumberger are set forth in **Exhibit E** attached hereto.

316.    In addition to the foregoing, during that same two-year time period, Hild caused Live Well to pay a total of (i) at least $1,493,280.64 to law firms that represented Hild and/or Laura Hild and the Hild entities, (ii) at least $274,498.17 to a law firm that represented Rohr, and (iii) at least $1,356,280.95 to a law firm that represented Stumberger, even though none of them had given an undertaking or otherwise was entitled to have such legal fees paid.  Such transfers are set forth on **Exhibit F** to this Complaint.  Hild also repeatedly used Live Well's funds, employees, and resources for the Hilds' personal businesses, for the benefit of Michael Hild, Laura Hild, and each of the Hild entities.

317.    All of the above transfers derived from one of Live Well's bank accounts and Live Well had an interest in the property transferred.

318.    As explained in detail above, none of the transferors of the above transfers received reasonably equivalent value in exchange for such transfers.

319.    None of the transferors of the above transfers received fair consideration in exchange for such transfers.

320.    None of the transferors of the above transfers received consideration deemed valuable in law in exchange for such transfers.

321.    Each of the above transfers were made at a time when Live Well was undercapitalized.

322.    Each of the above transfers was made at a time when Live Well had unreasonably small capital.

323.    Each of the above transfers was made at a time when Live Well was insolvent or such transfers rendered Live Well insolvent.  Because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the Criminal Defendants' ever-growing dependence on new bond repo lenders to repay old lenders, Live Well is presumed to have been insolvent from the very inception of the Criminal Defendants' fraudulent scheme beginning in 2015.

324.    Each of the above transfers was made at a time when Live Well had incurred, intended to incur, or believed it would incur debts beyond its ability to repay as such debts matured.

325.    Hild, Rohr, Stumberger, and the other Defendants personally profited by a total of not less than $36,280,663.84 as a direct result of the fraud.

326.    Before and after the date of each transfer challenged in this Complaint and as of the Filing Date, Live Well had at least one unsecured creditor holding an allowable claim that could have challenged such transfers.

327.    Pursuant to applicable law, each and every transfer made by Live Well to the Criminal Defendants and their alter egos is void.

328.    By reason of the foregoing, the above transfers (and as set forth in detail in the exhibits hereto) constitute constructive fraudulent transfers which should be avoided, unwound,

and recovered and returned to Live Well's estate pursuant to Bankruptcy Code section 544 and applicable state law.

### FIFTH CAUSE OF ACTION
**(Claim to Avoid and Recover Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550 Against Michael C. Hild, Laura D. Hild, Church Hill Ventures LLC, Anderson's Neck LLC, The Butterbean LLC, Dogtown Brewing LLC, Gardenia, LLC, Hot Diggity Donuts LLC, Kingfisher LLC, Eric G. Rohr, and C. Darren Stumberger (collectively, the "Preference Recipient Defendants")**

329.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 328 as though they were fully set forth herein.

330.    Within one year period to the Filing Date, that is between June 10, 2018 to June 10, 2019, Michael Hild caused Live Well to transfer to him not less than $7,049,647.15 from Live Well—comprising $5,678,222.15 in "guaranty" fees, $128,925.00 in "director fees, and not less than $1,242,499.92 in excessive and unjustified salary and other compensation—to a joint bank account owned by him and Laura Hild. The specific date, amount, and other details of each individual transfer comprising the above aggregate amounts are set forth in **Exhibit A** attached hereto.

331.    During the same one-year time period, Michael and Laura Hild transferred millions of dollars in fruits of the fraud to certain Hild entities, including not less than the following:

   a.    $4,587,000 to Church Hill Ventures;

   b.    $111,000 to Anderson's Neck;

   c.    $335,000 to Butterbean;

   d.    $525,000 to Dogtown Brewing;

   e.    $400,500 to Gardenia;

   f.    $200,000 to Hot Diggity Donuts; and

   g.    $175,000 to Kingfisher.

The specific date, amount, and other details of each individual transfer from Michael Hild and

Laura Hild's personal bank account(s) to these entities that comprise the respective aggregate

amounts are set forth in **Exhibit B** attached hereto.

332.    Also during that same one-year time period, Michael Hild and Laura Hild caused

Church Hill Ventures to make transfers to certain other Hild entities, including not less than:

      a.      $11,350 to Anderson's Neck;

      b.      $343,114 to Dogtown Brewing;

      c.      $1,070,928 to Gardenia;

      d.      $124,524 to Hot Diggity Donuts; and

      e.      $1,032,007.54 to Kingfisher.

The specific date, amount, and other details of each individual transfer from Church Hill Ventures

to these entities that comprise the respective aggregate amounts are set forth in **Exhibit C** attached

hereto.

333.    With respect to Defendant Eric Rohr, within one year prior to the Filing Date, Rohr

received not less than $255,701.81 in transfers from Live Well.  The specific date, amount, and

other details of each individual transfer from Live Well to Rohr are set forth in **Exhibit D** attached

hereto.

334.    With respect to Defendant Darren Stumberger, within one year prior to the Filing

Date, Stumberger received not less than $876,237.50 in transfers from Live Well.  The specific

date, amount, and other details of each individual transfer from Live Well to Stumberger is set

forth in **Exhibit E** attached hereto.

335.    In addition to the foregoing, during that same one-year prepetition time period,

Hild caused Live Well to pay a total of (i) at least $656,322.55 to law firms that represented Hild

and/or Laura Hild and the Hild entities, (ii) at least $274,498.17 to a law firm that represented

Rohr, and (iii) at least $709,003.04 to a law firm that represented Stumberger.  Such transfers are set forth on **Exhibit F** to this Complaint.  Hild also repeatedly used Live Well's funds, employees, and resources for the Hilds' personal businesses, for the benefit of Michael Hild, Laura Hild, and each of the Hild entities.

336.    Each of the above-described transfers was made from or is directly traceable to funds transferred from one of Live Well's bank accounts and Live Well had an interest in the property transferred.  Accordingly, the transfers constitute an interest of Live Well in property.

337.    Each of the above-described transfers was made on account of an antecedent debt to or for the benefit of Michael Hild, Eric Rohr and Darren Stumberger, each of whom was a creditor of Live Well at the time such transfers were made.

338.    Each of Michael Hild, Eric Rohr and Darren Stumberger is an initial transferee of the preferential transfers received by them within one year prior to the Filing Date.

339.    The remaining Preference Recipient Defendants—specifically, Laura D. Hild, Church Hill Ventures LLC, Anderson's Neck LLC, The Butterbean LLC, Dogtown Brewing LLC, Gardenia, LLC, Hot Diggity Donuts LLC and Kingfisher LLC—is an immediate, mediate, or subsequent transferee from whom such avoidable transfers are recoverable.

340.    As explained above, Live Well was insolvent at the time each of the above-described transfers was made.  As a direct result of the Criminal Defendants' fraudulent bond pricing scheme, Live Well was balance sheet insolvent by no later than June 2016, as the fair value of its liabilities far exceeded the fair value of its assets.  And because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the Criminal Defendants' ever-growing dependence on new bond repo lenders to repay old lenders, Live Well is also presumed to have been insolvent from the very inception of the Criminal Defendants'

fraudulent scheme beginning in 2015. Further, Plaintiff is entitled to the statutory presumption that Live Well was insolvent during the 90 days prior to the Filing Date.

341. The transfers were made within one year prior to the Filing Date.

342. As set forth in detail above, each of the Preference Recipient Defendants is an "insider" of Live Well as that term is defined in 11 U.S.C. § 101(31).

343. The transfers enabled each of the Preference Recipient Defendants to receive more than he, she or it would have received if: (i) Live Well's case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) defendants received payment on account of the debt paid by the transfers to the extent provided by the provisions of the Bankruptcy Code.

344. Based on reasonable due diligence in the circumstances of this Chapter 7 Case and taking into account the Preference Recipient Defendants' known or reasonably knowable affirmative defenses, the Trustee has determined that he may avoid and recover the above-described transfers from the Preference Recipient Defendants as sought in this Complaint.

345. Thus, for the foregoing reasons, the above transfers (and as set forth in detail in the exhibits hereto) constitute preferential transfers which should be avoided as preferential pursuant to Bankruptcy Code section 547 and recoverable by the Trustee from the Preference Recipient Defendants pursuant to Bankruptcy Code section 550.

**SIXTH CAUSE OF ACTION**
**(Avoidance of Guaranty Fee Agreement as Actually Fraudulent**
**Pursuant to 11 U.S.C. § 544 and Applicable State Law, including without limitation**
**6 Del. Code § 1301, _et seq._, N.Y. D.C.L. § 270, _et seq._, and**
**Va. Code Ann. §§ 55-80; 55.1-400, _et seq._**
**Against Michael C. Hild)**

346. The Trustee incorporates each and every allegation contained in paragraphs 1 through 345 as though they were fully set forth herein.

347.    In flagrant violation of their fiduciary duties to Live Well, Rohr executed the Guaranty Fee Agreement on behalf of Live Well and Cantor approved the Guaranty Fee Agreement on behalf of Live Well's board.  Pursuant to the terms of the Guaranty Fee Agreement, Live Well incurred various obligations, including the purported obligation to pay not less than $15,563,644.52 in guaranty fee payments to Hild, to indemnify Hild, and to pay his personal legal fees, among other things.

348.    As explained in detail in this Complaint, Live Well, acting through its agents, incurred the obligations set forth in the Guaranty Fee Agreement with the actual intent to hinder, delay, or defraud Live Well and its creditors.  Specifically, each of Cantor and Rohr knew, should have known, or were willfully blind in not knowing, that Hild's purported guaranty was worthless.  In violation of their fiduciary duties, Rohr and Cantor knowingly caused Live Well to approve and accept the obligations under the Guaranty Fee Agreement in their own self-interest and to the detriment of Live Well and its creditors.  In addition, as discussed in detail in this Complaint, Hild had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

349.    The Guaranty Fee Agreement and the obligations Live Well purportedly incurred thereunder exhibit numerous badges of fraud, including among other things:

a.    The obligations Live Well incurred were to an insider;

b.    Live Well received less than reasonably equivalent value in exchange for the obligations incurred under the Guaranty Fee Agreement because, among other things, it required Live Well to pay to Hild an annual fee equal to 1.5% of the gross amount of all debts ever guaranteed by Hild, regardless of the amount actually borrowed by Live Well, regardless of the fact that most of those debts had already been fully satisfied, and regardless of the fact that (absent Hild's own fraud) these debts were structured to be fully secured and therefore virtually risk-free to Hild.

c.    Live Well was insolvent at the time the obligations under the Guaranty Fee Agreement were incurred.

      d.     The agreement was executed on behalf of Live Well by Rohr, one of Hild's criminal conspirators, and was blessed by Cantor, a faithless director.

350.    Moreover, the obligations under the Guaranty Fee Agreement were purportedly incurred by Live Well in furtherance of the Criminal Defendants' ongoing fraudulent scheme to loot the company through the perpetration of their Ponzi-like bond price-fixing scheme that dissipated of all of Live Well's legitimate assets.  As such, the obligations incurred under the Guaranty Fee Agreement are presumed to have been incurred with the actual intent to hinder, delay, or defraud creditors.

351.    Within days of the Guaranty Fee Agreement having been approved, Rohr received a $1.6 million dollar bonus and Cantor received more than $1 million in purposed historical director fees.  In reality, such payments were nothing more than bribes that Hild caused Live Well to make to Hild's coconspirators as a reward for signing off on his sham transaction.

352.    Soon after the Guaranty Fee Agreement was approved, Hild and his coconspirators fraudulently caused Live Well to incur tens of millions of dollars in new bond repo debt.  In short, Hild caused Live Well to incur obligations to and to pay to himself more than $15.5 million for guaranteeing debts that should have been risk free and fully secured (but for the fraud), all the while Hild fraudulently increased Live Well's bond repo debts, which Hild did not guaranty.

353.    Before and after the date of entering into the Guaranty Fee Agreement and each incurrence of an obligation to and each transfer made to Hild thereunder, Live Well had at least one unsecured creditor holding an allowable claim that could have challenged the Guaranty Fee Agreement and the obligations and transfers thereunder as fraudulent.

354.    Because both Cantor and Rohr were materially conflicted in the transaction, all aspects of the Guaranty Fee Agreement, including the obligations Live Well incurred to Hild and the payments it made to Hild thereunder, are void, are avoidable, and should be unwound.

355.    By reason of the foregoing, the Guaranty Fee Agreement and the obligations purportedly incurred by Live Well thereunder constitute constructively fraudulent obligations which should be avoided pursuant to Bankruptcy Code section 544 and applicable state law.

**SEVENTH CAUSE OF ACTION**
**(Avoidance of Guaranty Fee Agreement as Constructively Fraudulent**
**Pursuant to 11 U.S.C. § 544 and Applicable State Law, including without limitation 6 Del.**
**Code § 1301, *et seq.*, N.Y. D.C.L. § 270, *et seq.*, and**
**Va. Code Ann. §§ 55-81; 55.1-401, *et seq.***
**Against Michael C. Hild)**

356.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 355 as though they were fully set forth herein.

357.    As explained in detail in this Complaint, Live Well did not receive reasonably equivalent value, fair consideration, or consideration deemed valuable in law in exchange for the Guaranty Fee Agreement and the obligations to and transfers to Michael Hild thereunder.  Among other things, the Guaranty Fee Agreement required Live Well to pay to Hild an annual fee equal to 1.5% of the gross amount of all debts ever guaranteed by Hild, regardless of the amount actually borrowed by Live Well, regardless of the fact that most of those debts had already been fully satisfied, and regardless of the fact that (absent Hild's own fraud) these debts were structured to be fully secured and therefore virtually risk-free to Hild.

358.    Live Well's entering into the Guaranty Fee Agreement and each incurrence of an obligation to and transfer made to Hild thereunder were made at a time when Live Well was undercapitalized, had unreasonably small capital, was insolvent, was rendered insolvent, or had incurred, intended to incur or believed it would incur debts beyond its ability to repay as such debts matured.  Because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the Criminal Defendants' ever-growing dependence on new bond repo lenders to repay old lenders, Live Well is presumed to have been insolvent from the very inception

of the Criminal Defendants' fraudulent scheme beginning in 2015.  Moreover, as discussed in this Complaint, Live Well was actually balance sheet insolvent by no later than June 2016, which was months prior to the execution and approval of the Guaranty Fee Agreement on or about November 22, 2016.

359.     Before and after the date of entering into the Guaranty Fee Agreement and each incurrence of an obligation to and each transfer made to Hild thereunder, Live Well had at least one unsecured creditor holding an allowable claim that could have challenged the Guaranty Fee Agreement and the obligations and transfers thereunder as fraudulent.

360.     By reason of the foregoing, the Guaranty Fee Agreement and the obligations purportedly incurred by Live Well thereunder constitute constructively fraudulent obligations which should be avoided pursuant to Bankruptcy Code section 544 and applicable state law.

### EIGHTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against
### Michael C. Hild, Eric G. Rohr, and C. Darren Stumberger)

361.     The Trustee incorporates each and every allegation contained in paragraphs 1 through 360 as though they were fully set forth herein.

362.     At all times relevant to the allegations in this Complaint, the Criminal Defendants— Michael C. Hild, Eric G. Rohr, and C. Darren Stumberger—were each officers and/or employees of Live Well, and Michael Hild was a director of Live Well.

363.     As directors, officers, and/or employees of Live Well, a Delaware corporation, the Criminal Defendants owed Live Well fiduciary duties, including but not limited to fiduciary duties of good faith, candor, care, and loyalty.

364.     As set forth in detail in this Complaint, each of the Criminal Defendants repeated breached their fiduciary duty to Live Well by, among other things:

a.    directing, participating in, and perpetuating a scheme to artificially inflate the value of the bond portfolio for the purpose of defrauding Live Well's lenders;

b.    engaging in repeated acts of self-dealing and causing Live Well to make and/or accepting millions of dollars in unjustified overcompensation;

c.    aiding and abetting the other Criminal Defendants and other in that fraudulent scheme;

d.    making numerous misrepresentations to Live Well's board of directors and others about the nature, risks, and value of the bond portfolio and related bond repo financing; and

e.    utterly failing in their duties to supervise, oversee, and manage Live Well's business, assets, and employees.

365.    Michael Hild and Eric Rohr also breached their fiduciary duty to Live Well by, among other things, preparing materially false, misleading, and fraudulent financial statements to be prepared and presenting same to Live Well's board of directors, auditors, lenders, regulators, and others. As detailed above, throughout the period of 2015 through in or about 2019, Hild and Rohr repeatedly prepared, presented, or signed off fraudulent financial statements that relied upon the inflated bond valuations and inflated values for other assets.  Hild and Rohr also, among other things, provided at least one repo lender with backdated financial statements and provided another repo lender with a copy of the financial statements that specifically omitted the dramatic bond price increases that the Criminal Defendants had just pushed through in the first quarter of 2017 in order to avoid suspicious.

366.    In addition to the foregoing, Michael Hild repeated breached his fiduciary duty to Live Well by, among other things:

a.    engaging in repeated acts of self-dealing, including causing Live Well to pay Hild more than $15.5 million in "guaranty fee" payments, more than $1.3 million in "director fee" payments, and more than $9.1 million in other compensation, bonuses, and other amounts that were excessive and unjustified;

b.   causing Live Well to pay him $1.2 million in guaranty fee payments during 2016 at a time when the Board had specifically directed that such payments not be made;

c.   misappropriating or causing Live Well to incur more than $3.1 million in unjustified costs and expenses, including use of Live Well employees and resources for the Hilds' personal business, payment of defense costs for himself and his coconspirators, and payment of excessive compensation to the coconspirators;

d.   engineering the preferred stockholder payoff at a time when Live Well was insolvent for the purposes of obtaining control of Live Well so that Hild could enrich himself, his affiliates, and his coconspirators;

e.   causing Live Well to pay Cantor nearly $1.4 million in "director fee" payments, including $1,002,000 in historical director fee payments dating back to 2006, in exchange for Cantor's acquiescence in Hild's systematic looting of Live Well and numerous breaches of duty; and

f.   aiding and abetting breaches of duty by each of Karides, Rome, and Cantor by, among other things, paying each of them millions of dollars not to exercise their fiduciary duties owed to Live Well and its creditors.

367.   The Criminal Defendants, and those acting at their direction and under their control, repeatedly misrepresented the performance of the bond portfolio, using as support the fraudulently inflated bond prices that Hild and the other Criminal Defendants were creating and reporting.

368.   For example, in August 2014, before Live Well acquired its first HECM IO bonds, Hild presented the potential transaction to Live Well's board of directors as "an incredible opportunity." Hild described the bond trading business model as "extremely lucrative" and the bond portfolio as a "gold mine" that "gins [] cash." Hild further assured the Board that funding the portfolio with repo financing would not present any risk to the company, explaining "[i]f at some future point we ever need cash, we can simply sell off an appropriate amount of the [HECM] IOs (these are highly liquid)." Hild knew these representations were all false; the bonds were volatile, illiquid, and not nearly as lucrative as Hild described.

369.     In a presentation given at the December 2015 board meeting, Hild and Rohr boasted that they had grown the bond portfolio from $71 million in August to $218 million in December by "[s]eiz[ing] the opportunity [to] acquir[e] undervalued [HECM] IOs, given the industry's lack of analytical sophistication."  These were all lies: the bond portfolio was not, in fact, worth $218 million; the bonds were not undervalued; Hild and Rohr had misrepresented the values to Live Well's Board, its lenders, and others; and to the extent the bond portfolio had actually grown, that growth only occurred as a direct result of Hild causing Live Well to borrow far more than the bonds were worth, *losing* money rather than making it.

370.     Additionally, as discussed above, Rohr and Stumberger each have admitted to, Michael Hild has been found guilty of, committing numerous criminal and wrongful acts that constitute breaches of the Criminal Defendants' duties to Live Well.

371.     The numerous breaches of duty by the Criminal Defendants as detailed in this Complaint directly caused the value of Live Well's business to be destroyed, more than 200 Live Well employees to lose their jobs, and more than $110 million in damages to Live Well and its creditors.

**NINTH CAUSE OF ACTION**
**(Aiding and Abetting Breach of Fiduciary Duty**
**Against Michael C. Hild, Darren Stumberger, and Eric Rohr)**

372.     The Trustee incorporates each and every allegation contained in paragraphs 1 through 371 as though they were fully set forth herein.

373.     As detailed above, the Criminal Defendants each owed Live Well fiduciary duties and breached those fiduciary duties.

374.     Each also knew that the others owed fiduciary duties to Live Well.

375.    And each substantially assisted the others in breaching their fiduciary duties by, *inter alia*, planning, orchestrating, coordinating, and executing the fraud scheme.

376.    For example, the Criminal Defendants masterminded the fraudulent bond mispricing scheme in close collaboration with one another.  Hild personally directed Rohr and Stumberger to execute critical elements of the fraudulent scheme, including, among other things, directing them to submit inflated bond quotes to IDC, to create fraudulent financial statements, and to enter Live Well into financing transactions with its lenders based on the fraudulently-inflated bond prices.

377.    For their part, Rohr and Stumberger executed critical elements of the fraud scheme, including, among other things, submitting fraudulent bond price quotes to IDC, creating fraudulent financial statements, and entering Live Well into financing transactions with its lenders based on the fraudulently-inflated bond prices.

378.    In addition, Michael Hild aided and abetting breaches of fiduciary duty by Karides, Rome, and Cantor, each of whom accepted a payoff in exchange for completely abdicating their fiduciary duties to Live Well.

379.    The numerous breaches of duty by Hild, Rohr, Stumberger, Karides, Rome, Cantor, and others, and the Criminal Defendants' knowing and substantial assistance to those breaches of fiduciary duty as detailed in this Complaint directly caused the value of Live Well's business to be destroyed, more than 200 Live Well employees to lose their jobs, and more than $110 million in damages to Live Well and its creditors.

## TENTH CAUSE OF ACTION
### (Civil Conspiracy Against
### Michael C. Hild, Darren Stumberger, and Eric Rohr)

380.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 379 as though they were fully set forth herein.

381.    As detailed above, the Criminal Defendants planned and conspired with one another and with others to artificially inflate the value of the bond portfolio for the purpose of defrauding Live Well's lenders and enriching themselves.

382.    The Criminal Defendants also committed numerous wrongful overt acts in furtherance of the scheme as detailed in this Complaint.  For example, among other things, Hild and Stumberger conspired to pressure IDC to report the Criminal Defendants' fraudulently inflated bond price quotes knowing that lenders were relying on those price quotes and did not know they were created by the Criminal Defendants.  Hild and Rohr conspired to prepare materially false, misleading, and fraudulent financial statements and to present same to Live Well's board of directors, auditor, lenders, regulators, and others.  Hild and Rohr also conspired to over-borrow hundreds of millions of dollars from Live Well's repo lenders based upon fraudulently inflated bond values.

383.    Hild ensured the continued cooperation and participation of the other Criminal Defendants—Rohr and Stumberger—and others by conspiring with them to grossly and unjustifiably overcompensate them based upon fraudulently inflated bond values.

384.    These and other overt acts by the Criminal Defendants directly caused the value of Live Well's business to be destroyed, more than 200 Live Well employees to lose their jobs, and more than $110 million in damages to Live Well and its creditors.

## ELEVENTH CAUSE OF ACTION
### (Corporate Waste Against
### <u>Michael C. Hild, Darren Stumberger, and Eric Rohr)</u>

385.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 384 as though they were fully set forth herein.

386.    As detailed above, the Criminal Defendants caused Live Well to engage in a cyclical scheme in which it would borrow money to acquire certain HECM IO bond and then borrow more money collateralized on the newly acquired bonds, etc.  However, because the HECM IO bonds that Live Well was acquiring with the borrowed money were, in reality, worth much less than the next loan Live Well took using those bonds as collateral, each cycle of the scheme put Live Well further and further into debt.

387.    Not only was this scheme fraudulent as to Live Well's creditors, it made no economic sense.  It was completely unsustainable and would and did inevitably result in Live Well's collapse.

388.    By no later than June 2016, the Criminal Defendants' fraudulent bond pricing scheme had rendered Live Well insolvent.

389.    No person of ordinary, sound business judgment would deem this scheme to have been a rational decision in the interests of the company.

390.    As detailed in this Complaint, the Criminal Defendants' numerous acts of corporate waste included, without limitation, the following:

      a.    causing Live Well to pay the Criminal Defendants and others millions of dollars in compensation, bonuses, and other transfers that were excessive and unjustifiable under any circumstances, and particularly in light of the Criminal Defendants' ongoing fraudulent bond mispricing scheme;

      b.    causing or enabling Live Well to borrow hundreds of millions of dollars in repo debt in excess of the actual value of the bonds securing that debt; and

      c.    destroying the value of Live Well's legitimate business activities and assets.

391.    In addition to the foregoing, Hild engaged in numerous acts of corporate waste by, among other things:

    a.    causing Live Well to pay at least $1,493,280.64 to law firms that represented Michael Hild and/or Laura Hild and the and Hild entities;

    b.    caused Live Well to pay at least $274,498.17 to a law firm that represented Rohr;

    c.    causing Live Well to pay at least $1,356,280.95 to a law firm that represented Stumberger;

    d.    repeatedly used Live Well's funds, employees, and resources for the Hilds' personal businesses, among other things;

    e.    causing Live Well to pay Rohr and Stumberger together more than $7.1 million in excessive and unjustified bonuses and other compensation;

    f.    causing Live Well to pay Cantor nearly $1.4 million in director fees to look the other way while the Criminal Defendants' fraud continued unabated;

    g.    causing Live Well to incur $29 million for the preferred stockholder buyout at a time when Live Well was insolvent and such equity interests were worthless; and

    h.    paying off Karides and Rome to resign from the Board rather than exercising their fiduciary duties.

392.    These and other acts of corporate waste by the Criminal Defendants directly caused the value of Live Well's business to be destroyed, more than 200 Live Well employees to lose their jobs, and more than $110 million in damages to Live Well and its creditors.

## TWELFTH CAUSE OF ACTION
### (Unjust Enrichment Against All Defendants)

393.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 392 as though they were fully set forth herein.

394.    As detailed in this Complaint, between 2015 and the Filing Date, the Defendants were unjustly enriched by tens of millions of dollars that the Defendants wrongfully took from Live Well.

395.    Defendant Michael Hild was unjustly enriched in the amount of not less than $27,544,903.63, consisting of (i) not less than $26,051,622.99 in excessive and unjustified bonuses, salary, overcompensation, guaranty fee payments, director fee payments, and other fruits of the fraud that Michael Hild caused Live Well to transfer to him between 2015 and 2019; and (ii) not less than $1,493,280.64 in unlawful and unjustified payments that Hild caused Live Well to make between 2017 and 2019 to law firms representing Hild in connection with the SEC, the criminal investigations, and/or the Guaranty Fee Agreement, and such other amounts as may be discovered.

396.    Defendant Laura Hild was unjustly enriched in the amount of not less than $26,051,622.99 in excessive and unjustified bonuses, salary, overcompensation, guaranty fee payments, director fee payments, and other fruits of the fraud that Michael Hild caused Live Well to make to the Hilds between 2015 and 2019.  Laura Hild exercised dominion and control over all or substantially all of these funds and transferred substantially all of these funds, directly or indirectly, to entities, businesses and properties titled in her name or to her own individual bank account, and such other amounts as may be discovered.

397.    Defendant Church Hill Ventures was unjustly enriched in the amount of not less than $16,967,000 in fruits of the fraud, and such other amounts as may be discovered.

398.    Defendant Anderson's Neck was unjustly enriched in the amount of not less than $475,850 in fruits of the fraud, and such other amounts as may be discovered.

399.    Defendant Butterbean was unjustly enriched in the amount of not less than $721,023.54 in fruits of the fraud, and such other amounts as may be discovered.

400.    Defendant Climax Beverage was unjustly enriched in the amount of not less than $15,000 in fruits of the fraud, and such other amounts as may be discovered.

401.    Defendant Dogtown Brewing was unjustly enriched in the amount of not less than $1,177,374 in fruits of the fraud, and such other amounts as may be discovered.

402.    Defendant Gardenia was unjustly enriched in the amount of not less than $2,118,428 in fruits of the fraud, and such other amounts as may be discovered.

403.    Defendant Hot Diggity Donuts was unjustly enriched in the amount of not less than $461,485 in fruits of the fraud, and such other amounts as may be discovered.

404.    Defendant Hot Diggity Donuts was unjustly enriched in the amount of not less than $461,485 in fruits of the fraud, and such other amounts as may be discovered.

405.    Defendant Manastoh Brewing was unjustly enriched in the amount of not less than $76,300 in fruits of the fraud, and such other amounts as may be discovered.

406.    Defendant Urban Bleat was unjustly enriched in the amount of not less than $10,000 in fruits of the fraud, and such other amounts as may be discovered.

407.    Defendant Eric Rohr was unjustly enriched in the amount of not less than $3,191,658.35, consisting of (i) not less than $2,917,160.18 in excessive and unjustified bonuses, salary, and other overcompensation between 2015 and 2018; and (ii) not less than $274,498.17 in unlawful and unjustified payments that Hild caused Live Well to make in 2019 to counsel representing Rohr in connection with the SEC and criminal investigations, and such other amounts as may be discovered.

408.    Defendant Darren Stumberger was unjustly enriched in the amount of not less than $5,781,601.86, consisting of (i) not less than $4,187,820.91 in excessive and unjustified bonus payments between 2015 and 2018; and (ii) not less than $1,356,280.95 in unlawful and unjustified payments between 2017 and 2019 to counsel representing Stumberger in connection with the SEC and criminal investigations, and such other amounts as may be discovered.

409.     Live Well received no consideration for the amounts unjustly received by the Defendants.  As set forth in detail above, the Criminal Defendants masterminded a pervasive bond mispricing scheme that robbed Live Well's unsuspecting bond repo lenders and other creditors of more than $110 million.  Live Well did not, and could not, receive any consideration or benefit from the criminal and fraudulent misconduct of Hild, Rohr, and Stumberger.  Similarly, Live Well received no consideration in exchange for the systematic looting of Live Well and defrauding of its creditors and the hiding of such ill-gotten gains in the bank accounts, properties, businesses, and entities owned or controlled by Laura Hild and the Hild entities.

410.     The Criminal Defendants directed, participated in, and perpetuated a fraudulent bond price-fixing scheme that directly and proximately caused the enrichment of themselves, Laura Hild, and the Held entities in the amounts set forth above.

411.     The transfers to or for the benefit of each of the Defendants were unsupported by adequate consideration and were made with the actual intent to hinder, delay, or defraud Live Well and its present and future creditors.

412.     Live Well was damaged and impoverished by the amounts unjustly received by the Defendants.  Because Live Well was forced to borrow more and more money from its repo lenders based on the Conspirator's fraudulently inflated bond prices to finance the overcompensation and other wrongful transfers to or for the benefit of the Defendants, such transfers further destroyed the value of Live Well's legitimate mortgage origination and servicing businesses.

413.     The money and other benefits that each of the Defendants received came from, and would not have been possible but for, the Criminal Defendants' fraudulent scheme against Live Well's lenders.

414.     The Criminal Defendants directed, participated in, and perpetuated a fraudulent and unconscionable bond pricing scheme that directly and proximately caused the enrichment of Defendants and harm to Live Well—which includes not only the amounts unjustly taken by Defendants, but also more than $110 million in creditor claims.

415.     There is simply no justification whatsoever the Criminal Defendants' fraudulent and unconscionable bond pricing scheme, the gross overcompensation of Hild, the transfer of all or substantially all of the gross overcompensation and other wrongful transfers to or for the benefit of Hild to Laura Hild or the Hild entities, or the gross overcompensation of and other wrongful transfers to or for the benefit of Rohr and Stumberger.

416.     Defendants knew or are charged with knowledge that this money and other benefits they received came from and would not be possible but for the Criminal Defendants' fraudulent and unconscionable scheme against Live Well's lenders and their wrongful, self-interested, unfair, and completely unjustified decisions to transfer such sums out of Live Well to the Defendants.

417.     Defendants also knew or are charged with knowledge that the transfers were unsupported by adequate consideration and were made with the actual intent to hinder, delay, or defraud Live Well and its present and future creditors.

418.     Consequently, it would be inequitable for Defendants to retain this money or the other fruits of the fraud, including the Subject Real Properties.

**THIRTEENTH CAUSE OF ACTION**
**(Declaratory Judgment – Alter Ego/Mere Instrumentality/Veil Piercing**
**<u>Against Laura Hild and the Hild Entities)</u>**

419.     The Trustee incorporates each and every allegation contained in paragraphs 1 through 418 as though they were fully set forth herein.

420.    As set forth in detail in this Complaint, Michael Hild's affiliates, in particular, Laura Hild and the Hild entities, were essential to Hild's scheme to inflate the value of the bond portfolio, borrow excessively against those bonds, and extract tens of millions of dollars for himself.

421.    Laura Hild and the Hild entities were necessary to obscure the more than $26 million that Michael Hild looted from Live Well and its creditors.

422.    As also detailed in this Complaint, the Trustee is entitled to recover from Laura Hild and the Hild entities on all claims the Trustee has against Michael Hild as the Hild entities are mere alter egos and instrumentalities of each of Michael Hild and Laura Hild.

423.    Michael Hild directed Live Well to transfer his overcompensation to the Hilds' joint bank account for the purpose of evading responsibility for his fraud, breaches of duty, and other willful misconduct.

424.    Similarly, the Hild entities were created for the purpose of evading responsibility for Michael Hild's fraud, breaches of duty, and other willful misconduct. Tellingly, after Michael Hild learned the SEC was investing Live Well's bond trading activities, Hild transferred control of the Hild entities to Laura Hild in a further attempt to evade responsibility for his wrongdoing.

425.    Each of the Hild entities is the alter ego of Michael Hild in that these entities did not have the capital, employees, and other resources to exist independently.

426.    There is complete unity of interests by and among the Hild entities, Laura Hild and Michael Hild. At all times relevant to this Complaint, Michael Hild and Laura Hild were married. They shared a joint account at Wells Fargo into which all of the overcompensation of Michael Hild was transferred and from which both Michael Hild and Laura Hild transferred millions of dollars to the Hild entities. Laura Hild exercised dominion and control over all or substantially all

of the funds fraudulently transferred by Live Well to Michael Hild and Laura Hild diverted those funds to entities, businesses and properties titled in her name or to her own individual bank account.

427.   Michael Hild and Laura Hild controlled or managed the Hild entities.  Michael Hild and Laura Hild regularly commingled their assets.  And Laura Hild directly and substantially benefited from Michael Hild's fraudulent scheme and other misconduct.  Among other things, the personal income of Laura Hild was wholly insufficient to fund the Hild entities, the acquisitions of the Subject Real Properties, and the operations of the Hild entities' businesses.

428.   Each of the Hild entities is wholly owned by Laura Hild and is or was managed or controlled by Michael Hild.  Although nominally owned by Laura Hild, the Hild entities received substantially all their capital from Michael Hild who used the Hild entities as instruments to conceal the proceeds of his fraud.  The Hild entities had no independence from Michael Hild.  The bank accounts of the Hild entities were used by Michael Hild and Laura Hild to commingle funds and also to launder at least $4.2 million from Live Well to Laura Hild.  Michael Hild personally guaranteed certain of the Hild entities' business debts.  Through, among other things, a website called "The Dogtown Dish," Michael Hild has promoted the businesses and properties of various Hild entities and has held himself out to be the owner or controller of such entities.  Further, there was a complete failure to follow business formalities.  Among other things, Michael Hild directed Live Well employees, money, and other resources toward the Hild entities and their businesses.  In short, the Hild entities do not operate as separate personalities and to adhere to the fiction that they were separate from Michael Hild would work an injustice on the Live Well estate.

429.   As further detailed above, Michael Hild and Laura Hild used the Hild entities to evade personal obligations by transferring tens of millions of dollars through the accounts of

various Hild entities and into numerous properties and businesses, as well as into Laura Hild's personal account at Bank of America.

430.    Accordingly, the Trustee is entitled to a judgment declaring Laura Hild and each of the Hild entities to be liable to the Live Well estate for all damages caused by Michael Hild.

### FOURTEENTH CAUSE OF ACTION
**(Declaratory Judgment – Constructive and Resulting Trust and Property of the Estate Pursuant to 28 U.S.C. § 2201, *et seq.,* and 11 U.S.C. § 541 <u>Against Michael C. Hild, Laura D. Hild, and the Hild Entities</u>)**

431.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 430 as though they were fully set forth herein.

432.    As set forth in detail in this Complaint, during the period when Michael Hild was orchestrating and participating in the pervasive fraud from 2015 through 2019, Hild extracted more than $26 million from Live Well—in clear breach of, *inter alia*, his fiduciary duties as well the fiduciary duties of his coconspirators, including Darren Stumberger and Eric Rohr.

433.    Virtually all of the fruits of Hild's fraud were transferred, first, to the joint bank account Michael Hild and Laura Hild had at Wells Fargo Bank, and from there, to the Hild entities, their businesses, and the Subject Real Properties.

434.    In particular, at least $22.5 million that Michael Hild obtained from Live Well, as a result of his breaches of duty and criminal and fraudulent conduct, is directly traceable to the Subject Real Properties in the form of purchase price payments, construction loan payments, and payments to numerous contractors, architects, designers and other professional firms as well as equipment purchased for and installed at the Subject Real Properties.  In short, the Subject Real Properties were purchased, renovated, and operated with funds Michael Hild obtained by defrauding Live Well's bond lenders and breaching his duty to Live Well and which Hild looted from Live Well to enrich himself, his wife, and their wholly owned entities.

435.     It would be wholly inequitable, and each of Michael Hild, Laura Hild, and the Hild

Entities would be unjustly enriched if they were permitted to retain the funds, businesses, and

Subject Real Properties acquired with proceeds wrongfully taken from Live Well and its creditors.

436.     A clear nexus exists between the *res* of the constructive or resulting trust, *i.e.,* the

Subject Real Properties and other businesses and real and personal property acquired with the fruits

of the fraud and breaches of duty.  As discussed above, all such Subject Real Properties, businesses

and other assets of Michael Hild, Laura Hild, and the Hild entities acquired during the period from

2015 through 2019 were purchased, financed, or funded with funds directly traceable to Live Well

and are proceeds of Michael Hild's fraud and breaches of duty.

437.     Accordingly, the Trustee seeks a declaration that:  (i) each of Michael Hild, Laura

Hild, and the Hild Entities holds all of their assets that are traceable to the fruits of the fraud and

breaches of duty, including without limitation the Subject Real Properties, in a constructive or

resulting trust for the benefit of the Trustee on behalf of the Live Well chapter 7 estate, and (ii) that

all such assets, including without limitation the Subject Real Properties, constitute property of the

Live Well bankruptcy estate.

### FIFTEENTH CAUSE OF ACTION
**(Avoidance of Actual Fraudulent Transfers Under**
**Applicable State Law, including without limitation 6 Del. Code § 1301, *et seq*.,**
**N.Y. D.C.L. § 270, *et seq.*, and Va. Code Ann. §§ 55-80; 55.1-400, *et seq.***
**Against Laura D. Hild and the Hild Affiliated Entities)**

438.     The Trustee incorporates each and every allegation contained in paragraphs 1

through 437 as though they were fully set forth herein.

439.     The Trustee, on behalf of the Live Well estate, is, and was at all relevant times, a

contingent creditor of Defendant Michael Hild in an amount not less than $27,544,903.63 as a

result of the massive fraud Hild perpetrated against Live Well described in this Complaint.  As

such, the Trustee is entitled to avoid, unwind, and recover transfers made by Hild with actual intent to hinder, delay, and defraud Hild's creditors.

440.    Moreover, during the course of and as a direct result of the fraud, between 2015 and 2019, Michael Hild wrongfully caused Live Well to transfer a total of not less than $26,051,622.99 to the joint bank account owned by Michael Hild and Laura Hild.  As such, Live Well also is a creditor of Laura Hild.

441.    During that same time period, Michael Hild and Laura Hild caused at least $19,982,300 to be transferred from the joint bank account to certain Hild entities as follows:

    a.    $16,967,000 to Church Hill Ventures of which not less than $4,200,000 was transferred by Church Hill Ventures to Laura Hild;

    b.    $443,500 to Anderson's Neck;

    c.    $437,500 to Butterbean;

    d.    $15,000 to Climax Beverage Co.;

    e.    $565,000 to Dogtown Brewing;

    f.    $1,000,500 to Gardenia;

    g.    $292,500 to Hot Diggity Donuts;

    h.    $175,000 to Kingfisher;

    i.    $76,300 to Manastoh Brewing; and

    j.    $10,000 to Urban Bleat Cheese Co.

The specific date, amount, and other details of each individual transfer are set forth in **Exhibit B** attached hereto.

442.    Each of the above-listed Hild entities is an initial transferee of such transfers.

443.    As explained in detail above, all of the above transfers were made, and received, with the actual intent to hinder, delay, or defraud creditors of Michael Hild and Laura Hild, the largest of which is the Live Well estate.  The primary purpose of these transfers, indeed the only

conceivable reason for such transfers, could be to delay, hinder and defraud creditors. In addition, as set forth in detail above, each of Laura Hild and the Hild entities had notice of the fraudulent intent of her or its immediate grantor or of the fraud rendering void the title of such grantor because, among other things, they received substantial transfers for which they gave no consideration.

444.    Because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, Michael Hild and Laura Hild are presumed to have been insolvent from the very inception of the fraudulent scheme beginning in 2015.

445.    These transfers were not made for valuable consideration as Michael Hild and Laura Hild received nothing in return for the transfers.

446.    In addition, each of Laura D. Hild and the Hild entities has notice of the fraudulent intent in making the transfers.

447.    Before and at all times after the date of each of the above-listed transfers, Live Well was an unsecured contingent creditor of Michael Hild and Laura Hild.

448.    Pursuant to applicable law, each and every one of the above-listed transfers is void.

449.    By reason of the foregoing, the above transfers (and as set forth in detail in the exhibits hereto) constitute actual fraudulent transfers which should be avoided, unwound and recovered by the Trustee, on behalf of the Live Well estate.

### SIXTEENTH CAUSE OF ACTION
**(Avoidance of Constructive Fraudulent Transfers Under
Applicable State Law, including without limitation 6 Del. Code § 1301, *et seq*.,
N.Y. D.C.L. § 270, *et seq.*, and Va. Code Ann. §§ 55-81; 55.1-401, *et seq.*
Against Laura D. Hild and the Hild Affiliated Entities)**

450.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 449 as though they were fully set forth herein.

451.    The Trustee, on behalf of the Live Well estate, is, and was at all relevant times, a contingent creditor of Defendant Michael Hild in an amount not less than $27,544,903.63 as a result of the massive fraud Hild perpetrated against Live Well described in this Complaint.  As such, the Trustee is entitled to avoid, unwind, and recover transfers made by Hild without reasonably equivalent value, fair consideration, or consideration deemed valuable in law and that were made at a time when Michael Hild, was rendered insolvent, was undercapitalized, or was incurring a debt beyond his ability to repay as such debt became due.

452.    Moreover, during the course of and as a direct result of the fraud, between 2015 and 2019, Michael Hild wrongfully caused Live Well to transfer a total of not less than $26,051,622.99 to the joint bank account owned by Michael Hild and Laura Hild.  As such, Live Well is also a creditor of Laura Hild.

453.    During that same time period, Michael Hild and Laura Hild caused at least $19,982,300 to be transferred from the joint bank account to certain Hild entities as follows:

a.    $16,967,000 to Church Hill Ventures of which not less than $4,200,000 was transferred by Church Hill Ventures to Laura Hild;

b.    $443,500 to Anderson's Neck;

c.    $437,500 to Butterbean;

d.    $15,000 to Climax Beverage Co.;

e.    $565,000 to Dogtown Brewing;

f.    $1,000,500 to Gardenia;

g.    $292,500 to Hot Diggity Donuts;

h.    $175,000 to Kingfisher;

i.    $76,300 to Manastoh Brewing; and

j.    $10,000 to Urban Bleat Cheese Co.

The specific date, amount, and other details of each individual transfer are set forth in **Exhibit B** attached hereto.

454.    Each of the above-listed Hild entities is an initial transferee of such transfers.

455.    Michael Hild and Laura Hild did not receive reasonably equivalent value in exchange for such transfers.

456.    Michael Hild and Laura Hild did not receive fair consideration in exchange for such transfers.

457.    Michael Hild and Laura Hild did not receive consideration deemed valuable in law in exchange for such transfers.

458.    Each of the above transfers were made at a time when Michael Hild and Laura Hild were undercapitalized.

459.    Each of the above transfers was made at a time when Michael Hild and Laura Hild had unreasonably small capital.

460.    Each of the above transfers was made at a time when Michael Hild and Laura Hild were insolvent or such transfers rendered Michael Hild and Laura Hild insolvent.  Because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, Michael Hild and Laura Hild are presumed to have been insolvent from the very inception of the fraudulent scheme beginning in 2015.

461.    Each of the above transfers was made at a time when Michael Hild and Laura Hild had incurred, intended to incur, or believed it would incur debts beyond its ability to repay as such debts matured.

462.    Before and at all times after the date of each of the above-listed transfers, Live Well was an unsecured contingent creditor of Michael Hild and Laura Hild.

463.    Pursuant to applicable law, each and every one of the above-listed transfers is void.

464.    By reason of the foregoing, the above transfers (and as set forth in detail in the exhibits hereto) constitute constructive fraudulent transfers which should be avoided, unwound, and recovered by Live Well's estate.

## SEVENTEENTH CAUSE OF ACTION
### (Recovery of Avoidable Transfers Pursuant to 11 U.S.C. § 550
### Against All Defendants)

465.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 464 as though they were fully set forth herein.

466.    As detailed in this Complaint, the above-described transfers to or for the benefit of the Defendants, including without limitation the transfers set forth on **Exhibits A, B, C, D, E**, and **F** to this Complaint, (collectively, the "Transfers") are avoidable by the Trustee pursuant to sections 544, 547, and 548, of the Bankruptcy Code and applicable state law.

467.    Defendants Michael Hild and Laura Hild are the initial transferee of the Transfers listed on **Exhibit A** to this Complaint.  In the alternative, Laura Hild is an immediate, mediate, or subsequent transferee of each of the transfers listed on **Exhibit A** to this Complaint.  Such Transfers were made from one of Live Well's bank accounts to the Hilds' joint account at Wells Fargo.

468.    Hild entity Defendants Church Hill Ventures, Anderson's Neck, Butterbean, Climax Beverage Co., Dogtown Brewing, Gardenia, Hot Diggity Donuts, Kingfisher, Manastoh Brewing, and Urban Bleat Cheese Co., as alter egos of Defendant Michael Hild, are the initial transferees of the Transfers identified as to such Defendant on **Exhibit B** to this Complaint.  In the alternative, each of Church Hill Ventures, Anderson's Neck, Butterbean, Climax Beverage Co., Dogtown Brewing, Gardenia, Hot Diggity Donuts, Kingfisher, Manastoh Brewing, and Urban

Bleat Cheese Co. are the immediate, mediate, or subsequent transferees of the Transfers identified as to such Defendant on **Exhibit B** to this Complaint. Such Transfers were made from one of Live Well's bank accounts to the Hilds' joint account at Wells Fargo to the account of each such Hild entity Defendant as set forth on **Exhibit B**.

469.    Further, Hild entity Defendants Anderson's Neck, Butterbean, Dogtown Brewing, Gardenia, Hot Diggity Donuts, and Kingfisher are the immediate, mediate, or subsequent transferees of the Transfers identified as to such Defendant on **Exhibit C** to this Complaint. Such Transfers were made from one of Live Well's bank accounts to the Hilds' joint account at Wells Fargo to Church Hill Ventures' account and to the account of each such Hild entity Defendant as set forth on **Exhibit C**.

470.    Upon information and belief, all of the other Hild entity Defendants also were immediate, mediate, or subsequent transferee of one or more of the Transferees or benefited therefrom.

471.    Defendant Eric Rohr is the initial transferee of the Transfers listed on **Exhibit D** to this Complaint.

472.    Defendant Darren Stumberger is the initial transferee of the Transfers listed on **Exhibit E** to this Complaint.

473.    Each of the Defendants is an immediate, mediate, or subsequent transferee or otherwise benefitted from the Transfers listed on **Exhibit F** to this Complaint.

474.    Each of the Defendants received or benefited other avoidable Transfers which the Trustee seeks to avoid and recover by this Complaint including, without limitation, the payments to counsel to the Hilds and the Hild entities and the use of Live Well's funds, employees, and other resources for the sole benefit of the Defendants, in an amount to be determined.

475.    None of the Defendants received any Transfer in good faith.

476.    Each of the Defendants knew or are charged with knowledge of the voidability of such Transfers.

477.    Live Well received no value in exchange for the Transfers.

478.    Accordingly, the Trustee is entitled to judgment against all Defendants, among other things, directing the avoidance and recovery from Defendants of all of the Transfers.

### EIGHTEENTH CAUSE OF ACTION
**(Disallowance of the Proofs of Claims Pursuant to 11 U.S.C. § 502**
**Against Michael C. Hild and Eric G. Rohr)**

479.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 478 as though they were fully set forth herein.

480.    The Proofs of Claim filed by Defendants Michael Hild and Eric Rohr are unenforceable against Live Well because, as explained above, such Proofs of Claim are based on and/or result from Hild's and Rohr's own intentional and willful acts, breaches of fiduciary duty, fraud, and other tortious acts.

481.    As detailed in this Complaint, each of Hild and Rohr is an individual from whom property is recoverable under section 550 of the Bankruptcy Code and is a transferee of the Transfers, which are avoidable under sections 544, 547, and 548 of the Bankruptcy Code.

482.    Neither Hild nor Rohr has paid the amount, or turned over such property, for which he is liable under sections 544, 547, and 548, and 550 of the Bankruptcy Code.

483.    Therefore, pursuant to section 502 of the Bankruptcy Code, the Proofs of Claim filed by each of Michael Hild and Eric Rohr should be disallowed.

## NINETEENTH  CAUSE OF ACTION
### (Setoff)

484.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 483 as though they were fully set forth herein.

485.    The Trustee (a) has the right to assert any right of setoff that the Debtor may have had and (b) may setoff against any claim any claims that the Trustee has against the holder of such claim.

486.    Consequently, the Trustee is entitled to setoff any recovery from the preceding causes of action against the Proofs of Claim, any payment or distribution to be made on account of the Proofs of Claim, or any other amounts asserted to be owned to any of the Defendants.

## ATTORNEY'S FEES

487.    Based upon the Criminal Defendants' egregious, bad faith, fraudulent and totally unjustified conduct, his numerous breaches of duty, and his other misconduct as set forth in this Complaint, the Trustee seeks an award of his reasonable attorney's fees and expenses incurred in connection with investigating, filing, and prosecuting this action.

## RESERVATION OF RIGHTS

488.    During the course of this proceeding, Plaintiff may learn through discovery or otherwise of additional avoidable transfers made to or for the benefit of Defendants or other claims or causes of action that are actionable under the provisions of the Bankruptcy Code or other applicable law.  It is Plaintiff's intention to avoid and recover all avoidable transfers of property made by Live Well to or for the benefit of the Defendants or any other transferee.  Plaintiff reserves all rights to amend this original Complaint to include:  (i) further information regarding the Transfers; (ii) additional transfers; (iii) modifications of and/or revisions to Defendants' names; (iv) additional defendants; and/or (v) additional causes of action, if applicable (collectively, the

"Amendments"), that may become known to Plaintiff at any time during this adversary proceeding,

through formal discovery or otherwise, and for the Amendments to relate back to the filing of this

original Complaint

## CONCLUSION

**WHEREFORE,** for the foregoing reasons, the Trustee respectfully requests the following

relief:

A.     That the Transfers identified in Counts One through Five (and on Exhibits A, B, C, D, E, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise, be avoided, as fraudulent, preferential, or unauthorized postpetition transfers;

B.     That judgment be entered in favor of the Trustee and against Defendants Michael C. Hild, Laura D. Hild and each of the Hild entities in an amount to be determined, but not less than **$27,544,903.63**, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five (and on Exhibits A, B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

C.     That judgment be entered in favor of the Trustee and against Defendant Eric G. Rohr in an amount to be determined, but not less than **$3,191,658.35**, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five (and on Exhibits D and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

D.     That judgment be entered in favor of the Trustee and against Defendant C. Darren Stumberger in an amount to be determined, but not less than **$5,544,101.86**, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five (and on Exhibits E and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

E.     That judgment be entered in favor of the Trustee and against Defendant Michael Hild declaring that the Guaranty Fee Agreements and the incurrence of each obligation to and each transfer made to Hild thereunder was actually fraudulent or, alternatively, constructively fraudulent and, therefore, is void *ab initio*, avoided, unwound, and of no force and effect;

F.     That judgment be entered in favor of the Trustee and against the Defendants declaring that all of the transfers made to or for the benefit of and transactions with the Defendants were the product of pervasive fraud and breaches of fiduciary duty and, accordingly, are void *ab initio*;

G.      That judgment be entered in favor of the Trustee (i) declaring that the Subject Real Properties and all other assets of Michael C. Hild, Laura D. Hild, and each of the Hild entities that is traceable to the fruits of the fraud is held in constructive or resulting trust for the benefit of the Trustee on behalf of the Live Well chapter 7 estate, (ii) declaring that all such assets, including without limitation the Subject Real Properties, constitute property of the Live Well bankruptcy estate, and (iii) ordering and directing each of Michael C. Hild, Laura D. Hild, and the Hild entities transfer title to the Subject Real Properties and to all other assets, real or personal, that is traceable to the fruits of the fraud to the Trustee for the benefit of the Live Well estate;

H.      That judgment be entered in favor of the Trustee and against Defendants Michael Hild, Eric G. Rohr, and C. Darren Stumberger each in an amount to be determined, but not less than **$110,000,000**, for all losses and damages Live Well has suffered as a result of their fraudulent conduct, breaches of fiduciary duty, aiding and abetting of breaches of fiduciary duty, civil conspiracy, and corporate waste and that the Court direct an equitable accounting of and the disgorgement of any income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from the foregoing wrongful acts;

I.      That judgment be entered in favor of the Trustee and against all Defendants for to the extent that they were unjustly enriched at the expense of Live Well;

J.      That judgment be entered in favor of the Trustee declaring that Defendants Laura Hild and the Hild entities are each the alter ego and instrumentality of Defendant Michael Hild and further declaring that Defendants Laura Hild and the Hild entities are liable to the Trustee for all claims asserted against Defendant Michael Hild in an amount to be determined, but not less than **$110,000,000**;

K.      That judgment be entered in favor of the Trustee and against Defendant Laura D. Hild in an amount to be determined, but not less than **$26,051,622.99,** avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteenth (and on Exhibits A, B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

L.      That judgment be entered in favor of the Trustee and against Defendant Church Hill Ventures LLC in an amount to be determined, but not less than **$16,967,000**, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

M.      That judgment be entered in favor of the Trustee and against Defendant Anderson's Neck LLC in an amount to be determined, but not less than **$475,850**, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits B, C,

and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

N.    That judgment be entered in favor of the Trustee and against Defendant The Butterbean LLC in an amount to be determined, but not less than **$721,023.54**, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen and Sixteen (and on Exhibits B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

O.    That judgment be entered in favor of the Trustee and against Defendant Climax Beverage Co. LLC in an amount to be determined, but not less than **$15,000**, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

P.    That judgment be entered in favor of the Trustee and against Defendant Dogtown Brewing LLC in an  amount to be determined, but not less than **$1,177,374.00**, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

Q.    That judgment be entered in favor of the Trustee and against Defendant Gardenia LLC in an  amount to be determined, but not less than **$2,118,428**, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

R.    That judgment be entered in favor of the Trustee and against Defendant Hot Diggity Donuts LLC in an  amount to be determined, but not less than **$461,485**, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five,  Fifteen, and Sixteen (and on Exhibits B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

S.    That judgment be entered in favor of the Trustee and against Defendant Kingfisher LLC in an  amount to be determined, but not less than **$1,026,700**, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

T.    That judgment be entered in favor of the Trustee and against Defendant Manastoh Brewing LLC in an  amount to be determined, but not less than **$76,300.00**,

avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

U.    That judgment be entered in favor of the Trustee and against Defendant Urban Bleat Cheese Co., LLC in an  amount to be determined, but not less than **$10,000**, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

V.    That judgment be entered in favor of the Trustee and against Defendant Aragon Coffee Co. LLC in an  amount to be determined, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits A, B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

W.    That judgment be entered in favor of the Trustee and against Defendant Peter Stumpf Brewing Company LLC in an  amount to be determined, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits A, B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

X.    That judgment be entered in favor of the Trustee and against Defendant Pin Money Pickles LLC in an  amount to be determined, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits A, B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

Y.    That judgment be entered in favor of the Trustee and against Defendant Rosenegk Brewing Co. LLC in an  amount to be determined, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits A, B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

Z.    That judgment be entered in favor of the Trustee and against Defendant Valentine's Meat-Juice Company LLC in an  amount to be determined, avoiding and recovering on account of the fraudulent, preferential, or postpetition transfers identified in Counts One through Five, Fifteen, and Sixteen (and on Exhibits A, B, C, and F to this Complaint), and any other transfers subsequently identified through discovery or otherwise;

AA.    That the Proofs of Claim filed by Defendants Michael Hild and Eric Rohr be disallowed in their entirety;

BB.    That the Trustee be awarded his reasonable attorney's fees and expenses incurred in connection with investigating, filing, and prosecuting this action, together with all costs of Court, and pre- and post-judgment interest at the legal rate;

CC.    That the Trustee be permitted to setoff any judgment obtained hereunder against any payment or distribution to be made on account of the Proofs of Claim; and

DD.    That the Trustee be granted such other and further legal and/or equitable relief as is just and proper.


Dated:  June 28, 2021

*/s/ Bryan J. Hall*
Alan M. Root (No. 5427)
Bryan J. Hall (No. 6285)
ARCHER & GREINER, P.C.
300 Delaware Avenue, Suite 1100
Wilmington, Delaware 19801
Tel.:  302-777-4350
Fax:  302-777-4352
aroot@archerlaw.com
bjhall@archerlaw.com

-and-

Michael B. Schaedle (admitted *pro hac vice*)
Michael D. Silberfarb (admitted *pro hac vice*)
Huaou Yan (*pro hac vice* to be filed)
Matthew E. Kaslow (*pro hac vice* to be filed)
BLANK ROME LLP
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania 19103
Tel.:  215-569-5500
Fax:  215-569-5555
Schaedle@BlankRome.com
MSilberfarb@BlankRome.com
HYan@BlankRome.com
MKaslow@BlankRome.com

*Counsel for David W. Carickhoff,*
*the Chapter 7 Trustee*

**<u>EXHIBIT A</u>**

**Transfers by Live Well Financial, Inc. to
Michael C. Hild / Laura D. Hild**

**EXHIBIT A**

**Transfers by Live Well Financial, Inc. to Michael C. Hild / Laura D. Hild \***

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ck. # | Transferee | Transferee bank | Account ending | Description |
|------|-----------|-----------------|----------------|--------|--------|-------|-----------|-----------------|----------------|-------------|
| 5/20/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $57,534.25 | Check | 15104 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 5/27/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $7,397.26 | Check | 15140 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 5/27/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $1,027.40 | Check | 15141 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 6/1/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $5,958.90 | Check | 15145 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 6/1/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $71,506.85 | Check | 15146 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 6/1/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $59,589.04 | Check | 15147 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 6/30/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $61,643.84 | Check | 15335 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 6/30/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $73,972.60 | Check | 15336 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 6/30/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $6,164.38 | Check | 15338 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 7/28/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $61,643.84 | Check | 15526 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 7/28/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $6,164.38 | Check | 15527 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 7/28/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $73,972.60 | Check | 15528 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 7/28/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $80,136.99 | Check | 15529 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 8/29/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $77,465.75 | Check | 15732 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 8/29/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $71,506.85 | Check | 15733 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 8/29/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $59,589.04 | Check | 15734 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 8/29/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $5,958.90 | Check | 15735 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 9/30/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $80,136.99 | Check | 15830 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 9/30/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $73,972.60 | Check | 15831 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 9/30/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $61,643.84 | Check | 15832 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 9/30/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $6,164.38 | Check | 15833 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 10/31/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $59,589.04 | Check | 15936 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 10/31/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $5,958.90 | Check | 15937 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 10/31/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $71,506.85 | Check | 15938 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 10/31/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $77,465.75 | Check | 15939 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 11/2/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $5,753.42 | Check | 15940 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 12/1/2016 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $272,055.47 | Check | 16040 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 1/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $232,350.00 | Check | 16128 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 2/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $232,350.00 | Check | 16214 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 3/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $232,350.00 | Check | 16294 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 3/31/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $232,350.00 | Check | 16408 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 5/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $232,350.00 | Check | 16496 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 5/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 16497 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 6/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $263,600.00 | Check | 16596 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 6/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $272,055.47 | Check | 16597 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 6/29/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $263,600.00 | Check | 16675 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 6/29/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $215,057.71 | Check | 16679 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 7/10/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $31,250.00 | Check | 16697 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 8/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 16761 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 8/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $294,850.00 | Check | 16762 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 9/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $294,850.00 | Check | 16852 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 9/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 16853 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 10/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $294,850.00 | Check | 16952 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 10/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 16953 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 11/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $294,850.00 | Check | 17045 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 11/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 17046 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 12/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $294,850.00 | Check | 17152 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 12/1/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 17153 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 1/2/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $294,850.00 | Check | 17218 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 1/2/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 17219 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 2/1/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $294,850.00 | Check | 17318 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ck. # | Transferee | Transferee bank | Account ending | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/1/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 17319 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 3/1/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 17416 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 3/1/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $294,312.50 | Check | 17418 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 4/2/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $294,312.50 | Check | 17520 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 4/2/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 17521 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 5/1/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $294,312.50 | Check | 17641 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 5/1/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 17642 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 6/1/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 17755 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 6/1/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $313,062.50 | Check | 17756 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 7/2/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $313,062.50 | Check | 17865 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 7/2/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 17866 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 8/1/2018 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $325,562.50 | Check | 7578 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 8/1/2018 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $243,556.59 | Check | 7579 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 9/14/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $325,562.50 | Check | 18152 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 9/14/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 18153 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 10/3/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $325,562.50 | Check | 18331 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 10/3/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 18332 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 11/2/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $325,562.50 | Check | 18352 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 11/2/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | Check | 18351 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 12/3/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $569,119.09 | EFT ** | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 1/2/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $569,119.09 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 2/1/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $568,962.84 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 3/1/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $325,406.25 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 3/1/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $243,556.59 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| 4/1/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $568,962.84 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Guaranty Fees |
| | | | | | | | | | | |
| | | **Total Guaranty Fee Payments:** | | **$15,563,644.52** | | | | | | |
| | | | | | | | | | | |
| 1/5/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $1,002,200.00 | Check | 16151 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Director Fees |
| 4/7/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $42,975.00 | Check | 16429 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Director Fees |
| 7/5/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $42,975.00 | Check | 16682 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Director Fees |
| 10/10/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $42,975.00 | Check | 16988 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Director Fees |
| 1/5/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $42,975.00 | Check | 17248 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Director Fees |
| 4/6/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $42,975.00 | Check | 17545 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Director Fees |
| 7/6/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $42,975.00 | Check | 17930 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Director Fees |
| 10/22/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $42,975.00 | Check | 18339 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Director Fees |
| 1/4/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $42,975.00 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | Director Fees |
| | | | | | | | | | | |
| | | **Total Director Fee Payments:** | | **$1,346,000.00** | | | | | | |
| | | | | | | | | | | |
| 2/13/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 2/13/2015 | Live Well Financial, Inc. - Payroll | | | $900,000.00 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | 2014 Bonus |
| 2/27/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 3/13/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 3/31/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 4/15/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 4/30/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 5/15/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 5/29/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 6/15/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 6/30/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 7/15/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 7/31/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 8/14/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 8/31/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ck. # | Transferee | Transferee bank | Account ending | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/15/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 9/30/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 10/15/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 10/30/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 11/13/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 11/30/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 12/15/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 12/31/2015 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 12/31/2015 | Live Well Financial, Inc. - Payroll | | | $300,000.00 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | 2015 Bonus |
| 1/15/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 1/29/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 2/12/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 2/18/2016 | Live Well Financial, Inc. - Payroll | | | $800,000.00 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | 2015 Bonus |
| 2/29/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 3/10/2016 | Live Well Financial, Inc. - Payroll | | | $687,500.00 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | 2015 Bonus |
| 3/16/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 3/31/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 4/15/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 4/29/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 5/13/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 5/31/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 6/15/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 6/30/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 7/15/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 7/29/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 8/15/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 8/31/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 9/15/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 9/30/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 10/14/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 10/31/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 11/15/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 11/30/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 12/15/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 12/15/2016 | Live Well Financial, Inc. - Payroll | | | $1,800,000.00 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | 2016 Bonus |
| 12/30/2016 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 1/6/2017 | Live Well Financial, Inc. - Payroll | | | $700,000.00 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | 2016 Bonus |
| 1/13/2017 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 1/31/2017 | Live Well Financial, Inc. - Payroll | | | $10,416.67 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 2/15/2017 | Live Well Financial, Inc. - Payroll | | | $134,479.15 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 2/28/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 3/15/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 3/31/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 4/14/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 4/28/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 5/15/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 5/31/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 6/15/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 6/30/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 7/14/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 7/31/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 8/15/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 8/31/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 9/15/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 9/29/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ck. # | Transferee | Transferee bank | Account ending | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/13/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 10/31/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 11/15/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 11/30/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 12/15/2017 | Live Well Financial, Inc. - Payroll | | | $53,970.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 12/22/2017 | Live Well Financial, Inc. - Payroll | | | $1,507,500.00 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | 2017 Bonus |
| 12/29/2017 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 1/12/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 1/31/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 2/15/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 2/28/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 3/15/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 3/30/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 4/13/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 4/30/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 5/15/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 5/31/2018 | Live Well Financial, Inc. - Payroll | | | $49,570.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 6/15/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 6/29/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 7/13/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 7/31/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 8/15/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 8/31/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 9/14/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 9/28/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 10/15/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 10/31/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 11/15/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 11/30/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 12/14/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 12/31/2018 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Transferred to taxing authority per M. Hild | | Salary |
| 1/15/2019 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 1/31/2019 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 2/15/2019 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 2/28/2019 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 3/15/2019 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 3/29/2019 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 4/15/2019 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 4/30/2019 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 5/15/2019 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 5/31/2019 | Live Well Financial, Inc. - Payroll | | | $51,770.83 | EFT | | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 6/14/2019 | Live Well Financial, Inc. | Wells Fargo Operating | 6771 | $51,770.83 | Check | 15585 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| 6/27/2019 | Live Well Financial, Inc. | Wells Fargo Operating | 6771 | $17,500.00 | Check | 19337 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank | 0625 | Salary |
| | | **Total Salary and Bonuses:** | | **$10,246,145.64** | | | | | | |

\* Includes transfers to the joint bank account of Defendants Michael C. Hild and Laura D. Hild.

\*\* "EFT" means electronic funds transfer (e.g., ACH or wire).

The Trustee reserves all rights including, without limitation, the right to add, remove, or amend any transfer referenced in the Complaint, including the Exhibits thereto.

It is the Trustee's intention, by the Complaint, to claw back all transfers avoidable and recoverable under applicable law.

**<u>EXHIBIT B</u>**

**Transfers by Michael C. Hild / Laura D. Hild to
Certain Hild Affiliated Entities**

<u>EXHIBIT B</u>

**Transfers by Michael C. Hild / Laura D. Hild to Certain Hild Affiliated Entities**

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ck. # | Transferee | Transferee bank | Account ending |
|---|---|---|---|---|---|---|---|---|---|
| 9/30/2015 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $100,000.00 | Check | 1278 | Church Hill Ventures, LLC | Branch Banking & Trust | 4221 |
| 10/15/2015 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $150,000.00 | Check | 1279 | Church Hill Ventures, LLC | Branch Banking & Trust | 4248 |
| 2/18/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $775,000.00 | Check | 1283 | Church Hill Ventures, LLC | Branch Banking & Trust | 4221 |
| 3/22/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $350,000.00 | Check | 1285 | Church Hill Ventures, LLC | Branch Banking & Trust | 4221 |
| 4/13/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $25,000.00 | Check | 1288 | Church Hill Ventures, LLC | Branch Banking & Trust | 4221 |
| 8/17/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $600,000.00 | Check | 1294 | Church Hill Ventures, LLC | Branch Banking & Trust | 4221 |
| 9/20/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $200,000.00 | Check | 1295 | Church Hill Ventures, LLC | Branch Banking & Trust | 4221 |
| 10/17/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $200,000.00 | Check | 1304 | Church Hill Ventures, LLC | Branch Banking & Trust | 4221 |
| 11/2/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $200,000.00 | Check | 1306 | Church Hill Ventures, LLC | Branch Banking & Trust | 4221 |
| 12/8/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $250,000.00 | Check | 1308 | Church Hill Ventures, LLC | Branch Banking & Trust | 4221 |
| 1/23/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $1,900,000.00 | Check | 1310 | Church Hill Ventures, LLC | Branch Banking & Trust | 4221 |
| 2/3/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $250,000.00 | Check | 1313 | Church Hill Ventures, LLC | Branch Banking & Trust | 4221 |
| 2/21/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $125,000.00 | Check | 1314 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 3/3/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $250,000.00 | Check | 1316 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 4/6/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $275,000.00 | Check | 1332 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 4/11/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1324 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 4/17/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $100,000.00 | Check | 1323 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 5/3/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $500,000.00 | Check | 1330 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 5/30/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $25,000.00 | Check | 1334 | Church Hill Ventures, LLC | Branch Banking & Trust | 4221 |
| 6/2/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1336 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 6/5/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $500,000.00 | Check | 1337 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 7/7/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $500,000.00 | Check | 1338 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 8/3/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $675,000.00 | Check | 1341 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 9/6/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $525,000.00 | Check | 1343 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 10/3/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $500,000.00 | Check | 1344 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 10/12/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $75,000.00 | Check | 1345 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 11/3/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $500,000.00 | Check | 1348 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 12/29/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $15,000.00 | Check | 1359 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 2/5/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $525,000.00 | Check | 1368 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 3/2/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $525,000.00 | Check | 1369 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 4/4/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $500,000.00 | Check | 1373 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 4/12/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $40,000.00 | Check | 1381 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 4/18/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1382 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 5/1/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $575,000.00 | Check | 1383 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 7/6/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $350,000.00 | Check | 1400 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 10/4/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $550,000.00 | Check | 1411 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 11/5/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $565,000.00 | Check | 1415 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 11/14/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $295,000.00 | Check | 1416 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 12/4/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $100,000.00 | Check | 1423 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 12/17/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $450,000.00 | Check | 1426 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 12/17/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $150,000.00 | Check | 1427 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 1/2/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $550,000.00 | Check | 1430 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 2/1/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $85,000.00 | Check | 1435 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ck. # | Transferee | Transferee bank | Account ending |
|---|---|---|---|---|---|---|---|---|---|
| 2/15/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $40,000.00 | Check | 1436 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 2/28/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $42,000.00 | Check | 1437 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 3/1/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $550,000.00 | Check | 1438 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 3/30/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1441 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 4/2/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $570,000.00 | Check | 1444 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 4/15/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1446 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 4/30/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $45,000.00 | Check | 1447 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 5/17/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $45,000.00 | Check | 1449 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 5/31/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1450 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 6/14/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1451 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 8/9/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $250,000.00 | EFT | | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| 8/13/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $250,000.00 | EFT | | Church Hill Ventures, LLC | Virginia Credit Union | 3663 |
| | | **Subtotal Church Hill Ventures LLC:** | | **$16,967,000.00** | | | | | |
| | | | | | | | | | |
| 2/13/2015 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $165,000.00 | Check | 1265 | Anderson's Neck LLC | | |
| 10/19/2015 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $10,000.00 | Check | 1280 | Anderson's Neck LLC | Branch Banking & Trust | 9454 |
| 8/8/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $10,000.00 | Check | 1293 | Anderson's Neck LLC | | |
| 10/11/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $10,000.00 | Check | 1302 | Anderson's Neck LLC | | |
| 11/17/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1307 | Anderson's Neck LLC | | |
| 3/15/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1319 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 7/16/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1339 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 10/31/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $5,000.00 | Check | 1347 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 12/21/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $7,500.00 | Check | 1356 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 1/17/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1366 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 3/5/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $15,000.00 | Check | 1370 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 4/3/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $10,000.00 | Check | 1378 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 4/12/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $10,000.00 | Check | 1379 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 5/8/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $10,000.00 | Check | 1384 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 6/11/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $6,000.00 | Check | 1392 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 6/15/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $10,000.00 | Check | 1394 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 7/6/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1399 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 12/3/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $25,000.00 | Check | 1419 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| 1/15/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1432 | Anderson's Neck LLC | Virginia Credit Union | 0513 |
| | | **Subtotal Anderson's Neck LLC:** | | **$443,500.00** | | | | | |
| | | | | | | | | | |
| 1/31/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $5,000.00 | Check | 1311 | The Butterbean LLC | Branch Banking & Trust | 9169 |
| 3/15/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1317 | The Butterbean LLC | Virginia Credit Union | 0638 |
| 10/3/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $15,000.00 | Check | 1350 | The Butterbean LLC | Virginia Credit Union | 0638 |
| 12/6/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $5,000.00 | Check | 1354 | The Butterbean LLC | Virginia Credit Union | 0638 |
| 12/27/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $2,500.00 | Check | 1357 | The Butterbean LLC | Virginia Credit Union | 0638 |
| 12/30/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $5,000.00 | Check | 1360 | The Butterbean LLC | Virginia Credit Union | 0638 |
| 1/17/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $10,000.00 | Check | 1365 | The Butterbean LLC | Virginia Credit Union | 0638 |
| 4/3/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $10,000.00 | Check | 1376 | The Butterbean LLC | Virginia Credit Union | 0638 |
| 5/16/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $30,000.00 | Check | 1389 | The Butterbean LLC | Virginia Credit Union | 0638 |
| 7/6/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1398 | The Butterbean LLC | Virginia Credit Union | 0638 |

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ck. # | Transferee | Transferee bank | Account ending |
|---|---|---|---|---|---|---|---|---|---|
| 8/7/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $40,000.00 | Check | 1406 | The Butterbean LLC | Virginia Credit Union | 0638 |
| 10/27/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1414 | The Butterbean LLC | Virginia Credit Union | 0638 |
| 11/20/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1417 | The Butterbean LLC | Virginia Credit Union | 0638 |
| 12/3/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $175,000.00 | Check | 1420 | The Butterbean LLC | Virginia Credit Union | 0638 |
| | | **Subtotal The Butterbean LLC:** | | **$437,500.00** | | | | | |
| 4/3/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $10,000.00 | Check | 1375 | Climax Beverage Co. LLC | Virginia Credit Union | 4122 |
| 12/16/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $5,000.00 | Check | 1428 | Climax Beverage Co. LLC | Virginia Credit Union | 4122 |
| | | **Subtotal Climax Beverage Co. LLC:** | | **$15,000.00** | | | | | |
| 1/31/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $5,000.00 | Check | 1312 | Dogtown Brewing LLC | Branch Banking & Trust | 9150 |
| 3/15/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1318 | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 8/24/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $15,000.00 | Check | 1342 | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 6/30/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1395 | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 7/6/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $75,000.00 | Check | 1397 | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 7/10/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1401 | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 8/7/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $40,000.00 | Check | 1407 | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 12/3/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $200,000.00 | Check | 1421 | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 1/7/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $60,000.00 | Check | 1431 | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 3/15/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $50,000.00 | Check | 1441 | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| | | **Subtotal Dogtown Brewing LLC:** | | **$565,000.00** | | | | | |
| 6/6/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $600,000.00 | Check | 1391 | Gardenia LLC | Virginia Credit Union | 0568 |
| 7/6/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1396 | Gardenia LLC | Virginia Credit Union | 0568 |
| 8/2/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $375,000.00 | Check | 1403 | Gardenia LLC | Virginia Credit Union | 0568 |
| 12/11/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $500.00 | Check | 1425 | Gardenia LLC | Virginia Credit Union | 0568 |
| 12/18/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $5,000.00 | Check | 1429 | Gardenia LLC | Virginia Credit Union | 0568 |
| | | **Subtotal Gardenia LLC:** | | **$1,000,500.00** | | | | | |
| 5/15/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1332 | Hot Diggity Donuts LLC | Virginia Credit Union | 2768 |
| 10/3/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $15,000.00 | Check | 1349 | Hot Diggity Donuts LLC | Virginia Credit Union | 2768 |
| 12/27/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $2,500.00 | Check | 1358 | Hot Diggity Donuts LLC | Virginia Credit Union | 2768 |
| 1/17/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1364 | Hot Diggity Donuts LLC | Virginia Credit Union | 2768 |
| 4/3/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $10,000.00 | Check | 1377 | Hot Diggity Donuts LLC | Virginia Credit Union | 2768 |
| 4/12/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $25,000.00 | Check | 1380 | Hot Diggity Donuts LLC | Virginia Credit Union | 2768 |
| 6/15/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $40,000.00 | Check | 1393 | Hot Diggity Donuts LLC | Virginia Credit Union | 2768 |
| 7/20/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $35,000.00 | Check | 1402 | Hot Diggity Donuts LLC | Virginia Credit Union | 2768 |
| 10/27/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1412 | Hot Diggity Donuts LLC | Virginia Credit Union | 2768 |
| 12/3/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $65,000.00 | Check | 1422 | Hot Diggity Donuts LLC | Virginia Credit Union | 2768 |
| 1/15/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1433 | Hot Diggity Donuts LLC | Virginia Credit Union | 2768 |
| 3/1/2019 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1439 | Hot Diggity Donuts LLC | Virginia Credit Union | 2768 |
| | | **Subtotal Hot Diggity Donuts LLC:** | | **$292,500.00** | | | | | |

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ck. # | Transferee | Transferee bank | Account ending |
|------|------------|-----------------|----------------|--------|--------|-------|------------|-----------------|----------------|
| 8/2/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $175,000.00 | Check | 1404 | Kingfisher LLC | Virginia Credit Union | 1698 |
| | | | Subtotal Kingfisher LLC: | $175,000.00 | | | | | |
| | | | | | | | | | |
| 9/20/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $5,000.00 | Check | 1296 | Manastoh Brewing LLC | Branch Banking & Trust | 9177 |
| 11/1/2016 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $25,000.00 | Check | 1305 | Manastoh Brewing LLC | Branch Banking & Trust | 9177 |
| 3/15/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1320 | Manastoh Brewing LLC | Virginia Credit Union | 3377 |
| 3/22/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $5,000.00 | Check | 1321 | Manastoh Brewing LLC | Branch Banking & Trust | 9177 |
| 4/21/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $1,300.00 | Check | 1328 | Manastoh Brewing LLC | Branch Banking & Trust | 9177 |
| 5/15/2017 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $20,000.00 | Check | 1333 | Manastoh Brewing LLC | Virginia Credit Union | 3377 |
| | | | Subtotal Manastoh Brewing LLC: | $76,300.00 | | | | | |
| | | | | | | | | | |
| 4/3/2018 | Michael C. Hild / Laura D. Hild | Wells Fargo Bank, N.A. | 0625 | $10,000.00 | Check | 1374 | Urban Bleat Cheese Co. LLC | Virginia Credit Union | 4106 |
| | | | Subtotal Urban Bleat Cheese Co. LLC: | $10,000.00 | | | | | |
| | | | | | | | | | |
| | | | Total | $19,982,300.00 | | | | | |
| | | | | | | | | | |
| The Trustee reserves all rights including, without limitation, the right to add, remove, or amend any transfer referenced in the Complaint, including the Exhibits thereto. | | | | | | | | | |
| It is the Trustee's intention, by the Complaint, to claw back all transfers avoidable and recoverable under applicable law. | | | | | | | | | |
| | | | | | | | | | |

## <u>EXHIBIT C</u>

**Transfers by Church Hill Ventures LLC to
Certain Other Hild Affiliated Entities**

**EXHIBIT C**

**Transfers by Church Hill Ventures LLC to Certain Other Hild Affiliated Entities**

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ck. # | Transferee | Transferee bank | Account ending |
|------|-----------|-----------------|----------------|--------|--------|-------|-----------|-----------------|----------------|
| 12/7/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $1,350.00 | EFT | | Anderson's Neck | Virginia Credit Union | 0513 |
| 5/28/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $6,000.00 | EFT | | Anderson's Neck | Virginia Credit Union | 0513 |
| 5/30/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $4,000.00 | EFT | | Anderson's Neck | Virginia Credit Union | 0513 |
| 6/11/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $4,500.00 | EFT | | Anderson's Neck | Virginia Credit Union | 0513 |
| 7/5/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $5,000.00 | EFT | | Anderson's Neck | Virginia Credit Union | 0513 |
| 7/17/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $3,000.00 | EFT | | Anderson's Neck | Virginia Credit Union | 0513 |
| 8/5/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $3,500.00 | EFT | | Anderson's Neck | Virginia Credit Union | 0513 |
| 8/13/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $5,000.00 | EFT | | Anderson's Neck | Virginia Credit Union | 0513 |
| | | | | | | | | | |
| | | **Subtotal Anderson's Neck LLC:** | | **$32,350.00** | | | | | |
| | | | | | | | | | |
| 11/14/2017 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $17,716.00 | Check | 10009 | The Butterbean LLC | Virginia Credit Union | 0638 |
| 10/18/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 11/28/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $3,354.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 12/19/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $12,834.39 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 2/6/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $21,619.15 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 4/3/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $12,000.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 4/12/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $6,000.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 4/18/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $11,000.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 4/24/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $9,500.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 4/30/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $18,000.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 5/22/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $11,000.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 5/30/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $20,000.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 6/4/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $5,000.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 6/12/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $15,000.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 7/5/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $25,000.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 7/17/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $8,000.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 8/5/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $27,500.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| 8/13/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $10,000.00 | EFT | | The Butterbean LLC | Virginia Credit Union | 0638 |
| | | | | | | | | | |
| | | **Subtotal The Butterbean LLC:** | | **$283,523.54** | | | | | |
| | | | | | | | | | |
| 11/14/2017 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $20,240.00 | Check | 10007 | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 10/18/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $15,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 10/18/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 11/17/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $25,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 11/17/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 11/28/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $9,614.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 3/4/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $32,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 3/5/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $3,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ck. # | Transferee | Transferee bank | Account ending |
|---|---|---|---|---|---|---|---|---|---|
| 3/11/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $4,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 4/3/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $8,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 4/3/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $22,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 4/18/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $9,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 4/24/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $9,500.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 4/30/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $10,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 5/22/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $5,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 5/28/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $12,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 5/30/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $26,500.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 5/30/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 6/4/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $2,500.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 6/12/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $15,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 6/19/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 6/19/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 6/19/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 7/10/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $20,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 8/6/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $28,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 8/8/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $36,000.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| 8/13/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $20.00 | EFT | | Dogtown Brewing LLC | Virginia Credit Union | 4508 |
| | | | | | | | | | |
| | | **Subtotal Dogtown Brewing LLC:** | | **$612,374.00** | | | | | |
| | | | | | | | | | |
| 9/28/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $10,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 9/28/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 9/28/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 9/28/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 9/28/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 9/28/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $25,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 12/18/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $2,728.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 12/27/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $5,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 1/23/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $20,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ck. # | Transferee | Transferee bank | Account ending |
|------|-----------|-----------------|---------------|--------|--------|-------|-----------|-----------------|---------------|
| 2/20/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $22,700.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 2/26/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $4,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 3/6/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $5,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 3/6/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $5,500.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 3/11/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $44,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 4/3/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $3,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 4/18/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $37,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 4/26/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $10,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 5/15/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $26,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 5/30/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $1,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 6/12/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $11,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 7/17/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $4,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| 8/5/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $32,000.00 | EFT | | Gardenia LLC | Virginia Credit Union | 0568 |
| | | | | | | | | | |
| | | **Subtotal Gardenia LLC:** | | **$1,117,928.00** | | | | | |
| | | | | | | | | | |
| 11/14/2017 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $12,960.00 | Check | 10008 | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 7/12/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 8/20/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $20,000.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 9/17/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $3,024.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 3/19/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $10,000.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 4/3/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $9,000.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 4/12/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $5,000.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 4/18/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $8,000.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 4/30/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $7,000.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 5/30/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $12,500.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 6/12/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $4,500.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 7/5/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $15,000.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 8/5/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $7,000.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| 8/13/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $5,000.00 | EFT | | Hot Diggity Donuts | Virginia Credit Union | 2768 |
| | | | | | | | | | |
| | | **Subtotal Hot Diggity Donuts LLC:** | | **$168,984.00** | | | | | |
| | | | | | | | | | |
| 8/20/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $225,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ck. # | Transferee | Transferee bank | Account ending |
|---|---|---|---|---|---|---|---|---|---|
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 11/5/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $50,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 12/18/2018 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $5,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 2/20/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $3,700.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 2/26/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $4,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 3/6/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $1,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 3/11/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $4,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 4/18/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $4,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| 5/15/2019 | Church Hill Ventures, LLC | Virginia Credit Union | 3663 | $5,000.00 | EFT | | Kingfisher LLC | Virginia Credit Union | 1698 |
| | | | | | | | | | |
| | | | Subtotal Kingfisher LLC: | $851,700.00 | | | | | |
| | | | | | | | | | |
| | | | Total: | $3,066,859.54 | | | | | |
| | | | | | | | | | |
| The Trustee reserves all rights including, without limitation, the right to add, remove, or amend any transfer referenced in the Complaint, including the Exhibits thereto. | | | | | | | | | |
| It is the Trustee's intention, by the Complaint, to claw back all transfers avoidable and recoverable under applicable law. | | | | | | | | | |
| | | | | | | | | | |

## **EXHIBIT D**

**Transfers by Live Well Financial, Inc. to
Eric G. Rohr**

**EXHIBIT D**

**Transfers by Live Well Financial, Inc. to Eric G. Rohr**

| Date | Transferor | Amount | Method | Transferee | Description |
|------|-----------|--------|--------|-----------|-------------|
| 12/31/2015 | Live Well Financial, Inc.  - Payroll | $600,000.00 | EFT | Eric G. Rohr | 2015 Bonus* |
| 1/6/2017 | Live Well Financial, Inc.  - Payroll | $1,000,000.00 | EFT | Eric G. Rohr | 2016 Bonus |
| 1/10/2018 | Live Well Financial, Inc.  - Payroll | $642,500.00 | EFT | Eric G. Rohr | 2017 Bonus |
| | | | | | |
| | Total Bonuses: | $2,242,500.00 | | | |
| | | | | | |
| 1/13/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 1/31/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 2/15/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 2/28/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 3/15/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 3/31/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 4/14/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 4/28/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 5/15/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 5/31/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 6/15/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 6/30/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 7/14/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 7/31/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 8/15/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 8/31/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 9/15/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 9/29/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 10/13/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 10/31/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 11/15/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 11/30/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 12/15/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 12/29/2017 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 1/12/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 1/31/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 2/15/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 2/28/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 3/15/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 3/30/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 4/13/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |

| Date | Transferor | Amount | Method | Transferee | Description |
|---|---|---|---|---|---|
| 4/30/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 5/15/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 5/31/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 6/15/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 6/29/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 7/13/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 7/31/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 8/15/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 8/31/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 9/14/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 9/28/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 10/15/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 10/31/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 11/15/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 11/30/2018 | Live Well Financial, Inc.  - Payroll | $21,145.83 | EFT | Eric G. Rohr | Salary |
| 12/14/2018 | Live Well Financial, Inc.  - Payroll | $1,951.85 | EFT | Eric G. Rohr | Salary |
| | | | | | |
| | **Total Salary:** | **$974,660.18** | | | |
| | | | | | |
| * This transfer was made between December 2015 and March 2016. | | | | | |
| The Trustee reserves all rights including, without limitation, the right to add, remove, or amend any transfer referenced in the Complaint, including the Exhibits thereto. | | | | | |
| It is the Trustee's intention, by the Complaint, to claw back all transfers avoidable and recoverable under applicable law. | | | | | |
| | | | | | |

## **EXHIBIT E**

**Transfers by Live Well Financial, Inc. to**
**C. Darren Stumberger**

**EXHIBIT E**

**Transfers by Live Well Financial, Inc. to C. Darren Stumberger**

| Date | Transferor | Amount | Method | Transferee | Description |
|---|---|---|---|---|---|
| 4/30/2015 | Live Well Financial, Inc.  - Payroll | $104,109.00 | EFT | C. Darren Stumberger | Q1 2015 Bonus |
| 7/31/2015 | Live Well Financial, Inc.  - Payroll | $161,385.00 | EFT | C. Darren Stumberger | Q2 2015 Bonus |
| 10/30/2015 | Live Well Financial, Inc.  - Payroll | $132,545.00 | EFT | C. Darren Stumberger | Q3 2015 Bonus |
| 1/29/2016 | Live Well Financial, Inc.  - Payroll | $280,671.73 | EFT | C. Darren Stumberger | Q4 2015 Bonus |
| 4/29/2016 | Live Well Financial, Inc.  - Payroll | $312,326.44 | EFT | C. Darren Stumberger | Q1 2016 Bonus |
| 7/29/2016 | Live Well Financial, Inc.  - Payroll | $429,562.35 | EFT | C. Darren Stumberger | Q2 2016 Bonus |
| 10/31/2016 | Live Well Financial, Inc.  - Payroll | $521,765.10 | EFT | C. Darren Stumberger | Q3 2016 Bonus |
| 1/31/2017 | Live Well Financial, Inc.  - Payroll | $295,848.45 | EFT | C. Darren Stumberger | Q4 2016 Bonus |
| 4/28/2017 | Live Well Financial, Inc.  - Payroll | $406,557.45 | EFT | C. Darren Stumberger | Q1 2017 Bonus |
| 7/31/2017 | Live Well Financial, Inc.  - Payroll | $362,499.80 | EFT | C. Darren Stumberger | Q2 2017 Bonus |
| 10/31/2017 | Live Well Financial, Inc.  - Payroll | $248,463.00 | EFT | C. Darren Stumberger | Q3 2017 Bonus |
| 4/30/2018 | Live Well Financial, Inc.  - Payroll | $293,350.09 | EFT | C. Darren Stumberger | Q1 2018 Bonus * |
| 7/31/2018 | Live Well Financial, Inc.  - Payroll | $254,030.00 | EFT | C. Darren Stumberger | Q2 2018 Bonus |
| 10/31/2018 | Live Well Financial, Inc.  - Payroll | $178,771.00 | EFT | C. Darren Stumberger | Q3 2018 Bonus |
| 1/31/2019 | Live Well Financial, Inc.  - Payroll | $205,936.50 | EFT | C. Darren Stumberger | Q4 2018 Bonus |
| | | | | | |
| | **Total Bonuses:** | **$4,187,820.91** | | | |
| | | | | | |
| 6/15/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 6/30/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 7/15/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 7/31/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 8/15/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 8/31/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 9/14/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 9/28/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 10/15/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 10/31/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 11/15/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 11/30/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 12/14/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 12/31/2018 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 1/15/2019 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 1/31/2019 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 2/15/2019 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |

| Date | Transferor | Amount | Method | Transferee | Description |
|---|---|---|---|---|---|
| 2/28/2019 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| 3/15/2019 | Live Well Financial, Inc.  - Payroll | $12,500.00 | EFT | C. Darren Stumberger | Salary |
| | | | | | |
| | **Total Salary (One Year Prepetition):** | **$237,500.00** | | | |
| | | | | | |
| * Based upon information available at the time of the filing of this Complaint, it does not appear a Q4 2017 bonus was paid. | | | | | |
| The Trustee reserves all rights including, without limitation, the right to add, remove, or amend any transfer referenced in the Complaint, including the Exhibits thereto. | | | | | |
| It is the Trustee's intention, by the Complaint, to claw back all transfers avoidable and recoverable under applicable law. | | | | | |
| | | | | | |

## EXHIBIT F

**Transfers by Live Well Financial, Inc. to
Certain Law Firms for the Benefit of the
Criminal Defendants and/or Their Affiliates**

**EXHIBIT F**

Transfers to Certain Law Firms for the Benefit of the Criminal Defendants and/or Their Affiliates

| Date | Transferor | Transferor bank | Account ending | Amount | Method | Ref. # | Transferee | Description |
|---|---|---|---|---|---|---|---|---|
| 3/21/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $274,498.17 | Check | 18913 | Firm A | Criminal and SEC counsel for Eric G. Rohr |
| | | | | | | | | |
| 10/5/2017 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $25,386.00 | Check | 6382 | Firm B | SEC counsel for Live Well and Michael Hild |
| 10/10/2017 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $135,155.20 | Check | 6398 | Firm B | SEC counsel for Live Well and Michael Hild |
| 11/29/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $160,822.60 | EFT | | Firm B | SEC counsel for Live Well and Michael Hild |
| 2/27/2018 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $153,525.79 | Check | 6963 | Firm B | SEC counsel for Live Well and Michael Hild |
| 3/23/2018 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $26,736.00 | Check | 7080 | Firm B | SEC counsel for Live Well and Michael Hild |
| 4/17/2018 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $35,332.50 | Check | 7192 | Firm B | SEC counsel for Live Well and Michael Hild |
| 6/12/2018 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $60,989.62 | Check | 7430 | Firm B | SEC counsel for Live Well and Michael Hild |
| 7/5/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $1,760.00 | Check | 17900 | Firm B | SEC counsel for Live Well and Michael Hild |
| 8/1/2018 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $47,509.00 | Check | 7572 | Firm B | SEC counsel for Live Well and Michael Hild |
| 8/24/2018 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $92,318.50 | Check | 7677 | Firm B | SEC counsel for Live Well and Michael Hild |
| 10/5/2018 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $35,126.50 | Check | 7787 | Firm B | SEC counsel for Live Well and Michael Hild |
| 11/30/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $39,966.50 | Check | 18540 | Firm B | SEC counsel for Live Well and Michael Hild |
| 12/18/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $122,305.09 | Check | 18634 | Firm B | SEC counsel for Live Well and Michael Hild |
| 1/8/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $23,202.50 | Check | 18733 | Firm B | SEC counsel for Live Well and Michael Hild |
| 2/25/2019 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $53,969.11 | Check | 8169 | Firm B | SEC counsel for Live Well and Michael Hild |
| 6/7/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $126,755.73 | EFT | | Firm B | SEC counsel for Live Well and Michael Hild |
| 6/11/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $150,000.00 | EFT | | Firm B | SEC counsel for Live Well and Michael Hild |
| | | | | | | | | |
| 10/25/2017 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $169,692.46 | Check | 6442 | Firm C | Criminal and SEC counsel for C. Darren Stumberger |
| 12/26/2017 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $214,518.66 | EFT | | Firm C | Criminal and SEC counsel for C. Darren Stumberger |
| 2/27/2018 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $43,489.81 | Check | 6966 | Firm C | Criminal and SEC counsel for C. Darren Stumberger |
| 5/18/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $219,576.98 | Check | 17704 | Firm C | Criminal and SEC counsel for C. Darren Stumberger |
| 6/28/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $192,618.48 | Check | 17837 | Firm C | Criminal and SEC counsel for C. Darren Stumberger |
| 7/24/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $111,709.82 | Check | 18019 | Firm C | Criminal and SEC counsel for C. Darren Stumberger |
| 10/5/2018 | Live Well Financial, Inc. | Republic Bank & Trust Co. | 3678 | $59,705.30 | Check | 7795 | Firm C | Criminal and SEC counsel for C. Darren Stumberger |
| 11/12/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $22,953.53 | Check | 18421 | Firm C | Criminal and SEC counsel for C. Darren Stumberger |
| 12/31/2018 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $141,161.12 | EFT | | Firm C | Criminal and SEC counsel for C. Darren Stumberger |
| 5/29/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $19,348.53 | EFT | | Firm C | Criminal and SEC counsel for C. Darren Stumberger |
| 5/31/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $77,231.06 | EFT | | Firm C | Criminal and SEC counsel for C. Darren Stumberger |
| 6/10/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $84,275.20 | EFT | | Firm C | Criminal and SEC counsel for C. Darren Stumberger |
| | | | | | | | | |
| 1/11/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $2,420.00 | EFT | | Firm D | Counsel to the Hilds and affiliated entities |
| 5/10/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $50,000.00 | EFT | 20190510CB | Firm D | Counsel to the Hilds and affiliated entities |
| 6/11/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $50,000.00 | EFT | 20190611LS | Firm D | Counsel to the Hilds and affiliated entities |
| 6/11/2019 | Live Well Financial, Inc. | Wells Fargo Bank, N.A. | 6771 | $100,000.00 | EFT | 20190611LS | Firm D | Counsel to the Hilds and affiliated entities |
| | | | | | | | | |
| | | | Total: | $3,124,059.76 | | | | |

The Trustee reserves all rights including, without limitation, the right to add, remove, or amend any transfer referenced in the Complaint, including the Exhibits thereto.

It is the Trustee's intention, by the Complaint, to claw back all transfers avoidable and recoverable under applicable law.

Nothing contained in this Exhibit F or in the Complaint shall be deemed to waive or limit any claims or rights of the Trustee as to any parties not named as Defendants in this adversary proceeding.